

**INTAKE**

AO 91 (Rev. 11/11) Criminal Complaint

AUSA Charles W. Mulaney (312) 469-6042

**FILED**

ꝰ NOV 7 2019

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

NOV 07 2019

UNITED STATES OF AMERICA

v.

SHELDON MORALES,
also known as "Shock"

CASE NUMBER:

MAGISTRATE JUDGE
SHEILA M. FINNEGAN

**UNDER SEAL** 19 CR 850

**CRIMINAL COMPLAINT** MAGISTRATE JUDGE FINNEGAN

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about March 1, 2019, at Chicago, in the Northern District of Illinois, Eastern Division, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Section 846 | did attempt to knowingly and intentionally possess with intent to distribute a controlled substance, namely, 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1) and (b)(1)(A)(viii) |

This criminal complaint is based upon these facts:

_X_  Continued on the attached sheet.

MIKHAIL GEYER
Task Force Officer, Drug Enforcement
Administration (DEA)

Sworn to before me and signed in my presence.

Date: November 7, 2019

Judge's signature

City and state: Chicago, Illinois

Sheila M. Finnegan, U.S. Magistrate Judge
*Printed name and Title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

## **AFFIDAVIT**

I, MIKHAIL GEYER, being duly sworn, state as follows:

1.     I am a Task Force Officer with the Drug Enforcement Administration ("DEA") and have been so employed since approximately July 2018. Prior to becoming a Task Force Officer with the DEA, I was employed by the Evanston Police Department since September of 2007. I am currently assigned to Chicago High Intensity Drug Trafficking Area program, and my responsibilities include the investigation of narcotics trafficking offenses. I have received special training in the area of narcotics investigations. I have experience with a wide range of investigative techniques, including various electronic surveillance methods, the debriefing of defendants, informants, and witnesses, as well as others who have knowledge of the distribution, transportation, storage, and importation of controlled substances. I have participated in numerous investigations involving violations of narcotics laws.

2.     This affidavit is submitted in support of a criminal complaint alleging that SHELDON MORALES, also known as "Shock," has violated Title 21, United States Code, Section 846. Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging MORALES with attempt to possess methamphetamine with intent to distribute, I have not included each and every fact known to me concerning this investigation. I

have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

3.      This affidavit is based on my personal knowledge, information provided to me by other law enforcement agents information obtained from court-authorized wire and electronic intercepts, information provided by confidential informants, information obtained from consensually-recorded telephone calls, information obtained from consensually-recorded in-person meetings, surveillance reports, arrest and incident reports, laboratory reports, my training and experience, and the training and experience of other law enforcement officers with whom I have consulted.

## FACTS ESTABLISHING PROBABLE CAUSE

### Background

4.      The DEA is conducting a narcotics investigation of a violent drug trafficking organization operating in Evanston, Illinois, and on the north side of Chicago. The organization, led by DARIUS MORALES and SHELDON MORALES, has been distributing heroin, fentanyl, cocaine, and methamphetamine within the DTO's territory. Based upon confidential source information, physical surveillance, tracking devices, toll records, and recordings from court-authorized Title III wire interceptions of telephone number (872) ###-1853 ("Target Phone 2"), used by S. MORALES, law enforcement officers have determined that S. MORALES communicates with co-conspirators who supply the DTO's heroin, fentanyl, cocaine, and methamphetamine which the DTO distributes in Evanston and on the north side of Chicago.

**Information Provided by CS-1**

5.     As part of the investigation, a confidential source, CS-1,[1] identified DARIUS MORALES as the leader of the MORALES DTO. According to CS-1, CS-1 has known D. MORALES since childhood and has known the MORALES DTO to traffic in narcotics for over ten years. Specifically, S. MORALES, a known member of the Gangster Disciples street gang, established the MORALES DTO during the early 2000s, which includes individuals from the Black P Stone street gang and the Gangster Disciples street gang. S. MORALES was forced to relinquish control of the MORALES DTO upon his 2013 conviction and incarceration for distribution of a controlled substance.[2] As a result, S. MORALES' younger brother, D. MORALES, took over the day-to-day control of the MORALES DTO. CS-1 further provided that the MORALES DTO distributes narcotics in Evanston and the north side of Chicago,

---

[1] CS-1 began cooperating in this investigation in or around July 2018, and has provided law enforcement officers with background intelligence information regarding the MORALES DTO. Law enforcement has independently corroborated this information through controlled buys, surveillance, and information received from other confidential sources. Based on law enforcement's controlled buys and surveillance, CS-1 has proven reliable and truthful. CS-1 has one prior felony conviction for possession of a controlled substance. In approximately July 2017, CS-1 delivered a controlled substance to an undercover officer in connection with this investigation. CS-1 subsequently agreed to cooperate in exchange for consideration regarding these potential charges. As of August 10, 2018, the state prosecutor has advised that the state will not seek charges, in part due to CS-1 cooperation, and CS-1 has been so informed. CS-1 has not received any monetary compensation for cooperation in this investigation. On December 13, 2018, CS-1 was intercepted during a court-authorized wire intercept (authorized pursuant to an order entered by this Court on November 30, 2018) discussing a narcotics transaction for CS-1 to purchase narcotics from Demetrius Shavers (who is part of the MORALES DTO), which was not at law enforcement's direction. Accordingly, following the intercepted phone call, CS-1 was deactivated as a confidential source.

