IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES,<br><br>Plaintiff,<br><br>v.<br><br>SHELDON MORALES and EDUARDO SANTANA,<br><br>Defendants. | Case No. 19-CR-850<br><br>Judge Mary M. Rowland |

**MEMORANDUM ORDER AND OPINION**

On August 5, 2022, a jury convicted defendants Sheldon Morales and Eduardo Santana of conspiracy to distribute controlled substance in violation of 21 U.S.C. § 846. After trial, both defendants' counsel filed timely motions for a new trial under Federal Rule of Criminal Procedure 33 [209] [210] [213]. Morales also filed a *pro se* motion arguing for judgment of acquittal under Federal Rule of Criminal Procedure 29 and/or a new trial [207]. The Government opposed both defendants' motions. [216]. For the following reasons, the Court DENIES both defendants' motions for a new trial. The Court also DENIES Morales's *pro se* motions for acquittal and/or a new trial and allows him to withdraw his ineffective assistance of counsel claim.

I. **Background**

On December 11, 2019, a grand jury returned a multi-count indictment charging both Morales and Santana with conspiracy to possess with intent to distribute 500 or more grams of methamphetamine in violation of 21 U.S.C. §841 (a)(1) and §846 (Count One). [14]. Morales was also charged with attempted

1

possession with intent to distribute in violation of 21 U.S.C. § 846 (Count Two) and engaging in a monetary transaction of criminally derived property in violation of 18 U.S.C. § 1957 (Count Three). *Id.* The Government proceeded to a jury trial on Counts One and Two. [155] [162].

At trial, the Government's primary evidence was intercepts of Morales's cell phone calls for two 30-day periods from February 12, 2019 to March 13, 2019, and March 29, 2019 to April 27, 2019. [191 (Tr. 8/2/22)] at 176-79. Officer Mikail Geyer, the Drug Enforcement Administration (DEA) agent assigned to the case, testified to the phone calls. *Id.* at 173-76. The earliest call indicating Morales and Santana's agreement was on February 15, 2019 between Morales and an individual in Belize. *Id.* at 185-90. There, Morales discussed splitting profits with "Guajo," Santana's nickname. *Id.*[1] In a series of subsequent calls to unknown individuals who were incarcerated and acted as brokers, Morales arranged for mailed samples of heroin, cocaine, and meth. *Id.* at 193-95. Morales then directed his sister Elisheba to retrieve the package of samples for him and place it in an orange vehicle at a car wash; that same day, a DEA agent observed Morales and his sister at the car wash standing over an orange vehicle. *Id.* at 201-02. Morales was seen later that day opening a box from Elisheba's vehicle and putting its contents in his pockets. *Id.* at 206-09. After retrieving and testing the samples, Morales was recorded talking with the brokers to order more drugs on consignment. *Id.* at 212-15. On March 1, 2019, the DEA

---

[1] The Government also produced evidence from Officer Geyer's investigation that established "Guajo" was Santana's nickname. [191] at 1077-78 ("We determined [Guajo] to be Mr. Eduardo Santana . . . through numerous calls, hearing Mr. Santana's voice on those calls. The individuals he was communicating with would refer to him numerous time as Guajo as if it's his nickname.").

intercepted a package containing meth and fentanyl. *Id.* at 217-22, 226-27. The package was sent to an associate of Morales with a return address of "Johnny's Commercial Kitchen." *Id.* at 226. During the first time period the DEA was recording Morales' telephone calls, Santana acted as translator for Morales on one phone call on March 9, 2019. *Id.* at 231-36.

