UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>SHELDON MORALES and<br>EDUARDO SANTANA | No. 19 CR 850<br><br>Judge Mary M. Rowland |

**GOVERNMENT'S RESPONSE TO**
**DEFENDANTS' SENTENCING MEMORANDA**

The government responds to the sentencing memoranda of defendants Sheldon Morales (R. 245) and Eduardo Santana (R. 248) as follows.

I. **MORALES'S OBJECTION TO GUIDELINE § 2D.1.1(B)(2)**

Morales objects to the enhancement set forth in Guideline § 2D.1.1(b)(2), which adds a two-level increase where "defendant used violence, made a credible threat of violence, or directed the use of violence." PSR ¶ 29. As explained below, this sentencing enhancement is appropriate because Morales tried to take the law into his own hands when a safe was stolen in a home invasion in February 2019, at the time of the charged conspiracy.

A. **Additional Factual Background**

As noted in the government's sentencing memo, on Saturday night, February 23, 2019, Bartlett Police were called out to investigate a home invasion and robbery of Morales's rental home in Bartlett, Illinois. Individual N, who was doing work on the house, was present and suffered a bullet graze wound to the head. Supp. GVO Ex. 8.

1

After that incident, Morales was intercepted in a series of phone calls talking about who he suspected committed the robbery. *See* R.247: Sealed Exhibits 1-7 (transcripts).

The day after the robbery, Morales called his brother, Darius Morales, and said "[Individual N] and [Individual A] did it." Sealed Exhibit 1 at 1:7. Morales elaborated "I swear to God, bro'. That's why- that's why they can't get in the safe. She don't know what to do and she don't want to put nobody in the business. That's why she can't get in the safe." *Id.* at 1:9-11.

Morales received a call from the Bartlett Police and told him that a source of his had identified Individual A as the thief, but he could not reveal who the source was. Sealed Exhibit 2. Morales told Detective Kissler:

> It's rumors going around saying that, you know I'm saying, that, that he [Individual N] staged it and that he was calling people trying to get them to stage, him and his girlfriend [Individual A]... him and his girlfriend they was trying to get people to um, bring his girlfriend out there and they said they had a safe, and they was trying to get a ride out there. [STAMMERS] He had his girlfriend try to get a ride out there.

*Id.* at 2:18-22. Morales told Detective Kissler that he could not reveal who his source of information is because he did not want to be involved. *Id.* at 3:7-10.

Instead, Morales appeared to take action himself. In a call a half hour later with Darius, Morales had the following exchange:

DARIUS: Yeah, where you at?

SHELDON: Shit, I'm right here on, uh... On, uh... On, uh... I'm right here on, uh... We on Church and, uh, Church and, uh... Uh... What's this?

DARIUS: A'ight. I finna run and grab it. I have- I- I have to grab it. I have

2

to grab it. That's what I'm...

SHELDON: Huh?

DARIUS: Yeah, I have to grab it.

SHELDON: Who you talking to? Me?

DARIUS: Yeah, I said I should just go grab it. I [U/I].

SHELDON: Go grab what?

DARIUS: You said the- the- the thing, right?

SHELDON: What thing? I'm lost.

DARIUS: The- the shit to, uh... The shit to, uh... to get dude, right?

SHELDON: To get dude? [Pause] I'm lost. Oh! Oh! Oh! Oh! To- What? To go get dude?

DARIUS: Yeah.

SHELDON: Oh... Yeah, we'll– That's- that's what we finna do. That's-- Come on. We finna go get him and I'mma take him to the crib.

Sealed Ex. 3 at 1:5-21.

Later that same evening, Morales called Individual P, and noted that the police were sitting outside the house where he thought the safe was—the home of Individual J, who was a friend of Individual A. Sealed Ex. 4 at 3. Based on Morales's apparent attempt to retaliate, the DEA deployed officers to protect Individuals A and J. PSR ¶ 29.

Morales then had a call with Individual B, and told him that the safe was at Individual J's house. Sealed Ex. 5 at 2:15-17. Morales told Individual B,

They came, took my safe up out my crib. My- my- my safe is at, uh, at [Individual J's] crib, bro'. You feel what I'm saying?.... If you go over there and get my shit, I'll give you five stacks, bro'. Look, I don't want no problems, but

3

they don't give me my shit, bro'... It is what it is.

*Id.* at 2:21-3:3. Individual B explained that he could not go over there now because he was at a halfway house, but that he could go over the next day. *Id.* at 3-5. Individual B said "I'mma fake like … I ain't talk to you about nothing. I'm finna quiz– Like, she just told me what's- exactly what's going on, but the bitch be lying. So, I'm finna quiz her [Individual J], and- and- and- and get the truth from her dumbass and then by- and- and we'll handle it from there. I'm not gon' say nothing. A'ight?" *Id.* at 4:28-5:2.