[2] On May 1, 2013, S. MORALES was convicted and sentenced in federal court to 108 months' imprisonment for distribution of a controlled substance. He was released from prison on January 12, 2018, and is currently serving a term of five years' supervised release. *See* Case No. 11 CR 821, at Doc. 85 (St. Eve, J., reassigned to Feinerman, J.)

and elsewhere in Evanston and on the north side of Chicago. S. MORALES was released from prison in January 2018, and law enforcement officers believe that he and D. MORALES are currently running the MORALES DTO.

### S. MORALES, Co-Conspirator A, and Co-Conspirator B Discuss Sending S. MORALES Samples of Narcotics

6. On February 15, 2019, at approximately 5:44 p.m., during a court-authorized[3] wire intercept[4] (call session #797), S. MORALES received an incoming call to Target Phone 2 from Co-Conspirator A using telephone number (702) ###-0596.

7. In summary, law enforcement officers believe that during this conversation, S. MORALES, Co-Conspirator A, and Co-Conspirator B discussed a narcotics transaction where Co-Conspirator A and Co-Conspirator B would sell S. MORALES quantities of heroin, cocaine, and methamphetamine. Further, in advance of that sale, Co-Conspirator A and Co-Conspirator B would send S. MORALES samples of each narcotic so that S. MORALES can determine the quality for himself.

---

[3] On February 12, 2019, Acting Chief Judge Rebecca R. Pallmeyer issued an order authorizing, for the period of 30 days, the interception of wire communications to and from Target Phone 2, used by S. MORALES. The authorization did not include text messages.

[4] Some of the court-authorized recorded telephone calls (the "recorded conversations") have been summarized in this Affidavit. The language that is quoted from the recorded conversations throughout this Affidavit is based upon a preliminary review of the recorded conversations, and not on final transcripts of the recorded conversations. The times listed for the recorded conversations are approximate. The summaries do not include all statements or topics covered during the course of the recorded conversations and include my interpretation of words and phrases used in the recorded conversations. At various points in this Affidavit, I have included in brackets my interpretation of words and phrases used in the recorded conversations. My interpretations are based on information received from CS-1, the contents and context of the recorded conversations, events occurring before and after the conversations, my knowledge of the investigation as a whole, my experience and training, and the experience and training of other law enforcement officers in this investigation.

Law enforcement officers further believe that S. MORALES, using Target Phone 2, texted Co-Conspirator A an address ("the Davis Street Address") to send the narcotics samples.

8.       More specifically, during the conversation, Co-Conspirator A stated, "This is me. I called you earlier about the white china [heroin]." S. MORALES stated, "Yeah."[5] Co-Conspirator A stated, "I talked to my homeboy. He said he's gonna send you 3 things so you can try it out. The white girl [cocaine] and white china [heroin]. And frio/hielo (cold/ice) [methamphetamine]." S. MORALES stated "What's that?" Co-Conspirator A responded, "Meth [methamphetamine]. Hielo (ice)." S. MORALES stated, "Yeah! Yeah!" Co-Conspirator A stated, "Ice [methamphetamine]." S. MORALES stated, "Hey, tell him how much he want for the pounds of ice [ask the unknown male how much does he want for the pounds of methamphetamine]." Co-Conspirator A asked an unknown male in the background, Co-Conspirator B, in Spanish "How much is a pound of ice [methamphetamine]?" Co-Conspirator B responded in Spanish, "Tell him [unintelligible]. Can we send you the [unintelligible] first to see if you like it?" S. MORALES asked, "But how much do he want for a pound [of methamphetamine]? Ask him." Co-Conspirator A asked Co-Conspirator B in Spanish, "How much do you/he want for a pound?" Co-Conspirator A then stated to S. MORALES, "He said he's gonna get a hold of the other guy right now to find that

---

[5] The voice identification of S. MORALES in this complaint is based on previously intercepted phone calls in which he is identified by name ("Sheldon," "Shell," or his nickname "Shock"), surveillance that has corroborated him as the user of the phone, and law enforcement's previous experience with him in which officers heard his voice in person.

out, but we want to send you some stuff first so you could try it out." S. MORALES stated, "Okay." Co-Conspirator A asked, "Is that okay with you?" S. MORALES responded, "That's cool." Later in the conversation, Co-Conspirator A stated, "Yeah he's gonna send you some of that white china [heroin], some white girl [cocaine] and some of that ice [methamphetamine]. Is that straight?" S. MORALES responded, "A'ight. Yeah, that's cool. But tell him to find out how much is the white girl [cocaine] going for?"