The second wire period began March 29, 2019. [192 (Tr. 8/3/22)] at 314. Santana then began translating regularly for Morales when he spoke to his supplier, Omar. *See, e.g., id.* at 246. In a call on March 30, 2019, Morales sought an assurance that drugs would arrive that week, as "a lot of people lined up" to purchase from him. *Id.* at 243. Morales then told Santana that he purchased a brick compressor to process his stores of cocaine, *id.* at 406, to which Santana said that he hoped Morales would get more drugs soon to replenish Santana's own supply for customers. *Id.* at 412 ("Man, I hope you eventually get that shit cause, man . . . .I just be like, 'Man I'm popped.'"). Morales then assured Santana that "we straight, though . . . we finna go to the moon, bro." *Id.* at 409. In a call dated April 2, 2019, Morales warned Santana to be "respectful to Omar," as "he said that they gonna make us the office of Chicago . . . we're the head of Chicago, bro, from their cartel." On April 10, 2019, Santana checked on a delivered package for Morales that wound up being empty. *Id.* at 249-55. The DEA later seized this empty package. *Id.* at 256-57.

Phone calls between Morales, Santana, and Omar continued for the rest of April 2019. On one call, the three talked about a shipment from Omar that contained "6.6 keys" of meth, meaning 6.6 kilograms. *Id.* at 282-83. Between themselves,

3

Morales and Santana discussed tricking Omar with a fake police seizure to keep the drugs but avoid payment, *id.* at 274, tracking numbers for additional shipments of narcotics, *id.* at 246, and the risk of surveillance by federal agents. *Id.* at 280-85. On the latter topic, Santana warned Morales that "we need a goon bitch in the squad that she gonna do whatever the fuck is necessary." *Id.* Officer Geyer testified that he interpreted Santana's use of "squad" to refer to "their narcotics trafficking organization." *Id.* at 283.

After the second wire period ended, DEA agents seized two more packages containing cocaine and fentanyl. The first package was seized from an Evanston address on May 10, 2019 with the same "Johnny's Commercial Kitchen" return address, and contained at least two kilograms, of which a sample tested positive for cocaine. *Id.* at 286-90. The second package was seized on September 16, 2019 from Morales's home. That package contained two samples of 30.48 grams and 844.1 grams, both with traces of fentanyl. *Id.* at 291-95.

After five days of trial, the jury returned a verdict, finding Morales guilty of conspiracy to possess with intent to distribute at least 500 grams of methamphetamine, at least 400 grams of fentanyl, and cocaine (Count One), and attempted possession with intent to distribute the same quantities (Count Two). [178]. As to Santana, the jury found him guilty of the conspiracy charged in Count One, but only involving at least 500 grams of methamphetamine, not for quantities of fentanyl or cocaine. [179].

II. **Standard**

4

Criminal defendants seeking a judgment of acquittal on the basis of insufficient evidence face an "uphill battle." *United States v. Perryman*, 20 F.4th 1127, 1133 (7th Cir. 2021) (further describing Rule 29 as "a heavy burden," "momentous task," and "a nearly insurmountable hurdle."). Courts reviewing Rule 29 motions "view the evidence in the light most favorable to the Government to determine whether any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt." *United States v. Garcia*, 919 F.3d 489, 496 (7th Cir. 2019) (quoting *United States v. Seidling*, 737 F.3d 1155, 1159–60 (7th Cir. 2013)). In conducting this review, courts do not reweigh evidence or second-guess witnesses' credibility. *United States v. Campbell*, 985 F.2d 280, 283 (7th Cir. 2020). If there is a "reasonable basis in the record for the verdict, it must stand." *United States v. Moshiri*, 858 F.3d 1077, 1082 (7th Cir. 2017).

Rule 33 allows district courts to vacate judgment and grant a new trial in the "interest of justice." Fed. R. Crim. P. 33. Still, "jury verdicts are not to be overturned lightly, and therefore a Rule 33 motion is not to be granted lightly." *United States. v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994). The Seventh Circuit has made clear that there must be a "reasonable possibility that the trial error had a prejudicial effect on the jury's verdict" to warrant a new trial. *United States v. Flournoy*, 842 F.3d 524, 530 (7th Cir. 2016). Granting relief under Rule 33 is hence "reserved for only the most extreme cases." *United States v. Coscia*, 4 F.4th 454, 465 (7th Cir. 2021).