On March 9, 2019, Morales got a call from Individual G, who accused him of "playin' with my name." Sealed Ex. 6 at 2:12. After the call, Morales called Individual E to vent about his dispute with Individual G, who he suspected was involved with the home invasion. Morales told Individual G,

> Nah, but n###as can put a gun to me, rob me like that, some shit like that, bro'. I'm killing every last one of them. On my life. You see what I'm saying? But, a motherfucker's just come break in my crib, found out where I live? Okay, I slipped up. You feel what I'm saying? On my mama, it's good, bro. It's good! I ain't even tripping.

Sealed Ex. 7 at 5:8-12. Later in the conversation, Morales said "[h]ey, you want me to tell you something, bro'? See, I got stashes in all my cars. You gotta ride around with a pole [firearm], n###a, on my mama, and look over your shoulder." *Id.* at 7:16-18.

### B. Morales made a credible threat of violence and directed another to use violence.

Guideline § 2D1.1(b)(2) states that "[i]f the defendant used violence, made a credible threat to use violence, or directed the use of violence, increase by 2 levels." The government agrees with United States Probation that, when viewed

4

cumulatively and in context, Morales's statements constituted a credible threat of violence or the directed use of violence. Most notably, Morales offered to pay Individual B "five stacks," to get his safe back, specifying that "I don't want no problems, but they don't give me my shit, bro'… It is what it is."

In a recent case, the district court found that a defendant's texts messages with veiled threats, when combined with the fact that the defendant had purported ties to Mexican cartels, triggered the enhancement. The text messages included statements such as the following:

> "My peeps are mad at you ... I told them to take it easy and not harm you,"
>
> "I just heard you threatened my peeps ... I may not be able to control them now ... Calling south in two hours to get them prepared if necessary ... I hope you have some big guns ... They are vested up ... And strapped up too"; and
>
> "I'm willing to die for my respect. Are you? They have all addresses. How it will go, you drop off money, kids are okay, but you will be alone. If not, whomever it is, I will consider a threat. Not good."

*United States v. Hecke*, No. 1:20-CR-7-HAB, 2023 WL 3244441, at *4 (N.D. Ind. May 4, 2023).

In *Hecke*, the court found that the defendant did "not specifically direct anyone to take a hostile action against another person" did not engage in "an actual use of violence," but the defendant still transmitted a "credible threats to use violence.'" *Hecke*, 2023 WL 3244441, at *4 (noting that "[t]he very nature of a 'threat' is that it involves an intention to cause reasonable fear in another.")

Morales contends that "[t]his enhancement is based on a speculative interpretation of phone calls" and Morales "never made any efforts to communicate

5

threats to the people he believed robbed his house." R. 24 at 1. But Morales specifically offered to pay Individual B to get his safe back. Morales's statement "I don't want no problems, but they don't give me my shit, bro'... It is what it is" indicates that he authorized Individual B to carry out violence or threats of violence. In Morales's conversations with his brother Darius, Sheldon tells Darius who he suspects of the robbery, and then Darius talks about getting "the thing" to "get dude." This is further evidence that Morales was planning to get his safe back with force or threats of force. *Hecke*, 2023 WL 3244441, at *4 ("a threat is a threat, even if the speaker never intends to carry it out"); *see also* Tr. 102:14-23 (expert testimony about how drug traffickers use coded language).

Morales also argues that the "context" of the statements, in which he was angry about the home invasion and had not had any recent convictions for violence, does not support the enhancement. But the statements were made during the time-period of the charged conspiracy, in which defendant was conspiring to bring large quantities of narcotics into Mexico. The safe was presumably proceeds from his drug trafficking operation, and given the connection between drug trafficking and violence, defendant's threats were credible.

## II.  MORALES'S POLICY ARGUMENTS

Morales makes a number of policy arguments based on social science literature, including "empirical research regarding the limited deterrent effect of custodial sentences." R. 245 at 15. To the extent that the Court were to consider social science material that has not been tested through the adversarial process,

6

defendant's arguments are particularly inapt in this context.

Morales has explained in his own words that he has previously gone to jail for his lucrative narcotics operation. R 249 at 13-14. It was so lucrative that he resumed it shortly after being released from his last federal narcotics sentence. The Seventh Circuit recently recognized "where the profits to be made from violating a law are higher, the penalty needs to be correspondingly higher to achieve the same amount of deterrence." *United States v. Arroyo*, 75 F.4th 705, 708 (7th Cir. 2023) (citing *United States v. Cavera*, 550 F.3d 180, 196 (2d Cir. 2008)).

The relevant statute, 18 U.S.C. § 3553(a)(2)(B), explicitly "requires judges to consider general deterrence when fashioning a sentence," and the Seventh Circuit has "reject[ed] outright the contention that [a] district judge's 'emphasis on general deterrence [i]s unreasonable because the theory that longer sentences deter illegal activity lacks empirical support.'" *Arroyo*, 75 F.4th at 708 (quoting *United States v. Hatch*, 909 F.3d 872, 876 (7th Cir. 2018)); *see United States v. Oregon*, 58 F.4th 298, 303 (7th Cir. 2023) (district court properly noted that "general deterrence requires looking beyond the defendant to see how a sentence would impact others considering committing the same offense").