9. Co-Conspirator B then spoke on the phone and stated, "Hey, Shell [SHELDON MORALES], it's me, man." S. MORALES responded, "What's up?" Co-Conspirator B replied, "Look, I want to send you the samples first 'cause if I give you price right now, maybe you'll say, 'No, this is too high' or some shit like that right? So I want you to check the samples first. If you think it's good, we can make a deal. So I need the address, [unintelligible] send the address and you can check everything and I give you the price, and like that you know if it's good or not." S. MORALES stated, "Okay." Later that same day, at approximately 11:32 p.m., toll records from Target Phone 2 show that S. MORALES sent a text message to (702) ###-0596, the same number used by Co-Conspirator A in the above conversation, which law enforcement believes contained a destination address on Davis Street in Evanston (the "Davis Street Address"), discussed further below.

### S. MORALES Discusses Receiving a Package Containing Narcotics Samples with Co-Conspirator A, Individual A, and Individual C

***Call with Co-Conspirator A***

10.     On February 19, 2019, at approximately 12:19 p.m., during the court-authorized wire intercept (call session #1335), S. MORALES placed on outgoing call using Target Phone 2 to Co-Conspirator A who was using telephone number (702) ###-0596.   Law enforcement officers believe that during this conversation, Co-Conspirator A told S. MORALES that he received information that the package containing the sample narcotics that Co-Conspirator A and Co-Conspirator B arranged to have sent to S. MORALES arrived at the Davis Street Address.

11.     More specifically, during the conversation, Co-Conspirator A asked, "You get the package [containing the sample narcotics] already?" S. MORALES replied, "The tracking [number]?" Co-Conspirator A asked, "Did you get the package already?" S. MORALES responded, "No, I'm not over there [the Davis Street Address]. Is it there [has the package been delivered]?" Co-Conspirator A stated to Co-Conspirator B in the background in Spanish, "He's not there." Co-Conspirator A then stated to S. MORALES, "My homeboy said he sent it off already and somebody received it over there [the supplier sent the package to the Davis Street Address and it has already been delivered]." S. MORALES stated, "Hold on. Where's the tracking number?" Co-Conspirator A asked, "The fax number?" S. MORALES replied, "The tracking number." Co-Conspirator A asked Co-Conspirator B in the background in Spanish, "The [tracking] number for that?" Co-Conspirator A then stated to S. MORALES, "He was tracking it and he said it already got there." S. MORALES

stated, "Hold on. Let me call my brother. When did it get there?" Co-Conspirator A asked Co-Conspirator B in the background in Spanish, "When did [unintelligible]?" Co-Conspirator A then stated to S. MORALES, "Maybe like 10-15 minutes ago." Later in the conversation S. MORALES stated, "It'll be there. If they just dropped it off 10 minutes ago, bro', It's gonna be there."

### Call with Individual A

12.     On February 19, 2019, at approximately 12:33 p.m., during a court-authorized wire intercept (call session #1339), S. MORALES placed an outgoing call from Target Phone 2 to Individual A who was using telephone number (870) ###-9195. Law enforcement officers believe that during this conversation, S. MORALES attempted to get Individual A to pick up the package containing narcotics samples from the porch of the Davis Street Address and hide it away for S. MORALES to later come and retrieve it, but Individual A would only agree to go to the Davis Street Address and watch the package as it sat on the porch until S. MORALES arrived.

13.     More specifically, during the conversation S. MORALES asked, "Hey P [nickname for Individual A], where you at?" Individual A replied, "I'm in Skokie." S. MORALES stated, "Hey, do me a favor, pull over by [the resident of the Davis Street Address, Individual B's] crib, right there on Davis [Street] right off of McCormick [Boulevard, near the Davis Street Address]. Right around the corner from my mom house." Individual A asked, "Okay, I mean right now? 'Cause I'm about to ..." S. MORALES stated, "Yeah. Right now." Individual A asked, "You said Davis and McCormick?" S. MORALES stated, "Right off McCormick. You know, right around