### III. Analysis

#### A. Morales's Motion for New Trial

Morales contends, both through counsel and his own *pro se* motion, that the Court erred in refusing to give a buyer-seller jury instruction. The Court previously addressed this argument during the parties' jury instruction conference. [193 (8/4/2022 Tr.)] at 89-96. There, Morales asked the Court to give the Seventh Circuit pattern instruction 5.10(A), which distinguishes a defendant's participation in a drug distribution conspiracy from a mere sales transaction. *Id.* The Court declined to give the instruction at that time, finding that the evidence in the case, particularly Morales's conversations with the incarcerated individuals who acted as brokers, did not support a buyer-seller theory under *U.S. v. Cruse*, 805 F.3d 795 (7th Cir. 2015). *Id.* at 94. Morales now renews his objection, arguing that the Court's denial amounts to an error requiring a new trial. [213]. In opposition, the Government contends that the jury had no evidence to reasonably find that Morales was only a buyer-seller. [216].

"Defendants are not automatically entitled to any particular theory-of-defense jury instruction." *United States v. Walker*, 746 F.3d 300, 307 (7th Cir. 2014). Instead, the "defendant must demonstrate: 1) the instruction is a correct statement of law, 2) the evidence in the case supports the theory of defense, 3) that theory is not already part of the charge, and 4) a failure to provide the instruction would deny a fair trial." *United States v. Maldonado*, 893 F.3d 480, 487 (7th Cir. 2018) (quoting *United States v. Choiniere*, F.3d 967, 970 (7th Cir. 2008)). A buyer seller-instruction in particular should "be used only in cases in which a jury reasonably could find that there was only a buyer-seller relationship rather than a conspiracy." 7th Cir. Pattern Crim.

6

Jury Instructions 5.10(A) cmt. (2012); *see also United States v. Askew*, 403 F.3d 496, 503 (7th Cir. 2005) (stating buyer-seller instruction must have "some foundation in the evidence.").

Here, as this Court previously determined, the evidence at trial could not have reasonably supported a finding that Morales was merely a buyer-seller. Morales's communications with Santana, Omar, the brokers, and multiple other individuals exhibited the hallmark characteristics of a drug conspiracy: first, a "joint stake" in the distribution scheme, and second, "an agreement," whether explicit or implicit, "to advance further distribution beyond the initial transaction." *United States v. Page*, 76 F.4th 583, 585 (7th Cir. 2023) (quoting *United States v. Hidalgo-Sanchez*, 29 F.4th 915, 925 (7th Cir. 2013)).

The evidence at trial made clear that Morales had a stake in the drug sales. He repeatedly requested specifications on prices and quality from the two unidentified brokers and Omar himself, and he also bragged about the status in the cartel he stood to gain from his sales. [191] at 193-95; [192] at 400-10. He promised Santana a cut of his profit. [191] at 185-90. The detailed planning Morales took to receive shipments creates a reasonable inference that he considered further shipments a possibility.

The jury may infer the existence of a conspiratorial agreement from circumstantial evidence including an "agreement to advance further distribution through sales on credit, advice on conduct of business, [and] frequent purchases in quantities too large for personal consumption on credit." *Hidalgo-Sanchez*, 29 F.4th

7

at 925 (quoting *U.S. v. Brown*, 726 F.3d 993, 1002 (7th Cir. 2013). In the tapes played at trial, Morales discussed each of these topics. Morales then worked with Santana and his own family members "to transport controlled substances, hide them, send them elsewhere," *Hildago-Sanchez*, 29 F.4th at 925-27, all in order to "negotiat[e] further sales to local customers." *Id.* Moreover, as this Court observed at the jury instruction conference, Morales's contact with brokers "on the same side of the sale" defeats any attempt to cast him as a buyer-seller acting alone. *See* [193 (Tr. 8/4/22)] at 95 (citing *Cruse*, 805 F.3d at 816) *see also United States v. Payton*, 328 F.3d 910, 912 (7th Cir. 2003) ("When a buyer or a seller is assisted by a third person, that collaboration is punishable as a conspiracy."). Over weeks of phone calls, Morales entered into, then furthered, a multilateral agreement to expand the distribution of drugs.