In addition, Morales's social science arguments should not be considered because Congress and the Sentencing Commission are specifically tasked with synthesizing the empirical data and hearing the conflicting social science data. In 2014, the Sentencing Commission amended the drug quantity tables after it

7

> heard expert testimony from the Executive Branch, including the Attorney General and the Director of the Federal Bureau of Prisons, defense practitioners, state and local law enforcement, and interested community representatives. The Commission also received substantial written public comment, including from the Federal judiciary, members of Congress, academicians, community organizations, law enforcement groups, and individual members of the public.

*See* https://www.ussc.gov/guidelines/amendment/782 (last visited March 12, 2024).

Defendant's arguments are better aimed at policy makers like Congress and the Sentencing Commission, given the conflicting viewpoints and data on these issues. Judge St. Eve recognized this in the sentencing hearing of defendant's brother, Darius Morales, who also had a lengthy criminal history. Judge St. Eve told Darius Morales:

> Your lawyer has also raised some arguments about deterrence from a lengthy sentence and the fact that the social science literature doesn't support that a lengthy sentence imposes deterrence. And I have read that social science literature. I agree with what Judge Chang said, that this relevance applies more to policy-makers than to picking individual sentences. But significantly here that argument might have more strength if you were here for your first time appearing in the criminal justice system and didn't have any kind of prior convictions or any kind of prior sentences. But given that your prior sentences have not deterred you from going out and engaging in this activity, the social science research does not seem particularly relevant to the Court in this case.

Ex. 1 at 59-60. Judge St. Eve was referred to a sentencing transcript that the government cited from another case, in which Judge Chang evaluated the limitations of the social science literature and concluded: "I have no doubt that if it became known that the federal judges in the Northern District of Illinois were giving slaps on the wrist for drug crimes that drug crimes would increase" and "I do have to account for general deterrence." Ex. 2 at 42 (Tr. 75:7-11).

8

Likewise, Morales's previous sentence of 84 months did not adequately deter Morales and Santana from engaging in this crime. A dramatically higher sentence is necessary to get the attention of those in their position.

### III. SANTANA'S REQUEST FOR MINOR ROLE REDUCTION

Santana argues for a two-level decrease for a minor participant under Guideline § 3B1.2(b), arguing that "Santana served as a translator during phone calls, and kicked a box on a porch." R. 248 at 2.

Guideline § 3B1.2 asks the sentencing court to compare a defendant's role to that of other participants in the criminal activity. Guideline § 3B1.2, comment n.3A. Section 3B1.2 defines a "minimal participant" as a defendant "who plays a part in committing the offense that makes [him] substantially less culpable than the *average participant* in the criminal activity." U.S.S.G. § 3B1.2(b) cmt. n.4 (emphasis added); *United States v. Guzman-Ramirez*, 949 F.3d 1034, 1037 (7th Cir. 2020). A "minor participant" reduction "applies to a defendant described in Application Note 3(A) who is less culpable than most other participants in the criminal activity, but whose role could not be described as minimal." U.S.S.G. § 3B1.2(b) cmt. n.5.

Santana was a trusted partner of Morales who was involved in the charged conspiracy from the beginning. Although he was not needed as a translator when the deals with Omar were being brokered by a Spanish speaking prisoner in Texas, Santana was not merely brought in as a translator. Santana was referenced as getting "a whole one from first thing that we did" in a February 15, 2019 phone call, before the calls with the Texas prisoners started.

9

Aside from the Mexican supplier ("Omar"), defendant played the most prominent role next to Morales based on the phone calls and surveillance. Santana did not merely translate and kick a box. He spoke directly to Omar to make Omar trust him and Morales, then he conspired with Morales about how to rip off Omar through ruses about police seizing packages. GVO at 16-20. Santana talked of plans for the future with Morales. Morales told Santana "we finna go to the moon, bro" and "we're the head, we're the head of Chicago, bro', from their cartel." GVO at 14-15.

Santana also gave advice to Morales about other people involved in his criminal activity. GVO at 19-20. When Morales suspected that the woman who lived at the Davis Street address, where narcotics packages were sent, had "called the feds on me," Santana responded: "she could get touched. There is a lot of fucking bitches out here that need to get touched so, [U/I] that's what we need a goon, goon bitch in the squad that she gonna do whatever the fuck is necessary." *Id*. at 20. Officer Geyer testified that he interpreted Santana's use of "squad" to refer to "their narcotics trafficking organization." Tr. 284:9-10.

IV. **CONCLUSION**

For these reasons, the government requests that the Court overrule defendants' objections to the Presentence Investigation Report.

> Respectfully submitted,
>
> MORRIS PASQUAL
> Acting United States Attorney
>
> By: /s/ *Charles W. Mulaney*
> CHARLES W. MULANEY

10

Assistant United States Attorneys
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604