from my mom house, where you used to meet me at [the Davis Street Address]. Pull right there, it should be a package on the porch [of the Davis Street Address]. Grab it for me." Individual A stated, "Man, hey, [unintelligible]..." S. MORALES stated, "But if you see anything funny then don't grab it [look around for law enforcement or anything suspicious before grabbing the package]." Individual A stated, "Hey, listen, bro'... man, shit, you on your way [to the area of Davis Street and McCormick Boulevard as well]?" S. MORALES replied, "Yeah, I'm finna [going to] get dressed and come out there." Later in the conversation Individual A asked, "[Unintelligible] you telling me ... I'm just trying to figure out ... you're telling me." S. MORALES stated, "Man, look, just go there. If there's a package on the porch, you can throw the package somewhere where you think ... just throw it somewhere in the cut so I could come get it [hide it so that S. MORALES can get it later]. I just don't want the bitch [Individual B] to grab it." Individual A stated, "Uh, I could watch it. I could watch it even though I don't have [unintelligible], but I could watch the mother fucker [rather than pick it up]." S. MORALES stated, "All right, go there and watch it for me. I'm finna fly out there [be on his way over]." Individual A stated, "Man, you gotta come now because..." S. MORALES stated, "I'm coming now. Hey, go there and make sure it's [the package] still there, and make sure the bitch [Individual B] didn't take it [the package] in the house." Individual A asked, "Okay. Wait a minute, you said McCormick and ... ?" S. MORALES stated, "It's [Davis Street Address]. Go down my mom's block, right down the side street and make a right right there. It's that house right there on the corner." Later in the conversation S. MORALES stated, "Just see

if the package is there. That's it. Just go there and see if it's right there." Individual A stated, "Okay. I'm going now. You said [Davis Street Address]?" S. MORALES stated, "Yeah, [Davis Street Address]."

### Call with Individual C

14.     On February 19, 2019, at approximately 12:55 p.m., during a court-authorized wire intercept (call session #1348), S. MORALES placed an outgoing call from Target Phone 2 to Individual C who was using telephone number (773) ###-8771. Law enforcement officers believe that during two phone conversations, S. MORALES asked Individual C to go to the Davis Street Address and retrieve the package and put it in the trunk of an orange car at Spex, a local business, and that Individual C agreed.

15.     During the conversation S. MORALES stated, "Where you at?" Individual C stated, "My daddy [with her father]."[6] S. MORALES stated, "Hey, hurry up, run up by [Individual B's home at the Davis Street Address in Evanston]. It's something on her porch, grab it for me." Individual C asked, "Really, Sheldon?" S. MORALES stated, "Man, they [Co-Conspirator A and Co-Conspirator B] just called me out the blue and just told me [that the package had arrived]." Individual C stated, "And I been calling you since this morning." S. MORALES stated, "Man, I'm telling you they [Co-Conspirator A and Co-Conspirator B] just called me out the blue." Individual C stated in the background, "Daddy, I'll be back."

---

[6] Individual C's voice was identified based on previously recorded conversations in which she is identified by name, references to her family relationship to S. MORALES, and surveillance of her actions in the context of the recorded conversations.

16.     On February 19, 2019, at approximately 1:06 p.m., during a court-authorized wire intercept (call session #1352), S. MORALES placed an outgoing call from Target Phone 2 to Individual C who was using (773) ###-8771. During the conversation Individual C stated, "Yeah?" S. MORALES stated, "Hey, take it [the package] up to [Carwash A in Skokie]. Put it [the package] in the car, the car that's up at [Carwash A], the orange car."

17.     At approximately 5:45 p.m., law enforcement officers observed S. MORALES arrive at Carwash A in Skokie and look in the trunk of an orange car. At the same time, during a court-authorized wire intercept (call session #1392), S. MORALES placed an outgoing call from Target Phone 2 to Individual C who was using (773) ###-8771. During the conversation S. MORALES asked Individual C, "what did you do with the thing [package]?" Individual C replied, "It's [the package is] still in my car. I'm by Daddy [her father's residence]." S. MORALES stated, "Oh, I thought you put it [the package] in trunk [of the orange car at Carwash A]. I told you ..." Individual C stated, "No, I had to go to an appointment." Later in the conversation S. MORALES, asked, "Why didn't you tell me that?" Individual C replied, "Nigga, you kept on 'I'll call you right back' every time I'm telling you something [so she did not have a chance to tell him during previous phone calls]." S. MORALES stated, "That's crazy." Individual C stated, "I'm up here by daddy."

18.     A short time later, at approximately 6:01 p.m., during a court-authorized wire intercept (call session #1398), S. MORALES placed an outgoing call from Target Phone 2 to Individual C who was using (773) ###-8771. During the

conversation, Individual C stated, "Yeah." S. MORALES stated, "Yeah, I'll be up there in like 10 minutes [at [her] father's residence]." Individual C replied, "Alright."

19.     At approximately 6:46 p.m., surveillance officers observed S. MORALES arrive at a nursing home in Wilmette, Illinois, park in its lot, and then walk inside of the building. At approximately 7:05 p.m., surveillance officers observed S. MORALES and Individual C exit the nursing home and walk to Individual C's car. Individual C retrieved a package from her vehicle and turned it over to S. MORALES who opened it and removed items, which he placed in his pockets.

### S. MORALES Discusses the Narcotics Samples With Co-Conspirator A on February 20, 2019

20.     On or about February 20, 2019, at approximately 12:44 p.m., during a court-authorized wire intercept (call session #1499), S. MORALES received an incoming call to Target Phone 2 from Co-Conspirator A, who was using (702) ###-0596. Law enforcement officers believe that during the conversation, S. MORALES and Co-Conspirator A discussed the samples of narcotics that Co-Conspirator A sent to S. MORALES.