Overall, viewed in the light most favorable to the Government, the evidence established that Morales and his associates shared the quintessential "joint stake" required to form a drug distribution conspiracy: a "shared objective of acquiring more drugs and ensuring [their] customers were satisfied." *Hidalgo-Sanchez*, 29 F.4th at 927. Morales expressed this aspiration multiple times. Considering the overwhelming weight of the evidence supporting a conspiracy, it was not error to refuse to give the jury a buyer-seller instruction. Accordingly, the Court's decision not to give it did not deprive Morales of a fair trial.

### B. Morales' *Pro Se* Claims

Morales also separately filed an uncounseled motion seeking a judgment of acquittal, or in the alternative, a new trial. [207] [208]. Apart from his ineffective assistance of counsel claim, discussed further below, the Court denies Morales's *pro se* motion.

### i. Sufficiency of the Evidence

Morales argues for a judgment of acquittal due to insufficient evidence on the conspiracy count, insisting that the Government did not prove the existence of a criminal agreement beyond a reasonable doubt. [208] at 4. For the same reasons described above, this argument lacks merit.

Morales was convicted of conspiracy to distribute controlled substances, which required the Government to prove beyond a reasonable doubt that he knowingly agreed with someone else to distribute drugs. *Hidalgo-Sanchez*, 29 F.4th at 924-25. As this Court has already explained herein, the bevy of evidence from the Government at trial showed both Morales's joint stake in the drug distribution and his agreement with Sanatana and others to further the venture. There was sufficient evidence to support Morales's conspiracy conviction.

### ii. Co-Defendant's Opening Statement

Morales next asserts that Sanatana's counsel, James Tunick, made statements that unfairly prejudiced his right to a fair trial. In Tunick's opening, he said, "[Morales] got his own sister to do -- pick up a package and hand it to him. He had his own sister involved. He had his baby's mama involved. He had this guy named Paul involved . . . he got his own mama involved in this . . . he got things done." [191]

at 16-17. Morales argues these remarks caused him "unreasonable bias." [208] at 1. However Morales has no "specific trial right . . . not to have a co-defendant give damaging testimony." *United States v. Mietus*, 237 F.3d 866, 874 (7th Cir. 2001). Like the remarks at issue in *Mietus*, counsel's statement gave the jury context; Tunick did not attempt to incriminate Morales, but "wanted only to suggest that if a conspiracy existed, his client had no part in it." *Id.* Finally, Morales does not link this particular remark by Sanatana's counsel to any specific risk of prejudice in this case. This Court denies his motion for a new trial on this basis.

### iii. Ineffective Assistance of Counsel

The bulk of Morales's *pro se* motion is dedicated to an ineffective assistance of counsel claim against his trial counsel, Joseph Lopez. [208]. After trial, Morales fired Lopez and Holly Blaine and James Vanzant were appointed to represent Morales. [186] [188] [189]. Despite having counsel, on April 21, 2023, Morales filed a *pro se* motion for a new trial based on ineffective assistance of counsel. On May 22, 2023, his counsel's motion affirmatively withdrew the ineffective assistance claim to protect Morales's ability to raise it in subsequent collateral proceedings. [213].

It is well-established that a defendant only has one opportunity to raise a claim of ineffective assistance of counsel. "[O]nce he raises the claim and loses, he can never raise it again." *United States v. McClinton*, 23 F.4th 732, 737 (7th Cir. 2022) (citing *United States v. Flores*, 739 F.3d 337, 341 (7th Cir. 2014)). For this reason, Morales's counsel withdrew the claim.