21.     During the conversation, Co-Conspirator A stated, "Everything's good? You like that candy [samples of narcotics previously sent to S. MORALES]?" S. MORALES responded, "Yeah, but you got to send me price." Co-Conspirator A stated, "Yeah, what do you want to work with [which of the types of narcotics do you want to purchase]?" S. MORALES responded, "Shit, both of them good." Co-Conspirator A asked, "Can I ask you something? Was it the ice cream [methamphetamine]? The icy [methamphetamine]? And what was the other one?"

S. MORALES responded, "The fentanyl." Co-Conspirator A replied, "Oh, okay. So what you wanna do?" S. MORALES asked, "Shit, what's the price for the fentanyl?" Co-Conspirator A replied, "What is that, the white girl [cocaine]?" S. MORALES responded, "No, it wasn't no white girl [cocaine]." Co-Conspirator A asked, "The white china [heroin]?" S. MORALES responded, "No, it was some purple shit. Tell him what was that?" Co-Conspirator A stated in Spanish to Co-Conspirator B in the background, "It was purple colored. [Unintelligible.] Was it that ice [methamphetamine]?" S. MORALES stated, "No, I'm thinking maybe it was some H [heroin]." Co-Conspirator A asked, "H [heroin]? ... Oh, shit, I'm trying to figure it out. It wasn't brown?" S. MORALES responded, "No, it was purple." Co-Conspirator A stated in Spanish to Co-Conspirator B in the background, "It was purple." Co-Conspirator B responded, "Tell him that I'm going to ask right now." Co-Conspirator A then advised S. MORALES, "He's going to call to make sure what it is. But which one did you like?" S. MORALES responded, "Shit, the purple shit is decent." Co-Conspirator A asked, "It tastes good?" S. MORALES responded, "Yeah, they said it was decent. I had someone taste it [try the sample]. I didn't even ask them what it was. I just told them to taste it. They said it was good, but now you got me second guessing. I gotta go check with them to see what the fuck is it." Co-Conspirator A asked, "Can you give me 2 minutes? I'mma call my homeboy to make sure what it is." S. MORALES responded, "Yeah." Co-Conspirator A stated, "Okay, but answer the phone. I'mma hit you up for sure." S. MORALES responded, "All right, call me right back."

### S. MORALES and Co-Conspirator A and Co-Conspirator B Discuss Pricing of Methamphetamine for a Future Narcotics Transaction

22. On February 22, 2019, at approximately 4:35 p.m., during a court-authorized wire intercept (call session #1746), S. MORALES received an incoming call to Target Phone 2 from Co-Conspirator A who was using (702) ###-0596. Law enforcement officers believe that during the conversation S. MORALES, Co-Conspirator A and Co-Conspirator B discussed methamphetamine pricing and Co-Conspirator A obtaining better-quality heroin for future narcotics transaction, all of which they would discuss later.

23. More specifically, during the conversation, S. MORALES stated, "I got the people on the phone real quick." Co-Conspirator A stated, "All right. But how much [unintelligible], well what you wanna do? You wanna work with it [buy drugs] or no?" S. MORALES replied, "Yeah, yeah, no, I'm talking to my homeboy. My homeboy he finna call me right back. Can you call me back in ten minutes? No, we gon' do something. We gon' do something with the ice [methamphetamine] for sure. You hear?" Co-Conspirator A asked Co-Conspirator B in Spanish in the background, "Three thousand what?" Co-Conspirator B replied, "Three thousand one hundred-fifty." S. MORALES stated again, "We gon' do something with the ice [methamphetamine] for sure. I'm trying to find out what's up [talk to his associate about it]." Co-Conspirator A stated, "He [Co-Conspirator B] says uh, he says, he says the ice [methamphetamine] for the price will be three thousand one hundred and fifty bucks [$3,150 per pound]." S. MORALES replied, "Yeah, nah, I know that. I know. Nah, we gon' do something with that for sure." Later in the conversation S.

MORALES stated, "Hey, listen, hey um, tell me that, hey, you can't get no, no different D [Can you get better quality heroin]? No different uh, the uh, heroin [do you have better quality heroin]?" Co-Conspirator A stated, "Well yeah but, but we have to call our homeboy, and we don't want to call him, and then tell him and he's gonna uh." S. MORALES stated, "You gotta tell him 'cause I gotta find out what you got first, so you gotta let me know. Send me something or let me know what the fuck it is. I can't just, I just ... [S. MORALES wants Co-Conspirator A to tell Co-Conspirator A's supplier about the heroin because S. MORALES needs to know if Co-Conspirator A has better quality heroin]." Later in the conversation, Co-Conspirator A stated, "Yeah, he's going to call his homeboy and see what's up [Co-Conspirator B is going to call his supplier and see if he has better quality heroin]. You know if he have different shit [heroin] but he don't want to be calling him a lot." S. MORALES stated, "Bro', I'm serious bro'. I ain't about no bullshit, bro'." Co-Conspirator A stated, "No and he knows that. He knows you're good for it. He knows your word is good ... my homeboy [supplier]. So um, you want us, we call him or do you want us to give you a call or what's up?" S. MORALES stated, "Yeah, I want you to call him. See if he got some different shit [different better-quality heroin]." Co-Conspirator A stated, "All right. We'll give you a call like in an hour." S. MORALES stated, "All right, cool."