10

While certain aspects of decision-making are reserved for the client, counsel has exclusive control over "trial management, tactical and strategic decisions." *McClinton*, 23 F.4th at 737. This includes choosing whether to pursue a certain post-trial or appellate argument. *Id.* (citing *McCoy v. Louisiana*, 138 S. Ct. 1500, 1508 (2018)). The Seventh Circuit has used this rationale to encourage counsel to withdraw ineffective assistance claims on direct appeal, even when their clients disagree. *See, e.g., McClinton*, 23 F.4th at 737; *United States v. Harris*, 394 F.3d 543, 557-59 (7th Cir. 2005). Here, the Court defers to counsel's expertise and judgment to withdraw this claim. Moreover, "a defendant does not have an affirmative right to submit a pro se brief when represented by counsel." *United States v. Gwiazdzinski*, 141 F.3d 784, 787 (7th Cir. 1998). Withdrawing a claim is the type of decision squarely in the province of counsel, not Morales.

Without commenting on the merits of the claim, this Court will accept counsel's withdrawal of the ineffective assistance of counsel claim.

### C. Santana's Motion for New Trial

Santana raises three arguments for a judgment of acquittal and/or a new trial. For the following reasons, the Court denies his motions in their entirety.

#### i. Sufficiency of the Evidence

Santana moves for judgment of acquittal based on the Government's failure to produce sufficient evidence to find him guilty beyond a reasonable doubt of conspiring to possess 500 grams or more of methamphetamine with intent to distribute. [209]. He argues that the evidence did not conclusively show that he and Morales entered

into a conspiratorial agreement. *Id.* The Government responds that the sum of Santana's conversations about drug dealing was enough for the jury to find that he was a co-conspirator with Morales. [216]. Considering the evidence as a whole from trial, in the light most favorable to the prosecution, the Court finds that "any rational trier of fact could have found the essential elements of the conspiracy as charged beyond a reasonable doubt." *United States v. Wallace*, 991 F.3d 810, 812 (7th Cir. 2021)

The Government was required to prove beyond a reasonable doubt that there was an agreement to commit an unlawful act, and that Santana knowingly and intentionally joined that agreement. *See Page*, 76 F.4th at 585. Viewing the evidence and making all reasonable inferences in favor of the prosecution, this Court finds the trial evidence sufficient for the jury to determine that Santana was a member of the conspiracy.

The Government produced evidence that showed Santana frequently translated between Morales and supplier Omar, thus displaying his knowledge of the scheme. *See* [192] at 246. He then advised Morales on plans for distribution — including their mutual goal of gaining power in the cartel. *Id.* at 409; *see Hidalgo-Sanchez*, 29 F.4th at 927 (identifying "advice on conduct of business" as characteristic of conspiratorial agreement). Santana went so far as to check on a package for Morales to ensure that the drugs arrived without interception by law enforcement. *Id.* at 249; *see Hidalgo-Sanchez*, 29 F.4th at 927 (explaining defendant's participation in transport of drugs was evidence of conspiratorial agreement). Santana acted in

12

furtherance of a shared financial stake in the scheme; Morales confirmed that Santana received a cut of proceeds "for what he did." [191] at 185-90. Though Santana attempts to minimize his role as that of translator, those services, too, can count as "tools to advance the distribution." *United States v. Pulgar*, 789 F.3d 807, 813 (7th Cir. 2015); *see U.S. v. Villasenor*, 977 F.2d 1992 331, 337 (finding defendant was "an integral and active member of the conspiracy whose duties happened to include translating."). The jury could reasonably conclude from this evidence that Santana knowingly and intentionally joined into the agreement to distribute controlled substances.

Also, the evidence was sufficient to support the specific quantity of 500 grams or more of meth charged in the conspiracy. Santana was party to phone calls where Morales ordered large quantities of drugs, including one conversation where the pair discussed a particular shipment of 6.6 kilograms of meth. [192] at 282-83. All told, the Government produced sufficient evidence to sustain its burden beyond a reasonable doubt as to Santana's membership in the drug conspiracy as charged. Santana's motion for judgment of acquittal is denied.