### Between February 22, 2019 and February 28, 2019, S. MORALES and Co-Conspirator A Continue to Communicate About Narcotics

24.     According to toll records from Target Phone 2, between the intercepted call above on February 22, 2019 and the call described below on February 28, 2019, Target Phone 2 and (702) ###-0596 exchanged approximately 25 texts, including

approximately 12 outgoing texts from Target Phone 2 to (702) ###-0596 and 13 incoming texts to Target Phone 2 from (702) ###-0596.

25. On February 28, 2019, at approximately 10:33 a.m., during a court-authorized wire intercept (call session #2660), S. MORALES received an incoming call to Target Phone 2 from Co-Conspirator A who was using telephone number (702) ###-0596. During the conversation, S. MORALES stated, "Check your text message. I'm in school. I'm at the school bro." According to toll records from Target Phone 2, at approximately 10:35 a.m., Target Phone 2 received an incoming text message from (702) ###-0596, and then at approximately 10:39 a.m. and 10:50 a.m., Target Phone 2 sent outgoing text messages to (702) ###-0596. Law enforcement officers believe that based on the investigation to date, including the events described below, the text messages exchanged between S. MORALES and (702) ###-0596 concerned a future narcotics transaction, including the amounts of methamphetamine that Co-Conspirator A and Co-Conspirator B would send to S. MORALES.

26. On February 28, 2019, at approximately 12:19 p.m., during a court-authorized wire intercept (call session #2703), S. MORALES placed an outgoing call from Target Phone 2 to Co-Conspirator A who was using (702) ###-0596. During the conversation, Co-Conspirator A, stated, "I spoke to my homeboy earlier but he wanna do it like this. Look they wanna send everything like the first time, mail. 'Cause he said he don't like-- He [unintelligible] his stuff to the customers so he wanna send you with the mail and he want you to send the money back in the same thing [for the first narcotics transaction, the supplier will send the narcotics to S. MORALES in the

mail, and S. MORALES should send the money back by mail]." S. MORALES stated, "That ain't no problem, bro." Later in the conversation Co-Conspirator A, stated, "Yeah, 'cause the guy is gonna send you the stuff [the narcotics] in the mail. He wants you to [unintelligible] over there." S. MORALES stated, "Yeah." Co-Conspirator A stated, "The guy, he gonna send you the stuff [the narcotics] in the mail. He was saying that, the money back [S. MORALES should send the money back in the mail]." S. MORALES asked, "The money the same way [send the money back in the mail]?" Co-Conspirator A replied, "Yeah, the money right back in the mail." S. MORALES stated, "I got you, bro." Later in the conversation, Co-Conspirator A stated, "Hey, dude. It's got a tracking device. Whenever it gets there, we're gonna know it's there." S. MORALES stated, "Okay, cool ..."

27. On February 28, 2019, at approximately 4:00 p.m., during a court-authorized wire intercept (call session #2730), S. MORALES received an incoming call to Target Phone 2 from Co-Conspirator A who was using (702) ###-0596. During the call, Co-Conspirator A stated, "Hey, my homie wants to tell you something. Uh... he's gonna send you 10 of the ice [10 pounds of methamphetamine]. And 200 of the other one [the purple substance previously discussed]." S. MORALES replied, "Okay." Co-Conspirator A asked, "Is that cool? Just so we can start off with?" S. MORALES stated, "Just so we can start off yeah, that's cool." Co-Conspirator A stated, "Alright. Once you get that and you send us the thing back, we'll send you the rest [once S. MORALES receives the narcotics and S. MORALES sends the money, suppliers will

send more narcotics]." S. MORALES stated, "Absolutely." Co-Conspirator A asked, "Is that straight [alright] with you?" S. MORALES stated, "Yeah."

### Law Enforcement Officers Take Control of Package Intended for the Davis Street Address in Evanston, Illinois

28.     On March 1, 2019, based on the aforementioned intercepted telephone calls, law enforcement set up surveillance in the area of the Davis Street Address in Evanston, Illinois. While conducting surveillance, law enforcement officers observed a United States Parcel ("UPS") truck around the corner from the Davis Street Address. Law enforcement officers approached the UPS driver and identified themselves as law enforcement personnel and asked the driver if he had any planned deliveries to the Davis Street Address of packages weighing approximately ten pounds or more. The driver responded affirmatively. Law enforcement officers asked the driver to turn over the package to law enforcement. The driver consulted with individuals at UPS and turned over the package to the officers.