### ii. Admissibility of February 15, 2019 Phone Call

Santana moves for a new trial based on the admission of Exhibit 301, a phone call on February 15, 2019 between Morales and an individual located in Belize. [210]. Santana argues, as he did before trial, that the call was unrelated to the charged conspiracy, and thus inadmissible hearsay. The Court previously addressed this argument when overruling Santana's pretrial objection to admitting this call, [191]

at 3-6, and finds once again that the call was admissible as a co-conspirator statement. Santana is not entitled to a new trial on these grounds.

A new trial is only granted for an error in the admission of evidence in "extraordinary situations." *Shick v. Ill. Dep't of Human Servs.*, 307 F.3d 605, 611 (7th Cir. 2002). There must be a "significant chance . . . that [the error] affected the outcome of the trial." *Hasham v. California State Bd. of Equalization*, 200 F.3d 1035, 1048 (7th Cir. 2000). Santana cannot satisfy this standard. First, as the Court already ruled, the February 15, 2019 phone call can be linked to Morales's overall drug distribution scheme. In that call, Morales used language that can be interpreted as references to drug quantities. [191] at 185-92. Shortly after hanging up with the Belize number, he had conversations with the incarcerated individuals who acted as brokers about ordering the drugs directly at issue in this case — shipments that Santana had knowledge of. *Id.* at 190-94. Weeks later, Morales had another phone call with an individual at the Belize number to discuss the same package that Santana checked on for Morales. [192] at 285. This is enough to connect the February 15, 2019 phone call to Sanatana's overall conspiracy.

The Federal Rules of Evidence exclude statements of co-conspirators from the general bar against hearsay. Fed. R. Evid. 801(d)(2)(E). To be admissible, the statement must be made "in furtherance of the conspiracy." *Id.* "A co-conspirator statement satisfies the 'in furtherance' requirement when the statement is 'part of the information flow between conspirators intended to help each perform a role." *Santos*, 20 F.3d at 286. Here, statements from the February 15, 2019 phone call were

14

made in furtherance of the conspiracy, as it was reasonable to infer that Morales discussed drugs that Santana both had knowledge of and later worked to transport. There was no error in admitting the phone call on this basis.

Even if the phone call was inadmissible, Santana cannot show that its admission affected the outcome of the trial. As explained earlier, the Government produced a series of phone calls wherein Santana himself facilitated the sale, transport, and distribution of drugs. Removing a single phone call from this evidence would not reasonably lead to a different outcome. For these reasons, Santana's motion for a new trial is denied.

### iii. Court's Response to Jury Question

Finally, Santana argues that the Court's improperly responded to a jury question. The jury asked, "is Santana not guilty if he has no intent to possess or distribute?" [210] at 8; [194 (Tr. 8/5/22)] at 22. After conferring with counsel, the Court responded by stating "I have reviewed your note with counsel. I refer you to the jury instructions." *Id.* at 24. Santana contends that the Court's response "had the effect of pressuring the jury into a verdict." [210] at 9. The Court disagrees.

District courts have considerable discretion in responding to juror questions. *United States v. Ambrose*, 668 F.3d 943, 965 (7th Cir. 2012). When jurors exhibit potential confusion, "judges are well within their discretion to refer a jury back to the original instructions." *Emerson v. Shaw*, 575 F.3d 680, 685 (7th Cir. 2009). Here, rather than introduce more variables, the Court pointed the jury back to the neutral guidance contained in the instructions. Santana does not challenge the accuracy of

any of those instructions, but instead makes a vague allegation that the Court's direction had the effect of coercing the jury. Because the Court's response was proper and "juries are presumed to follow the court's instructions," *CSX Transp., Inc. v. Hensley*, 556 U.S. 838, 841 (2009), Santana is not entitled to a new trial.

## IV. Conclusion

For the stated reasons, the Court denies Santana's motions for a judgment of acquittal and new trial. [209] [210]. The Court also denies Morales's motion for judgment of acquittal. [207]. Morales's *pro se* motion for a new trial is denied, and his ineffective assistance of counsel claim is withdrawn. [207] [213].

E N T E R:

Dated: October 26, 2023

MARY M. ROWLAND
United States District Judge