29.     Upon inspection, the package was mailed on February 28, 2019, from Los Angeles, California and was addressed to "Patrick Miller at [Davis Street Address]," with a return address in Las Vegas, Nevada, and weighed approximately 17 pounds. A Canine Officer conducted a controlled substance detection test of the package using a narcotics dog. The dog alerted to the package, which indicated the odor of narcotics and/or controlled substances in the package.

30.     On March 1, 2019, law enforcement obtained a search warrant to search the package. *See* Case No. 19 M 142 (Valdez, J.) During the execution of the search warrant, law enforcement officers discovered suspect narcotics that were submitted

to the DEA North Central Laboratory. Laboratory testing found that the package contained approximately 5.43 kilograms of methamphetamine in a large clear plastic bag, and approximately 827 grams of fentanyl, which was a dark-colored substance that had been wrapped in plastic wrap inside the package.

### S. MORALES Discusses with Co-Conspirator A and Co-Conspirator B the Undelivered Package of Narcotics that S. MORALES was Expecting

31. On March 1, 2019 at approximately 11:15 a.m., during a court-authorized wire intercept (call session #2832), S. MORALES received an incoming call to Target Phone 2 from Co-Conspirator A, who was using (702) ###-0596. As set forth below, law enforcement officers believe that during this conversation, S. MORALES, Co-Conspirator A, and Co-Conspirator B discussed how and why the package containing the methamphetamine and fentanyl that Co-Conspirator A and Co-Conspirator B arranged to be sent to S. MORALES was not delivered to the Davis Street Address, and how to get the package to S. MORALES.

32. During the call, Co-Conspirator A stated, "The homie [supplier] had called me and told me that they [the delivery company] went to drop off the package but nobody was there [at the Davis Street Address]." S. MORALES asked, "You said somebody went to drop it off?" Co-Conspirator A stated, "Yeah, yeah, they [the delivery company] went to drop it off already and nobody was there [at the Davis Street Address]." S. MORALES asked, "Why didn't you have it to where they just dropped it off [without the requirement that someone be at the residence in order to complete the delivery]?" Co-Conspirator A stated, "Uh, I'm not sure."

33.     Later in the conversation, S. MORALES stated, "But you don't make it for them to deliver for somebody to get it, bro' 'cause if it's the police that's how the shit gets popped off [that creates a risk to the person who has to be there to accept it of getting caught by the police]." Co-Conspirator A asked Co-Conspirator B in the background in Spanish, "Where is it [the package containing the narcotics]?" Co-Conspirator A then stated to S. MORALES, "He's [the supplier is] gonna send you the address so you can go pick it [the package] up." S. MORALES asked, "Go pick it [the package] up from where?" Co-Conspirator A replied, "From the office [the delivery company's office] I think or from ..." Co-Conspirator A asked Co-Conspirator B in the background in Spanish, "Where?" Co-Conspirator A then stated to S. MORALES, "He [Co-Conspirator B] said call my and he's gonna give you the address and the number where it's at [the delivery company holding the package]."

34.     Later in the conversation S. MORALES stated, "I'm not gonna risk my people to go pick something up and then fuck around, come on, bro' [S. MORALES is not comfortable with putting one of his associates at risk of being identified or caught by law enforcement if they were to go pick up a package of narcotics in person]." Co-Conspirator A stated, "Yeah, I know what you mean. I know, my bad, they just called us right now and told us that nobody was there so [the supplier just called and told Co-Conspirator A and Co-Conspirator B that the delivery company advised that nobody was home and therefore the package was not delivered]."

35.     Later in the conversation, S. MORALES stated, "So where is it [the package containing the narcotics]?" Co-Conspirator A stated, "We're gonna send the

address [to the delivery company] right now so you can send somebody for it. Is that cool?" S. MORALES responded, "Yeah. Psst." Co-Conspirator A stated, "You don't have to sign it, anybody else can sign it but we're gonna send you the address and everything right now so you can go get it [the package]. Is that straight [is that ok]?" Later in the conversation Co-Conspirator A stated, "If not, they're gonna go back til Monday to drop it off like that ... [unintelligible] somebody is there [at the Davis Street Address]." S. MORALES asked, "You say it's gonna go back [be delivered] on Monday?" Co-Conspirator A stated, "Yeah. Unless you wanna go and pick it up right now?" Co-Conspirator B stated to Co-Conspirator A in the background in Spanish, "Tell him the sticker [the message from the delivery company] says that they were [unintelligible], if you still don't go get it, they'll go back and drop it off 'til Monday]." S. MORALES stated, "Hey, I rather they go drop it off on Monday, bro' and I watch [keep an eye out for the delivery]. Bro' 'cause ain't no way, they were supposed to leave it there." Later in the conversation Co-Conspirator A stated, "He said he is gonna call him and find out all this shit [about the delivery] and then we're gonna hit you up again, right now." S. MORALES stated, "Yeah, tell him to call. Tell him to go back where he sent the package and tell them that – tell him to tell them just drop it off and leave it [without requiring a signature]." Co-Conspirator A replied, "Okay, I got you." S. MORALES stated, "Alright, appreciate it, bro'."

36.     Shortly after this phone call, at approximately 11:26 a.m., S. MORALES called Individual C at telephone number 773-###-8771 and asked, "can you stop by [Individual B's] front porch [at the Davis Street Address] and see. Some people just

went to drop something off over there and were nobody there to get it. So can you grab the piece of paper that they left?" Individual C responded "Yup." S. MORALES added "And if the paper ain't on the door then knock on the door and tell her to give it to you." Individual C responded, "alright."

37.    At approximately 2:05 p.m. that day, law enforcement conducting surveillance on the Davis Street Address observed Individual C arrive and park in front of the Davis Street Address.[7] Moments later, Individual C exited the vehicle while holding a cell phone to her ear. Individual C then walked to the front of the house and was greeted by an unidentified female (believed to be Individual B) who was inside and opened the front door of the residence. Surveillance observed Individual C hand Individual B the cell phone she was talking on as she was entering the residence.

38.    At approximately, 2:12 p.m., S. MORALES called Individual C at telephone number 773-###-8771, and had the following exchange:

S. MORALES: Did you ever grab that?

Individual C: I just pulled outside the door. Ain't no damn thing on her- a sign so she must have put it in the house. Hold on, I'm walking out the car right now.

S. MORALES: Is her car there?

Individual C: Mm-hum.

S. MORALES: Yeah, some lil bitch got it.

---

[7] Surveillance Officers had been supplied with photographs of Individual C. Her identity was confirmed the photo comparison, the surveillance of her on February 19, 2019, and the contemporaneous phone call set forth in paragraph 38.

Individual C: She doesn't answer her damn door.

S. MORALES: She gonna try to ignore you. If not tell DJ [D. MORALES] to give you her number. Gotta watch that [U/I] give that shit to the police.

Individual C: Mm-hm. [To Individual B]. Hey. Did you get a ticket thing for some mail?

S. MORALES: Yeah, they did. they dropped it off.

Individual C [to Individual B]: For a package or something?

Individual B: You talking about the certified mail?

Individual C [to Individual B]: Yeah

Individual B: I don't think (U/I).

Individual C [to Individual B]: They say they put it on today, they say they put one on the door today.

Individual B: We ain't get no paper.

Individual C [to Individual B]: Not today?

Individual B: Uh-uh

S. MORALES: Yes they did. They did this morning.

Individual C [to Individual B]: He said they did it this morning, they said they sent them a thing that said...

Individual B: No, because my mailman, I told him to bring anything that needs to be signed for on Saturdays when I'm actually home.

Individual C [to Individual B]: Oh

S. MORALES: It was FedEx.

Individual C [to Individual B]: He said it was FedEx.

Individual B: Oh

S. MORALES: They came earlier and they left [U/I].

Individual C: She said they didn't leave a thing. She said they didn't thing no FedEx thing on the door today. She said she been here, they ain't bring no

FedEx stuff here today.

S. MORALES: She didn't hear them knocking on the door?

Individual C [to Individual B]: He said, nobody knocked on the door?

Individual C [to S. MORALES]: She says, "No, not today." She been here, she in her pajamas.

S. MORALES: So they ain't leave no thing?

Individual C: Nothing, ain't nothing on [U/I]?

S. MORALES: What did she say?

Individual C: She said she had told them already, the regular mail carrier, if it was regular mail, that any- if it's packages, bring it on Saturday. She said FedEx ain't come.

S. MORALES: Tell her to look on her camera.

Individual C [to Individual B]: He said check your camera if you see any FedEx people that came by today 'cause they claim they left a slip.

Individual B: Come on in.

[Individual C talks aside to the dog.] [Pause]

Individual B: Who is this package (U/I)?

Individual C [to Individual B]: Huh? Sheldon.

S. MORALES: You shouldn't had told her my name. I don't know why the fuck you just gave her my name.

Individual C: [U/I]

[call ends]

39.     Law enforcement retained control of the subject package and directed the shipping company to return a substitute package to the sender address, which the shipping company included in its online tracking information. The package was never delivered to the Davis Street Address.

## CONCLUSION

40.     Based on the facts set forth above, there is probable cause to conclude that S. MORALES attempted to possess with intent to distribute and distribute over 500 grams of a mixture and substance containing a detectable amount of methamphetamine.

FURTHER AFFIANT SAYETH NOT.

MIKHAIL GEYER
Task Force Officer, Drug Enforcement
Administration

SUBSCRIBED AND SWORN to before me on November 7, 2019.

SHEILA M. FINNEGAN
United States Magistrate Judge