UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

SHELDON MORALES and
EDUARDO SANTANA

No. 19 CR 850

Judge Mary M. Rowland

**GOVERNMENT'S RESPONSE TO
DEFENDANTS' SENTENCING MEMORANDA**

# Exhibit 1

```
 1                 UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3
     UNITED STATES OF AMERICA,        )
 4                                    )
                     Plaintiff,       )
 5                                    )
              vs.                     )  No. 19 CR 874-1
 6                                    )
     DARIUS J. MORALES,               )  Chicago, Illinois
 7                                    )  June 10, 2022
                     Defendant.       )  1:00 p.m.
 8

 9            TRANSCRIPT OF PROCEEDINGS - Sentencing

10          BEFORE THE HONORABLE AMY J. ST. EVE

11
     APPEARANCES:
12
     For the Plaintiff:        UNITED STATES ATTORNEY'S OFFICE
13                             BY:  MR. CHARLES WILLIAM MULANEY III
                               Assistant United States Attorney
14                             219 South Dearborn Street, Fifth Floor
                               Chicago, Illinois  60604
15                             (312) 353-5300

16
     For the Defendant:        BEDI & SINGER, LLP
17                             BY:  MS. DENA M. SINGER
                                    MR. JONATHAN S. BEDI
18                             53 West Jackson Boulevard, Suite 1505
                               Chicago, Illinois  60604
19                             (312) 525-2017

20

21   Also Present:            MS. KATHY KIRIKLAKIS, U.S. Probation

22

23   Official Court Reporter:  NANCY L. BISTANY, CSR, RPR, FCRR
                               219 South Dearborn Street, Room 1706
24                             Chicago, Illinois 60604
                               (312) 435-7626
25                             nancy_bistany@ilnd.uscourts.gov
```

1    (Proceedings heard in open court:)

2            THE COURT:  Good afternoon.

3            THE CLERK:  19 CR 874, USA versus Darius Morales.

4            MR. MULANEY:  Good afternoon.  Charles Mulaney on

5    behalf of the United States.

6            MS. SINGER:  Good afternoon, Your Honor.

7            Dena Singer and Jonathan Bedi on behalf of Darius

8    Morales.

9            THE COURT:  Good afternoon.

10           MR. BEDI:  Good afternoon.

11           MS. KIRIKLAKIS:  Good afternoon, Your Honor.

12           Kathy Kiriklakis, U.S. Probation.

13           THE COURT:  You are here for sentencing today.  Are

14    you ready to proceed?

15           MS. SINGER:  Yes, Your Honor, the defense is ready to

16    proceed.

17           MR. MULANEY:  And yes for the government, Your Honor.

18           THE COURT:  Are you comfortable coming up to the

19    lectern?

20           MS. SINGER:  If you prefer --

21           THE COURT:  That would be my preference, but if you

22    are not comfortable with that, I will certainly respect that.

23    And if the defendant could come up, please, as well.

24           Mr. Morales, have you received the Presentence

25    Investigation Report in this case, sir, and reviewed it with

1    Ms. Singer?

2              THE DEFENDANT:  Yes, ma'am.

3              THE COURT:  And your prior counsel filed objections

4    to it.  Ms. Singer has filed additional objections to it.

5              Have you seen and discussed those objections with

6    Ms. Singer?

7              THE DEFENDANT:  Yes, ma'am.

8              THE COURT:  Other than the issues filed with the

9    Court already on your behalf -- so other than what Ms. Singer

10   has raised and other than what your prior counsel raised -- do

11   you have any other comments, corrections, or objections to the

12   information in the Presentence Investigation Report, sir?

13             THE DEFENDANT:  No, ma'am.

14             THE COURT:  And, Ms. Singer, I have received your

15   submissions, including the letters.

16             Is there anything else in terms of submissions for

17   the Court that you want to -- you want to raise?  I'll hear

18   oral argument on what you have set forth in your materials, but

19   I want to make sure you don't have any other filings.

20             MS. SINGER:  I have no other filings, Your Honor.

21             THE COURT:  Okay.  And same on behalf of the

22   government?

23             MR. MULANEY:  Yes, Your Honor.

24             THE COURT:  And, Mr. Morales, I have the Presentence

25   Investigation Report before me.  Did you have sufficient time

1 | to review this with your lawyer?

2 | THE DEFENDANT:  Yes, ma'am.

3 | THE COURT:  I want to make sure.  And she was able to

4 | answer all of your questions regarding the information in here;

5 | is that correct?

6 | THE DEFENDANT:  Yes, ma'am.

7 | THE COURT:  All right.  So let's turn to the

8 | guideline calculation.

9 | Mr. Mulaney, I did not get any written responses from

10 | you to the guideline calculations.  So I assume you're going to

11 | present them orally this morning to the guideline objections?

12 | MR. MULANEY:  Yes, Your Honor.

13 | THE COURT:  All right.  So there is -- on Count One

14 | there is a base offense level of 24, and there's no objection

15 | to that.  And that is pursuant to 2K2.1(a)(2).

16 | The specific offense characteristic there, the

17 | probation officer is recommending a four-level enhancement

18 | under 2K2.1(b)(6)(B) because the firearm recovered from the

19 | Jeep was brandished and discharged at someone in the alley.

20 | And you have objected to this enhancement,

21 | Ms. Singer.  I have read everything you submitted and prior

22 | counsel did as well.  I will consider all of those arguments as

23 | well.

24 | Is there anything else you would like to add or

25 | elaborate on or reiterate with respect to the 2K2.1(b)(6)(B)

1  objection for using or possessing a firearm or ammunition in

2  connection with another felony?

3              MS. SINGER:  I would, Your Honor.

4              THE COURT:  Okay.  Please, go ahead.

5              MS. SINGER:  As Your Honor referenced, our objection

6  to the enhancement under 2K2.1(b)(6)(B) is laid out in our

7  sentencing memorandum on pages 19, 20, and the majority of page

8  21.

9              The majority of that section does relate back to the

10  jury that was held in this case and our position that there was

11  not sufficient evidence for this enhancement based on the

12  testimony and evidence that was presented at trial.

13              Furthermore, in addition to that, Your Honor -- well,

14  Mr. Morales at this juncture and throughout this case maintains

15  his innocence regarding the possession as well as this

16  shooting.  If Your Honor believes that there is sufficient

17  evidence that was presented, I still object to this

18  enhancement.  Because in order for this enhancement to apply,

19  the Court has to find that it was in connection with another

20  felony.

21              Now, the government in their submission prior to me

22  taking over this case for Mr. Morales, there was -- I think

23  it's docket 121, Your Honor -- if I could have one moment just

24  to be sure of that -- docket 121 was the government's response

25  or the government's kind of sentencing memorandum.

1    THE COURT:  Sentencing memo.

2    MS. SINGER:  They argue in that that the four points

3  should apply because he attempted to kill or cause bodily harm

4  to the intended victim.

5    Now, I understand and as the Court and Mr. Morales

6  understands that in order for this enhancement to apply, the

7  government need not prove it beyond a reasonable doubt.

8    However, in order for this enhancement to apply, they

9  have to allege sufficient proof that it was in connection with

10  another felony.  And that has not been established.  There is

11  contention that it was with an attempt to kill.

12    There's been no evidence, either presented in

13  filings, in written submissions or at the trial that was held,

14  that there was a specific intent to kill somebody.  And as Your

15  Honor is aware, every time a firearm is shot does not lead to

16  the intent to kill, which is a specific intent crime under the

17  State of Illinois.

18    This was not charged as an attempt murder in federal

19  court, and there has not been sufficient evidence that even if

20  Your Honor finds that he shot the gun that it was in connection

21  with another felony.

22    And therefore, based on our submission, we ask that

23  that four points -- and our oral argument that those four

24  points not apply.

25    THE COURT:  Ms. Singer, I certainly understand your

1    argument.  The Presentence Investigation Report has recommended

2    this enhancement because the other felony offense was an

3    aggravated discharge of a firearm.

4             I understand that the government -- what they said in

5    the submission at 121 that was filed on November 15th of last

6    year, and I certainly understand your argument with respect to

7    that, but that's not what probation recommended.

8             I don't know if you have anything else you want to

9    add about the aggravated discharge of a firearm.

10            MS. SINGER:  Well, in terms of aggravated discharge

11   of a firearm, Your Honor, that it's -- the elements of

12   aggravated discharge of a firearm are that you fired a weapon

13   in the direction.  It's often seen in connection with another

14   vehicle or a vehicle that you knew a person was in or that

15   fired in the direction of a person.

16            There's -- and in this case, besides the fact that we

17   do not feel that there has been sufficient evidence that

18   Mr. Morales was the shooter at all, because of that there's no

19   one that testified that he shot at them; and therefore, the agg

20   discharge -- excuse me -- aggravated discharge doesn't apply

21   either for the four-point enhancement.

22            THE COURT:  Thank you, Ms. Singer.

23            Mr. Mulaney.

24            MR. MULANEY:  Yes, Your Honor.  Our position is that

25   either way that the enhancement is satisfied.  Aggravated

1  discharge is satisfied here because the defendant was shooting

2  a gun in the direction of the man in red and black that

3  Mr. Brian O'Malley saw in the alley.  Mr. O'Malley saw the Jeep

4  in the alley.  He saw the passenger door open.  He saw a

5  shooter wearing dark clothing outside the Jeep shooting towards

6  the man in red and black who was running towards that white van

7  where the bullet holes were found.

8          O'Malley looked away, and then Melissa Coward heard

9  shots, and then she saw a man in dark clothing getting into the

10  Jeep.  And we know it was the defendant in that passenger seat,

11  because after he crashed, the Northwestern student, Alan

12  Grampp, saw the -- both the driver and the passenger getting

13  out, and he described them consistent with the surveillance

14  footage that picked them up at the scene.  And he described the

15  driver, Twan Daniels-Robinson -- it turned out to be Twan

16  Daniels-Robinson -- wearing a white jacket coming out of the

17  driver's side, and the passenger-side passenger was wearing

18  dark-colored clothing.

19          We know it was the shooter who was in the passenger

20  seat based on the witnesses in the alley, and it would make

21  sense that the shooter would be the passenger rather than the

22  driver, because when you're pointing and shooting someone and

23  then getting away, usually there's a driver, and there's a

24  shooter.  When you have two people, it makes sense to divide up

25  responsibilities.

1    So on top of that, you have the defendant's DNA and

2    his fingerprint on the gun.  And Mr. Twan Daniels-Robinson was

3    excluded as the DNA contributor and also did not leave a print

4    on the gun.

5    So by a preponderance of the evidence, the defendant

6    was the shooter.  And as the probation office notes, it would

7    be aggravated discharge of a firearm by virtue of the fact that

8    he's shooting a gun in the direction of another individual.

9    THE COURT:  Ms. Singer, do you want to respond at all

10   before I rule?

11   MS. SINGER:  No, Your Honor, nothing further.

12   THE COURT:  I am overruling your objection to the

13   four-level enhancement under 2K2.1(b)(6)(B).  I find that the

14   government has established, based on the trial testimony, by a

15   preponderance of the evidence that Mr. Morales used or

16   possessed the firearm in connection with another felony

17   offense; namely, aggravated discharge of a firearm.

18   I would agree with you, Ms. Singer, that they have

19   not proved that he used it with the specific intent to kill

20   somebody, but it was certainly sufficient to establish

21   aggravated discharge of a firearm.

22   And specifically, the evidence showed that

23   Mr. Morales was the shooter in the alley that day.  It

24   certainly establishes this by a preponderance of the evidence.

25   We heard testimony from Ms. Coward who testified about the

1    gunshots outside of her window.  She saw a person in dark

2    clothing getting into the passenger side of a gray vehicle and

3    driving away towards Simpson Street.  Body cam footage from the

4    Evanston Police Department showed Ms. Coward's window and the

5    line of sight that she could have seen what happened from her

6    window.

7            Mr. O'Malley also testified that he saw a man in dark

8    clothing in a sort of track-like pants, which ultimately that

9    description matched close what Mr. Morales was wearing.  He saw

10   him pointing a gun and shooting it in the direction of somebody

11   dressed in red and black.

12           Detective Sosa also saw a gray Jeep leave the alley

13   and head west on Simpson Street, which is consistent with what

14   Ms. Coward testified to.  He followed the Jeep, caught up with

15   the Jeep after it crashed.

16           Mr. Grampp testified that he lives on the corner

17   where the Jeep crashed, and he observed two men exit that Jeep.

18   And the passenger was wearing dark clothing, and he saw them

19   running away.

20           And the Nest camera footage from Mr. Buchanan's

21   captured both Mr. Morales and Mr. Daniels-Robinson on foot

22   running away, matching the clothing description.

23           And the evidence further showed that the six

24   cartridge casings that were recovered at the scene of the

25   shooter matched the firearm that was recovered from the scene

1   of the Jeep crash, and that firearm had Mr. Morales's

2   fingerprint and DNA on it and did not have Mr. Daniel-

3   Robinson's.

4           For all of those reasons, the evidence shows by a

5   preponderance of the evidence that the four-level enhancement

6   under 2K2.1(b)(6)(B) is appropriate, and the government has met

7   its burden by a preponderance of the evidence.

8           The next enhancement that the defendant has objected

9   to is an enhancement for obstruction of justice.  The probation

10  officer is recommending in the PSR a two-level enhancement for

11  this, and you have objected.  This is for recklessly creating a

12  substantial risk of death or serious bodily injury to another

13  person in the course of fleeing from a law enforcement officer.

14          And, again, Ms. Singer, I have read your thorough

15  submission, read the submission from prior counsel.  But

16  anything you would like to argue, add, reiterate, please go

17  ahead.

18          MS. SINGER:  Your Honor, I think our sentencing memo

19  lays out our objection to this enhancement on pages 16, 17, and

20  portions of 18 of our sentencing memorandum.

21          And just to add to what you just read, based on the

22  fact that probation is also -- is requesting this and that we

23  are objecting to this as well as the government's request for

24  this in that the defendant recklessly created a substantial

25  risk of death or serious bodily injury to another person, as

1    Your Honor just stated, Mr. Morales was the passenger in this
2    vehicle, not the driver.  There is plenty -- there is case law
3    that we have cited to Your Honor that supports the fact that
4    this enhancement should not apply to him.

5             And based on the filing, we would rest on the oral
6    argument and filing regarding this objection to the two-point
7    enhancement.

8             THE COURT:  Mr. Mulaney.

9             MR. MULANEY:  Yes, Your Honor.  So it's our position
10   that the defendant induced this reckless flight from the police
11   by virtue of the shooting, which was set up by the defendant in
12   the alley with the -- with the get-away driver.

13            So after the shooting, he was obviously not going
14   just along for the ride.  He instigated the chase by doing the
15   shooting, jumping in the Jeep.  And not surprisingly, it was at
16   a high rate of speed because gunshots were heard, and a police
17   chase ensued.

18            So in addition to inducing the aided/abetted
19   counseled or commanded it, it's a fair inference that during
20   this car chase, which was at a high rate of speed, including
21   through residential neighbors and which included a near miss at
22   one of the intersections, the defendant was counseling or
23   commanding that the escape continue, because he was the
24   shooter.  He had a gun still in his possession at that point.
25            We cited it in our brief, but the Seventh Circuit in

*United States versus Seals* explained this enhancement applies to a passenger based on the driver's reckless conduct if the District Court specifically finds the passenger was responsible for or brought about the driver's conduct in some way.

And the Seventh Circuit quotes *United States versus Byrd,* which is a Sixth Circuit case from 2012. And in that case, the defendant was the initial get-away driver for a bank robbery. He drove away not at a high rate of speed but later on jumped into a co-defendant's car and fled from the police in the passenger seat. And the Sixth Circuit found that his participation in the bank robbery and the facts of the escape in which he jumped in the passenger seat was, quote, "motivated by a desire to escape." Therefore, one could infer that Mr. Byrd, the defendant, encouraged or supported the driver, Abdul-Jalil's reckless driving. And they relied on the fact that Byrd and the others were attempting to successfully rob a bank, which is a very serious crime, which provided them for motives to take desperate and reckless measures to flee and allude capture. And that was -- that was a bank robbery.

This is a shooting, and this is -- the case here is even more persuasive because shooting a gun in the middle of the afternoon in broad daylight, it's even more likely that a chase is going to ensue.

So I think based on the Seventh Circuit's interpretation of the guideline and its reliance on Byrd and

1  the facts of those case [sic], the guideline was properly

2  applied here.

3              THE COURT:  Is there anything you would like to

4  respond?

5              MS. SINGER:  Yes, Your Honor.

6              There is no proof of what the government just argued,

7  that this was -- that Mr. Morales induces.  There's no

8  statements that they have.  They don't have statements from the

9  co -- Mr. Robinson, the driver, who says, you know, Darius made

10  me do this or Darius told me to drive fast or -- you don't have

11  any statements that support what the government is saying.

12             The mere fact that the car was driven at a high rate

13  of speed does not mean that Mr. Morales induced or procured or

14  aided and abetted Mr. Robinson in doing that.  There has to be

15  more than just the car drove away fast after what -- now

16  they're saying now this shooting.

17             The government is focusing its argument here as well

18  as -- and I will argue this later -- but so much of this on

19  this shooting, Your Honor, for which is -- it's not what he was

20  convicted of.

21             And while these enhancements, again, are not proof

22  beyond a reasonable doubt, what we're talking about here is a

23  922(g).  This enhancement of the two points doesn't apply,

24  because they don't have anything to support that Mr. Morales,

25  you know, forced or told or did anything to Mr. Robinson.

1    Mr. Robinson maybe obstructed justice, but Mr. Morales did not.

2    And we're asking for that not to apply.

3            THE COURT:  I'm going to sustain your objection to

4    the obstruction of justice enhancement and not apply the

5    two-level enhancement under 3C1.2 for recklessly creating a

6    substantial risk of death or serious bodily injury to another

7    person in the course of fleeing from a law enforcement officer.

8            The government has not met its burden of establishing

9    this under our case law by a preponderance of the evidence.  As

10   you note, the defendant was not the driver of the vehicle.

11   Mr. Morales was not the one driving at the high speeds.  There

12   is a large inferential leap there that the evidence here

13   doesn't support that the defendant actually caused or aided and

14   abetted in that conduct.

15           Under *U.S. versus Seals*, there must be some form of

16   direct or active participation in order for this, and the

17   evidence that I listened to and heard and observed at trial

18   does not support that.  So I will sustain that objection.

19           Given that, there is an adjusted offense level of 28.

20   The total offense level here is a 28.  The criminal history

21   category is a V.

22           Ms. Singer, I understand you have argued that under

23   the history and characteristics element of 3553(a) that the

24   Court should not consider his -- all of the arrests and the

25   criminal history points as being as significant as it might

1    indicate.

2           I did not understand that you were objecting to the

3    level -- the criminal history category of V or the calculation

4    of a criminal history category V.  Is that correct?

5           MS. SINGER:  That's correct, Your Honor.  Under

6    the -- under the guidelines, I do believe that he -- that

7    Mr. Morales is a V for the criminal history.  Our argument

8    falls under 3553(a), Judge.

9           THE COURT:  Okay.  That's how I understood it.  I

10   just wanted to make sure.

11          So with an offense level of 28, a criminal history

12   category of V, there is a corresponding guideline range of 130

13   to 162 months in prison.

14          And now I will hear -- again, I have read everything

15   you submitted, but I will hear anything you would like to argue

16   with respect to sentencing, the 3553 factors, anything else.

17          And if you would please -- I'll ask the government

18   this, and I've already read it in your submission.  I didn't

19   see any position from the government.  But Mr. Morales served

20   51 days in state custody.  That looked like it was for this

21   same charge.

22          MR. MULANEY:  That's correct, Your Honor.  I believe

23   the BOP will credit -- credit him for that time.

24          THE COURT:  I don't know that we can count on the BOP

25   crediting him for that time because it was state custody.  So I

1    assume you agree he should get credit for that time?

2          MR. MULANEY:  My understanding of the statute is that

3    if defendant served time for the same offense, even if it's in

4    state custody, he gets credit under the BOP's rules under the

5    statute cited by the defense and that if he does not, he can --

6    he can challenge it through a habeas petition.

7          THE COURT:  Ms. Singer.

8          MS. SINGER:  This has been kind of an ongoing debate,

9    Your Honor.  My hesitation -- obviously, our position is that

10   he should be getting credit for those 51 days.  This was a case

11   that started in state, then the federal government took it.

12         So I don't think there's really a -- well, I don't

13   want to speak for the government, but I don't think there's a

14   dispute of what the sequence of this is.  I just don't like

15   speaking for the BOP and what they do, but this has been an

16   ongoing debate about whether or not the BOP gives credit for

17   that or not.

18         And so I'm hesitant to take any firm position on

19   that, because there has been some kind of ongoing discussions

20   with us.

21         THE COURT:  So -- and we'll get to this later.  I

22   agree he should get credit for those 51 days.  And I've had

23   issues in the past with BOP actually giving credit for state

24   time served on the same charge, so we can talk about that

25   later.  You can address it, and I'll address it when I impose

1    sentence ultimately.  But he should get credit for that, and I

2    want to make sure the sentence imposed reflects that today.

3            Okay.  Ms. Singer, go ahead, please, with respect to

4    sentencing, 3553(a) factors, and anything else you would like

5    to address.

6            MS. SINGER:  Just briefly, Your Honor.  There may be

7    two live witnesses that wanted to speak at his hearing.  Could

8    I just step away for one second just to check?

9            THE COURT:  Please.  Please.

10           MS. SINGER:  Thank you.

11       (Discussion off the record.)

12           MS. SINGER:  I do have -- I do have two family

13   members that would like to speak, Your Honor, at sentencing.

14   Would you like to hear from them now?

15           THE COURT:  Who are they, please?

16           MS. SINGER:  Zipporah Morales, Z-i-p-p-o-r-a-h,

17   Morales, M-o-r-a-l-e-s.

18           THE COURT:  And what is Ms. Morales's relationship to

19   Mr. Morales?

20           MS. SINGER:  His sister, Your Honor.

21           THE COURT:  Okay.

22           MS. SINGER:  And Alpha, A-l-p-h-a, Waller,

23   W-a-l-l-e-r.

24           THE COURT:  What is Ms. Waller's relationship?

25           MS. SINGER:  Cousin, Your Honor.

Case 1:19-cr-00085-DLC Document 256-1 Filed 09/22/24 Page 20 of 71 PageID #: 2375

```
 1              THE COURT:  Okay.  Of course.  Who wants to go first?
 2              MS. SINGER:  Ms. Zipporah Morales.
 3              THE COURT:  Okay.  Ms. Morales, if you would come
 4       forward, and whatever the marshals -- wherever you want
 5       Mr. Morales to stand or sit.  Everybody else can sit if you
 6       want.
 7              Good afternoon, Ms. Morales.
 8              MS. ZIPPORAH MORALES:  Good afternoon, Judge.
 9              THE COURT:  Would you please state your name, ma'am?
10              MS. ZIPPORAH MORALES:  Zipporah Morales.
11              THE COURT:  I understand you're related to
12       Mr. Morales; is that correct?
13              MS. ZIPPORAH MORALES:  Yes.  Yes, ma'am.
14              THE COURT:  He's your brother?
15              MS. ZIPPORAH MORALES:  Yes.
16              THE COURT:  Older brother?
17              MS. ZIPPORAH MORALES:  My younger brother, but he's
18       my older brother.
19              THE COURT:  I understand you'd like to address the
20       Court this afternoon, ma'am?
21              MS. ZIPPORAH MORALES:  Yes, ma'am.
22              THE COURT:  Please, go ahead.
23              MS. ZIPPORAH MORALES:  I just wanted to say, today I
24       want to give you a little history on Darius and us.
25              We come from a family of ten, five girls, five boys,
```

1  same mother, same father.  So as you know, our house was kind

2  of hectic.

3         Darius took on a lot within his life span.  When I

4  say a lot, from growing up being a burn victim, he dealt with a

5  lot in and out of the hospitals and everything like that.

6         As Darius got older, Darius took on -- when I say a

7  lot, he was a kid -- even though he was bullied, he was one of

8  those that still gave back, and he did a lot for the community.

9  He did a lot for anybody that he seen was in situations like

10  him with the bullying or anything.

11         I have friends that I know that were in serious

12  situations to where my brother stepped up.  He helped them,

13  whether it was financially, giving them a place to stay.  He

14  would take the shirt off his back.  A person could be out on

15  the streets homeless, not have anything, Darius make sure they

16  eat, give them a place to bathe, to do anything.

17         When it comes to my parents, that's -- when I say

18  Darius -- you would have thought he was older than a lot of us.

19  He took that leap and took the major responsibilities when it

20  came to my dad and my mother's health.  Unfortunately, he

21  wasn't able to be out when my mother passed, so that was a big

22  thing, a big burden on our family, because he was one of the

23  main supporters that we had to do a lot of things financially

24  to make sure that both of our parents' situations were handled.

25         As a father figure with a lot of the kids, it's not

1   just Uncle D.  They -- a lot of our kids looked up to him as a
2   father figure to them.  If their dad wasn't around or anything
3   like that, his kids, well, well mannered.  He did everything.
4   Make sure school activities, anything, Darius was there for
5   them.  He never missed a beat.

6       And when I say -- my mother called him her teddy
7   bear, because even though he looks so hard core on the outside,
8   he's soft as a bear.  He has -- he's just genuine in all
9   aspects, ma'am.  And when I tell you -- I don't want to get
10  emotional, but --

11      THE COURT:  Take your time.

12      MS. ZIPPORAH MORALES:  -- it's just he's definitely a
13  good person.  And, you know, I want you to just look at that
14  and hear what I'm saying.

15      And there's nothing scripted or anything.  This is
16  who my brother is really.  He's definitely a genuine person,
17  and I just hope that he's able to be able to come home and be
18  around the family and give his kids the love and the support
19  that they need, because they're definitely missing their dad.
20  We're definitely missing our brother.

21      THE COURT:  So, Ms. Morales, let me ask you a
22  question if I could, please.

23      One of the factors that the Court looks to when
24  sentencing somebody is danger to the community.

25      MS. ZIPPORAH MORALES:  Yes, ma'am.

1   THE COURT:  And your brother has quite a lengthy
2   criminal history --
3   MS. ZIPPORAH MORALES:  Okay.
4   THE COURT:  -- which concerns me, because somebody
5   with a lengthy criminal history who has been in jail before and
6   has gotten out and goes back and commits more crimes, there's a
7   suggestion there that person is going to recidivate and be a
8   danger to the community.
9   In terms of structure or what role family may play
10  when he's released -- he's certainly going to serve a prison
11  term --
12  MS. ZIPPORAH MORALES:  Yes, ma'am.
13  THE COURT:  -- but when he's released, what can you
14  tell the Court to give me some kind of comfort that I'm not
15  going to see him again?
16  MS. ZIPPORAH MORALES:  Well, I'm definitely -- I made
17  sure -- me and my niece, my sisters and them as well, I've been
18  building a business that can help to maintain my brother to
19  where when he comes home, he doesn't have to worry about trying
20  to find a job.  I have something that's legit, like, going
21  forward.  I have a grand opening tomorrow.
22  So this is my main thing, to make sure that my
23  brothers and them are on the right path -- that my brother is
24  on the right path.
25  THE COURT:  What type of business?

1    MS. ZIPPORAH MORALES:  I have a massage parlor.

2    THE COURT:  Okay.

3    MS. ZIPPORAH MORALES:  So that's -- this is just one

4    of many that I want to, you know, have.

5    So I'm going to make sure, me as his older sister,

6    that he's going to be on the right path.  I'm going to make

7    sure of that, and I promise myself that.  And to my mother,

8    that's -- I have to look out for my brother.  And that's why

9    I'm trying to build this brand so that there's nothing out

10   here, you know, that can steer him in the wrong path, because

11   he'll have this path to look forward to.

12   THE COURT:  Okay.  Thank you, Ms. Morales.

13   MS. ZIPPORAH MORALES:  Thank you.

14   THE COURT:  Anything else?

15   MS. ZIPPORAH MORALES:  That's all.

16   THE COURT:  Good luck with the opening tomorrow.

17   MS. ZIPPORAH MORALES:  Thank you.

18   THE COURT:  Ms. Waller is our next witness?

19   MS. SINGER:  Ms. Waller.

20   THE COURT:  Good afternoon, Ms. Waller.

21   MS. ALPHA MARIE WALLER:  Hello, Your Honor.

22   THE COURT:  Would you please state your full name,

23   ma'am?

24   MS. ALPHA MARIE WALLER:  Alpha Marie Waller.

25   THE COURT:  What is your relationship to Mr. Morales?

1    MS. ALPHA MARIE WALLER:  I'm his first cousin.

2    THE COURT:  And I understand you'd like to address

3    the Court this afternoon?

4    MS. ALPHA MARIE WALLER:  Yes.  I don't know who all

5    got to read the letter.

6    THE COURT:  I have read everything that was submitted

7    to me.

8    MS. ALPHA MARIE WALLER:  So I am addressing the

9    courtroom or just you?

10   THE COURT:  You could address whoever you would like.

11   I am imposing sentence today, but you can say anything you

12   would like to in court today.

13   MS. ALPHA MARIE WALLER:  Okay.  So as far as knowing

14   him, I actually met him when he was about three or four years

15   old.  And that's because his mother was very protective in how

16   she raised him, and how she raised him is how he actually

17   implements how he raises his children as well and how he takes

18   care of family.

19   He is a family person.  I know that everybody that

20   came to the court today as far as family can vouch and say that

21   he has touched their life in some way.  He has touched mine.

22   I was a missionary for 15 years in the United States,

23   religious missionary.  Okay?  And there were things that I

24   would do.  I would still talk to him in my missionary work, and

25   he would -- I would say, he always listened.  He always

1    listened and acknowledged the things that were right and what

2    was wrong.

3           And very helpful as a young child, and as I wrote in

4    the letter, that's a -- from what I understand what his mother

5    and I discussed and what she has told me is this is why he has

6    the scars that he has today is because he was trying to be

7    helpful, always a helpful person.

8           As far as the children are concerned, I could be

9    repeating myself, but very involved even with -- my daughter is

10   his cousin, but she calls him Uncle Darius.

11          So I'm just saying he's very close.  He's a person to

12   talk to.  Everybody can talk to him easily.  Yeah, so we love

13   him.

14          THE COURT:  I can tell.  Thank you.  Is there

15   anything else you would like to say?

16          MS. ALPHA MARIE WALLER:  That we just want him to

17   come home.

18          THE COURT:  Okay.  Thank you, Ms. Waller.

19          MS. ALPHA MARIE WALLER:  Okay.

20          THE COURT:  So, Ms. Singer, I will hear anything you

21   have to say --

22          MS. SINGER:  Thank you, Your Honor.

23          THE COURT:  -- with respect to sentencing, 3553(a) or

24   anything else.

25          MS. SINGER:  Thank you, Your Honor.

1    I would ask, obviously, that Your Honor consider our

2  written submission as well as the exhibits that were attached

3  in letters as well as certificates that Mr. Morales provided.

4    There was medical records that we also provided to

5  the Court -- I believe we filed those under seal only because

6  they were medical records --

7    THE COURT:  I understand.

8    MS. SINGER:  -- which support our argument, our

9  position as well as lay out the history of Darius's serious and

10  really quite unfortunate kind of -- not kind of -- incident

11  that happened when he was young.

12    And Darius said this to probation and has said it to

13  me several times, which is, as a child it's not something any

14  child asks for when something that tragic happens.  It's not

15  something that any child should have to go through.

16    The fire that occurred in Darius's home, well, he was

17  young, and it has affected his entire life, and it still

18  affects him.  The way he is treated, the way he is seen by

19  other people in the community, by other people that just see

20  him, the first thing they see are Darius's scars, and it is

21  quite often that he is judged strictly based on that.

22    The medical records support that this was not just a

23  one-time hospital visit.  Mr. Morales was in and out of the

24  hospital for various skin grafts, some serious surgeries.  And

25  it was really important to Darius that I do what I can to get

1  those medical records for the Court, so the Court could take
2  that into consideration and see that. And it is nothing that
3  any person, let alone any child, should have to go through.

4  As you heard from his sister, he is one of several
5  children. His mother passed away while he was in custody. And
6  not only was that hard on the family, which his sister alluded
7  to, it was extremely difficult for Darius. Darius did not get
8  to say good-bye. Darius did not get to see her.

9  And, yes, as the government often likes to point out,
10  that it is because he is in custody, and if he didn't make the
11  choices he did that he would have been out for his mother's
12  funeral. However, as Your Honor -- or his mother's passing.

13  However, as Your Honor is aware -- and I'm going to
14  address this, because the government kind of highlighted this
15  in their response to the sentencing memorandum that I filed --
16  Darius does maintain his innocence, and he does maintain that
17  the jury, while respectful of their decision and respectful of
18  the Court, he does maintain his innocence. And he has the
19  right to do that. And disagreeing with the government and
20  disagreeing is a cornerstone of our -- of this system, of
21  having the right to go to trial and having the right to have a
22  jury.

23  And, of course, he's already being -- it's already
24  being accounted for that he did that because he does not get
25  three points for any sort of acceptance of responsibility. But

1    he has the right to maintain that, and that does not mean that
2    he can't, as the government argues, be deterred.

3          As Your Honor is aware, there are many people that go
4    through the criminal justice system that exercise their right
5    to trial and exercise their right to challenge the government,
6    and years later they're actually found to be correct and that
7    there was something that happened and proves their innocence.

8          And I only raise that, Your Honor, because the
9    government in their submission in response to my filing argued
10   that because -- in essence, that because Darius still maintains
11   his innocence that he should somehow be -- that that 10 year,
12   the maximum penalty for this charge, is the appropriate
13   sentence.

14         There are many factors, as Your Honor knows, that you
15   have to take into consideration when sentencing Darius.  It is
16   not just deterrence.  It is not whether or not he takes
17   responsibility, because that's already been factored in.

18         Darius's history and characteristics, his family that
19   you've heard from, his children who adore him, who he talks to
20   and tries to support, his daughter -- his young daughter who
21   has struggled with him being in custody, and these are all
22   factors that the Court has to consider.

23         Yes, Darius feels -- and we -- and we lay this out in
24   our sentencing memorandum for the Court -- that he has in many
25   ways -- not only has he had a hard life but been targeted for

1    various reasons by members of police.

2          And the government took issue, I guess, with us -- us

3    raising this, but it is something for Your Honor to see, that

4    there are many traffic stops, traffic stops that end up with no

5    charges or that end up in an arrest that are then eventually

6    dismissed in state court or charges that are brought and then

7    dismissed.

8          These are -- this is part of Darius's life.  This is

9    part of who and how Darius sees that things are not always as

10   they are.  But that does not mean that Darius does not take

11   responsibility for things that he has done, and Darius will

12   address some of that when he -- which he wants to and will

13   address the Court.

14         Under the -- under 3553(a), Judge, we have laid out

15   many reasons for Your Honor in our written submission,

16   hearing -- the letters, hearing from family today, that -- and

17   sometimes, Judge, there -- you know, there's -- we go through

18   sentencing where there's no family that can come.

19         And Darius does have support.  And Your Honor asked a

20   really important question to his sister, which was:  What is

21   the structure?  How can I kind of know, as much as I can, as

22   much as anyone can know, that someone is not going to come back

23   in front of me?

24         But looking just at Darius's past or looking just at

25   what the PSR lays out regarding his criminal history or the

1    stuff doesn't indicate to the Court enough.

2        Darius is not a young man anymore.  Darius is older.
3    He has now been in custody for many years fighting this case
4    through difficult times, watching his children have even more
5    difficulty.

6        So to just look at someone's past is not enough.  I
7    understand the Court is going to consider criminal history.  I
8    understand that the Court has to, but the Court also needs to
9    consider where Darius is now.

10        His sister has established that, you know, Darius can
11    have a job with her upon his release.  Darius has his own hopes
12    and dreams, too.  It's wonderful that -- and I -- and we all
13    hope that Darius has this kind of system or structure set up
14    when he is released.

15        But Darius has his own hopes and dreams which do not
16    involve coming back to this criminal justice system.  And as
17    Your Honor is aware, no one can predict what's going to happen
18    in the future, and no one -- there are no for-sure guarantees.

19        Darius standing here right now is not the same person
20    as he was when he went in and not the same person he was in
21    that background that the PSR lays out.

22        And based on all that, Your Honor, we are asking for
23    a reasonable sentence.  The maximum sentence in this case
24    doesn't -- it is far greater than is necessary.  And just
25    because he went to trial doesn't mean he should get the maximum

1    sentence, and we ask that you consider everything that we've
2    said.

3                THE COURT:  Thank you, Ms. Singer.

4                Mr. Mulaney, on behalf of the government.

5                MR. MULANEY:  Yes, Your Honor.  So under the new
6    calculation of 130 to 162 months' imprisonment under the
7    guidelines, which is reduced to 120 based on the statutory max,
8    defendant still is well above the statutory maximum under his
9    sentencing guidelines.  And that should be taken into
10   consideration.  120 months is the guideline sentence, but the
11   guidelines calculations well overshoots that because of the
12   significant aggravation in this case.

13               And as Your Honor has already found, defendant was
14   shooting a firearm in the direction of another person.  And
15   even if we give him the benefit of the doubt and say that he
16   just intended to scare this person and was pointing it in his
17   direction but intending to miss, that is still a very serious
18   crime in which there is an intended victim.

19               And defendant's history and characteristics don't
20   give us adequate assurance that this was a one-time incident
21   and that we don't have to be worried about it again in terms of
22   protecting the public.

23               He's been in and out of the criminal justice system
24   over the past 15 to 20 years.  He's 32 years old now, I
25   believe, and he's been involved in criminal activity since he

1    was teenager, and it's sad that he was first getting arrested

2    at the age of 12.  And it's extremely tragic the severe burns

3    he suffered as a child and not only all the treatment but the

4    effect on his appearance and how that impacts his life.  We

5    have no dispute that that's tragic and that is mitigating.

6          But in light of all this history, it has to be taken

7    under consideration the interventions of the juvenile court

8    system and adult programs like boot camp didn't lead him to

9    correct his behavior.

10         So it would be one thing if defendant's tragic

11   background led him to make a mistake, and we now know that he's

12   going to -- he learned his lesson, and he wants to correct his

13   behavior.  I don't think we can be assured of that in this

14   situation at all.

15         It's also not adequate for general deterrence to give

16   him a below-guidelines sentence.  That shooting in the alley

17   was brazen.  It was in broad daylight.

18         We do not know what the defendant's beef was with

19   the -- with the intended victim.  And I say "victim" again,

20   because being shot at is victimizing, whether he meant to miss

21   or meant to hit him.  Defendant seemed to -- intended to send a

22   message to that intended victim and others.

23         And the sentence should also send a message that

24   defendant is not going to get a break on his conduct despite

25   the significant mitigation and despite his loving family, which

1    you've heard from.

2          So the government recommends a sentence of 120

3    months, which is the guideline sentence in this case.

4          THE COURT:  Thank you, Mr. Mulaney.

5          Ms. Singer, do you want to respond to anything before

6    I hear from Mr. Morales?

7          MS. SINGER:  No, Your Honor.

8          THE COURT:  Is there anything you would like to say

9    to the Court this afternoon, sir?

10         THE DEFENDANT:  Your Honor, I want to say -- it's a

11   lot of things that I want to say.

12         The first thing --

13         THE COURT:  Take your time.

14         THE DEFENDANT:  The first thing that I'm going to say

15   is, Your Honor, I'm not perfect.  I come from a struggle.  I

16   never had nothing.  Growing up, my mom struggled.  My parents

17   struggled.  My family struggled.  I (indecipherable).  I was

18   the oldest kid.  I had to piss and poop in the bucket because

19   my house was shut down because of my older brother.  He didn't

20   know what I went through.  Don't nobody know what I went

21   through.

22         I didn't want this life.  I didn't want a lot of

23   stuff that came my way.  It was unavoidable situations that

24   came on.  I'm not perfect.  I'm not perfect.  I'm not saying.

25         But the thing about me is when we sit in this court

1 | and I -- in the back, because I know that I've made -- I've
2 | been around (indecipherable), but, Your Honor, growing up --
3 |          MS. SINGER:  Don't yell.
4 |          THE DEFENDANT:  -- growing up, all I want was genuine
5 | love.
6 |          When we -- it's like when you in a relationship when
7 | you want something, you look for thing, you look for people,
8 | you look for what you never know.  I'm always the one giving.
9 | I never got.  I never had nobody give me nothing.  My family
10 | telling you I never had nobody.
11 |          I sat in this cell for two-and-a-half years.  I've
12 | been looking at my kids, the difficult -- everything, because I
13 | just giving, giving, giving, running, running, running.  All my
14 | life I've been running, running, running, running, running,
15 | running, running, running.  I've been running from the -- I've
16 | been running trying to get away from all the pain, all the
17 | stuff that's hurting inside of me.  I'm hurting.
18 |          You sit there and tell me -- you saying something
19 | about -- well, what about the stuff that's been done to me,
20 | too?  What about the stuff with the police?  There's a lot of
21 | things that been done that just -- I like trying -- they're
22 | just trying to say, like, okay, I been arrested by the police,
23 | but it's not because of me that the police knew about certain
24 | thing.  It's stuff that happen that I never bring up.  It's
25 | recordings.  It's things that's -- that's out there about these

1    officers that are happening and, like, y'all trying to hide,

2    like just not trying to fail and see what --

3                 MS. SINGER:  Slow down.  Slow down.

4                 THE DEFENDANT:  -- what the -- what's the big going

5    on.

6                 MS. SINGER:  Slow down.  Slow down.

7                 THE DEFENDANT:  And because I just trying not to run,

8    because I -- man, listen to me.  I -- man, Your Honor, it's --

9                 MS. SINGER:  Hold on.  Hold on.  Hold on.  Slow down,

10   because the court reporter -- slow down.  Take your time.

11   Okay?  She's not rushing you.  Just slow down, Darius.  Okay?

12                THE DEFENDANT:  Your Honor, I standing in front of

13   you, and I tell you it's from the bottom of my heart, I'm not

14   perfect.  I made mistakes in my life.  I agree I've been around

15   some people that I shouldn't have been around, but it wasn't,

16   like, my choice of being around them then, like, oh, I'm going

17   to be around these people.

18                This is the only people I knew.  I didn't have -- and

19   I don't have -- I don't have -- I only had my family.  These

20   are the only people I know.  This is what -- this is -- this is

21   (indiscernible) -- that's not like trying to be all -- I'm

22   trying to be -- it's like if I'm arrest and I'm guilty by

23   association or something like -- like, oh, oh, oh, he this.

24   He's around here (indiscernible).

25                But, like, no, this is not what it is.  It's --

1    it's -- it's -- it's not what's being put out here and saying,

2    like, oh, Darius is this (indiscernible) person.  No, I'm not.

3          I'm a loving person.  I always tried to be.  Yes,

4    I -- yes, that -- I didn't -- I didn't want -- I didn't

5    chose -- like, I didn't choose to get brought up.  That's not a

6    life that I want.  Who want to go through this?  I didn't want

7    to go through this.  I don't want -- I don't want to see my

8    kid -- my daughter and talk about killing herself three times.

9          I'm terribly sorry.  Like, I don't know what I be

10   like -- you be saying coming in -- be coming back to jail.

11   Like my kids alone make me never come back to jail.  Like the

12   stuff that I deal like -- my sister here right now, but I got

13   my other sister with my kids.  It's, like, what my kids been

14   forced to be with her and what's been going on with them, like

15   it make me, like, some day, like, I don't want to wake up

16   because it's so stressful and what I got to see them go

17   through.

18         I don't want my -- I was 20 years old.  I was -- I

19   was -- I was -- I was running.  I was somewhere I didn't know.

20         THE COURT:  Mr. Morales, can I ask you just to slow

21   down a tiny bit --

22         THE DEFENDANT:  I'm sorry.  I'm sorry, Your Honor.

23   I'm sorry.

24         THE COURT:  We've got -- I'll stay here as long as

25   you want.  We've got a lot of time but --

1          THE DEFENDANT:  I apologize.  I apologize --

2          THE COURT:  Wait, wait, wait.  Let me just -- Nancy

3     is taking down everything you say, and she's an awesome court

4     reporter, but you're talking so fast --

5          THE DEFENDANT:  I apologize.

6          THE COURT:  -- it's really hard for her to get

7     everything.

8          I will listen to you, whatever you have to say.  But

9     if you're going so fast, you're making her job three times as

10    hard.  And I want to make sure we have a record of everything

11    that you have said, and you want to make sure we have a record

12    of everything you have said.

13         So if you could just slow down a little bit.  I'll

14    listen to anything you want to say this afternoon.  We have

15    lots of time.

16         THE DEFENDANT:  Your Honor --

17         THE COURT:  Just slow down a little bit, please.

18         THE WITNESS:  I apologize.  I apologize.  But it's

19    just --

20         THE COURT:  I know you have a lot to say, but we've

21    got plenty of time.

22         THE DEFENDANT:  I'm just -- because when I see it and

23    I see it -- like I say, it's all speculation.  People look at

24    you, and they judge you and say, oh, you're just this type.

25    But, no, I'm not.

1         It's just getting to what my lawyer said about

2  traffic stops.  It's a lot of things that come -- my family was

3  known before I was even -- before I was even ever, ever caught

4  a arrest.

5         It's not -- this is not something that -- this was --

6  this is, like, things that was going on with my family, when my

7  house got boarded up, when I had to forced to be live with my

8  father at my aunt house, and she got us locked down in the

9  basement, you can't -- how could you think (indecipherable).

10  For years I'm going through so much stuff for years on out and

11  trying to find a way out, to make sure my mom don't end up in

12  the situation, to make sure my mom not getting beat like -- you

13  don't -- you don't -- you don't know, like, I deal with so much

14  stuff for so many years I been -- yes, I ended up being around

15  Twan, yes, but because who was there to help me?  Who was ever

16  there to help me?  Who was there to -- some of these people

17  that I -- that didn't look past my scars and looked in and

18  judged me and then cut jokes against me, didn't -- you know how

19  hurtful that is inside?  Do you know how hurtful it is inside?

20         I went through a lot of pain through my life.  It's

21  hurtful, and it puts me in -- being in places that it's not

22  that I -- that I want to or -- and I realize that, hey, you

23  know, I only -- and then I sit down, and I've been locked up.

24  And I really know I did it before because I just always been

25  going.  When I'm out I got to look back at my mom.  She did

1    this, this happen, this going on, this going on, all been

2    dealing with.  Everybody has a problem.  I've never been able

3    even to fix my own problem all my life.

4          Now my kids and stuff without me, now they is, dad,

5    when you coming home?  Dad, I just want to die.  My mom and

6    granny dead.  My mom is dead.

7          You know how hurt that inside, as a father that it

8    hurt me inside to got to go through that and think in my head,

9    like, you know, tomorrow -- what if tomorrow my mom died?  What

10   if tomorrow -- one day they call and my daughter, something

11   happened with my kids, something happened to them?

12         I don't want this for my life.  You saying -- you

13   saying it take -- no, it don't -- it don't take long for them,

14   because when you -- sometimes it take me -- you sit down, and

15   you really see the picture.  I never got the time to really

16   seriously look at nothing, because I always been running.  I

17   been running.  I been running from all the pain inside.  This

18   is pain.  This is pain.  This is not -- this is not a good

19   feeling.  It's not a food feeling.

20         You don't know the stuff that I been through.  And

21   yet I sit here, and I watch how the -- they trying to

22   (indecipherable), but it's a lot of things that I don't -- that

23   I don't put -- they don't put.  Now just with me, with officers

24   what they done done, the stuff they forced me for years.  Like,

25   come on, man, we not -- ain't nobody in this world perfect.

1    You try to -- while I'm getting bashed, like, I'm

2    just -- like I'm acting like I'm just somebody.  Like I'm this

3    cruel person.  I'm somebody bad or I'm somebody -- no, I'm not.

4    I'm a good, loving-hearted person.  I'm not that type of

5    person, Your Honor.  I'm not that type of person.

6    I agree with you.  I agree that I been around -- I

7    agree that I been around the wrong places at the wrong time at

8    times maybe in my lifetime.  I'm not this (indecipherable).  I

9    agree that maybe -- maybe I made bad decisions that you don't

10   (indecipherable) being around or whatever in my life.  I'm not.

11   I'm not.

12   I'm telling you -- I'm telling you like -- but, like,

13   what you think you'll lock me away for 10 years, lock me away

14   from my kids going to do?  Like (indecipherable) you know, the

15   thing -- I've been in jail.  I was trying to stay away from

16   (indecipherable) and the stuff you got to deal with inside of

17   here and -- and -- and -- and the thing you forced to do when

18   you got to go to the jails and what's happening.  Like, y'all

19   from the outside looking -- looking inside.

20   This still -- this still a BO people, this tear you

21   down even more (indecipherable).  How much you want to tear me

22   down?  How much do you really want to tear me down?  I'm

23   already tore down.  I'm not going to lie.  I'm tore down.  I

24   been going through this -- I've been going through this for a

25   long time.  I'm tore -- I'm tired.  I'm tired of fighting.  I'm

1    tired of the system.  I'm tired of everything.  I don't know
2    what else you want -- I throw my hands up.  I'm tired.  I don't
3    want to fight no more.  I don't want to -- I don't want to do
4    nothing wrong no more.  I don't -- I don't want get into
5    nothing.  I don't want to nothing -- I want to live and be with
6    my kids and take care of my kids.  I want to get my kids and
7    show them the right -- that I was trying to show them and do
8    the right thing.

9         I'm tired.  I'm hurt.  They hurt.  My son, he
10   autistic.  He can't even talk.  You know how bad it hurt me
11   right here to look at him, and he can't tell you he five years
12   old.  His mom, she doesn't even take care of him.  She putting
13   him on somebody else.  That hurt me inside (indecipherable).
14   That hurt me inside.  I never did (indecipherable) make sure
15   everything, everything emotional -- I do everything for my
16   kids.  They don't got nothing.

17        My sister here, yeah, she does try to help.  Okay.
18   But my other sisters, they don't.  Don't nobody help me.  They
19   don't.  I see them going down the same path if something were
20   to happening to them.  I'm pleading to you.  I'm not here
21   because -- I'm just here trying to get off for less
22   (indecipherable), get on and tell you (indecipherable).  This
23   is more than I just (indecipherable).  This is
24   (indecipherable) --

25        THE COURT:  Mr. Morales, Mr. Morales, can you just

1   slow down a little bit, sir?

2          THE DEFENDANT:  Your Honor, this is heading my kids

3   more problems and get (indecipherable), and I'm telling you

4   honest to God truth.

5          My brothers is in out and of jail all my life.  They

6   been in out (indecipherable) jail.  (Indecipherable) to my

7   brothers being in and out of jail.  My father, he was gone

8   living his life.  I watched him whoop my mom.  I watched him do

9   all type of crazy stuff.  Me and him fell out at an early age.

10  I didn't have no father, because my father was in and out of my

11  life.

12         Yeah, at times he showed, but once we kind of broke

13  the bond and he whooped me the way he whooped me, the time he

14  whooped me like -- we never really had a relationship for many

15  years.

16         Me and my kids, we got a strong bond and

17  relationship.  I try to make sure that my kids never suffered

18  the way that me -- that I suffered growing up as a kid.

19         My kids is now suffering.  They got to -- I got to

20  call, and they got to go in rooms and whisper to tell -- I got

21  to tell it like it is because this is what's going on.  This is

22  the hurt.

23         THE COURT:  Just slow down a little bit, please.  I

24  told you, we'll take -- I have got all afternoon.

25         THE DEFENDANT:  Your Honor, I'm telling you, I'm not

1   no bad person.  I swear to you I don't care -- if you want to
2   put me in a program and you wanted to help -- I'm telling you
3   my -- I'm asking for -- I'm telling you, I'm not that type of
4   person.

5               It's -- it's -- it's -- it's -- it's -- I'm never --
6   any judge in this state know if I've been wrong, I always said
7   it.  That's why they dismiss case.  If I'm wrong about
8   something or something, I'm -- I made mistakes in my life.  I'm
9   not perfect.  I've been misguided.  I've been -- I've been
10  let -- when you -- when you -- when you -- when you running,
11  running, running so long, sometimes you run into -- you run
12  into a brick wall, so you not even conscious of what's going on
13  no more because you just -- you just really trying to get rid
14  of all of the problems.

15              I've been running with problems all my life.  I've
16  been running with problems.  I've been running with problems.
17  I'm tired.  I'm tired.

18              What you -- if they want to do this, they kill me,
19  whatever.  I'm tired because it's not gonna -- it's not -- me
20  doing any time, taking away from my kids and letting my kids
21  suffer the way they suffer or let them look the way -- it's not
22  going to do that.  The only thing that's going to do is to kill
23  me.  I'm tired.  I don't know what else to (indecipherable).  I
24  plead and tell you, I swear my hand to Jesus God, I'm tired.

25              I lost my mom in here.  The closest person -- there

1 | was only me and my -- it was never -- I've always been the
2 | older, the bigger brother, the oldest sibling through
3 | everything that's going on. I never had a bigger brother.

4 | One of my brother's smoking crack. My other
5 | brother's in jail living. I never had nobody. This is what I
6 | was faced with. I never had nobody.

7 | And my -- (indecipherable) my dad, he didn't give me
8 | that type of -- he didn't give me that type of -- he didn't
9 | give that. He doesn't treated me that way, but I still loved
10 | him. I still loved him, but I never had that.

11 | I give my kids what I never had. I give them what I
12 | never had. I got my son, he's suffering right there. He's
13 | suffering. He's suffering. His mom -- through my fault, my
14 | other kids (indecipherable) suffering. You know what I'm
15 | saying? I'm telling you, they suffering. They
16 | (indecipherable) and my daughter, they suffering. My kids is
17 | suffering. They suffering without me. You know what I'm
18 | saying?

19 | I am whatever (indecipherable) personal. You got to
20 | listen to me. I'll tell you to do. It's the government,
21 | everybody, all you all, me and my brother -- me and my brother
22 | nothing. We gonna set this straight today.

23 | I don't even care. Right now I love my family
24 | because that's how we was raised. But me and my family, we
25 | don't have -- me and my sister and the tie -- me and my

1  brother, we don't have those type of ties, so that need to

2  stop.  You know what I'm saying?  Because we know what's going

3  on.  You know what's going on.  I know what's going on.  And it

4  got to stop.

5          You don't know the pain.  You don't know what I've

6  been done through with my family.  You don't know the stuff

7  that's really been going on or what happened just because I

8  don't say nothing.  But I'm saying it right now.  It got --

9  it's -- it's -- I'm not -- I'm not -- I'm not -- my life is on

10  a whole nother lane right now.  I'm on a whole nother -- I'm in

11  a whole nother atmosphere.  My focus is in -- with my kids and

12  my life and literally getting on with them.  That's the only

13  thing that matters.

14          Going on the -- doing onto each other, the best I've

15  done so much for my community through my years.  I've done so

16  much for foundation.  I've done so much for the kids, with

17  every kids, because what I've been through, the pain that I've

18  been through.

19          I'm telling you, I'm in pain.  I'm telling you the

20  truth.  It's what I've been through.  That's why I do so much.

21          I don't want it.  Your Honor, I'm just asking you --

22  I'm just asking you, please.  I'm just asking you.

23          I'm -- I'm -- I'm -- I'm a human being, Your Honor.

24  I made mistakes in my life.  I'm sorry.  You know what I'm

25  saying?  But that's not my life.  That's not my -- that's my

1  kids' life.  It's more like my daughters and my son, they're

2  teenagers.  They getting older -- they getting older now.

3  You know, this is -- this is beyond everything.  This

4  is -- this is what hurt.  They getting -- they -- they -- they

5  living -- they living in terrible situations right now.  Like

6  they -- honest to God truth, as much as my sister help so much,

7  my other sister, I assign her temporary custody because I was

8  in here but not figuring the stuff that she was doing, so much

9  damage that she was doing because her kids was there and were,

10  but it's a lot of damage to my kids.  And she don't even let

11  them now -- right now allow them to bring my kids -- to bring

12  them to court.  She didn't allow them to bring them to court to

13  see me.  I haven't seen my kids in two -- because she's so --

14  because how -- how -- how (indecipherable) she is, the fact

15  that I don't call because it's too much tension they keep on.

16  I'm just asking -- Your Honor, I'm just telling you

17  like -- I'm -- I'm -- I'm telling you from a -- from -- from --

18  from a parent, from a man, from a child that been through so

19  much that I'm tired.  I'm really tired.  I'm tired.  I want to

20  do what I want to -- my kids, I want to take care of my kids.

21  I want to get (indecipherable).

22  My son, to be -- to be living the way he living, I

23  don't want them to be living the way -- I don't want them to

24  end up in the street.  I don't want them to end up dead, so I

25  don't want them to end up with no gun.  I don't want them end

Case 1:19-cr-00854-D Document # 256-1 Filed 09/22/24 Page 48 of 71 PageID #: 2493

1    up doing none of that.  I don't want that.

2          Like, I'm being honest and tell you -- I'm telling

3    you like this (indecipherable) -- you got to -- I've been in

4    here sick.  I've been swelling up my legs.  I'm been swelling

5    up in here.  I can't walk.

6          So I'm dealing with the pressure in my mind.  I'm

7    dealing with the stuff with my kids.  I'm dealing with all

8    this.  Who would want to ever feel and go through the type of

9    situation again where I want to hear you sitting there and you

10   going through what you going through, everything just has been

11   through your mind?  It's flushing through your head, and then

12   you got to hear and talk about your child, your only daughter,

13   talking about she want to kill herself, she want to take her

14   life.  Like, that's not a thought that a kid at 12 years old

15   should be feeling -- 13 years old should be feeling.  They

16   shouldn't be feeling that way.

17         They should be feeling love.  They should be feeling

18   genuine love and care and support as a kid.  That's not there.

19   It's not there.  They're not feeling that.  They're not getting

20   that.

21         They sitting here and thinking about, like, if

22   tomorrow, what's gonna be next?  What's they gonna have to do

23   to get to where they gonna have to get to or do what they got

24   to do?  I don't want them thinking that type of way.  I don't

25   want my sons thinking that way.  My sons is boys.  I don't want

1  them thinking like, well, if this happen or I got to take care

2  of myself or I got to do something wrong maybe into the street

3  or end up being around -- these kids is into -- involved with

4  music and everything they hear, basically think what's in the

5  culture right now, (indecipherable) that's cool.  And that can

6  lead to problems that, you know, can never come

7  (indecipherable) to these same type of problems.  And I don't

8  want that.

9  I'm telling you, my right hand to Jesus Christ, I

10  don't want that.  I'm not -- I'm not the person -- the person

11  that I came here two-and-a-half years ago, I'm not that person.

12  My right hand to Jesus, I'm not that person.

13  Every day I get up 6:00 in the morning, and I go to

14  work just so I don't be in no type of mischief, no type of

15  nothing.  I go -- every single day I go to work.  The people

16  there, they love me inside the jail.  They know I'm very

17  helpful to people all the time.

18  Like, Your Honor, I'm not that -- I just -- I'm -- I

19  don't know how much to plead.  I'm trying to do right and take

20  care of my kids and get back and do the right thing.  I'm not

21  that type of person.

22  I lost a lot in these two-and-a-half years.  I've --

23  I've sat down with all the struggles and the pains and

24  everything else that I went through myself and on top of what

25  they going through, and I'm telling you, I'm not that person.

1    I'm not.  I'm honestly telling you, I'm not that person, Your

2    Honor, and I'm asking you, please.

3              THE COURT:  Mr. Morales, what's your plan when you're

4    released?

5              THE DEFENDANT:  My plan is -- obviously is to get

6    involved with the youth, because I'm seeing all the stuff

7    that's going on with these kids and these carjackings and stuff

8    like that.  And it's like -- and even if you call to the jail,

9    you ask them, I send emails to them awhile back to try to start

10   programs while I was in there.  But, you know, they didn't do

11   it because for the youth that's coming in, 18, 19, that been

12   indicted with carjackings and stuff like that, because I'm

13   looking.  And they're really robbing you.  Like I'm seeing the

14   kids, like, 12, 13 years old, and they was in there.

15             And I'm, like, man, you know, like, man, this is --

16   I'm just -- that's why it really even hurt me even more.  Like,

17   this is my son maybe.  What if he go to -- supposed to be at

18   basketball or do something, and one day he with one of these

19   kids or he with one of them -- and this happen to him, and they

20   go on a joy ride or something happen?

21             And, you know, I don't want that to happen.  I want

22   to -- I want to get back to -- I want to, you know, be on

23   something else for -- for -- for my community, for the kids,

24   you know, so they don't go through this.  Show them my life and

25   what I went through, the pain that I had to suffer that they

1  don't got to suffer and go through, that somebody love them and
2  give them, you know, some of the stuff that I never had.
3          You know, I'm -- I'm telling Your Honor -- my right
4  hand to Jesus Christ, I'm telling you, you give me this
5  opportunity, I'm going to show Your Honor -- I promise you I'm
6  going to show you the type of person that I really am.  And I'm
7  going to show you what I'm going to do for the community, Your
8  Honor.  I'm just -- I'm asking you, please.
9          THE COURT:  Thank you, Mr. Morales.
10         Is there anything else you would like to say, sir?
11         THE DEFENDANT:  No, Your Honor.
12         THE COURT:  Thank you.
13         MS. SINGER:  Oh, the pictures?
14         THE DEFENDANT:  Right there.
15         MS. SINGER:  Your Honor, there was -- there was one
16  other thing.  Mr. Morales had a few pictures of the family that
17  he was hoping that I could just pass --
18         THE COURT:  Sure.  Just hand them up to Claire,
19  please.
20         MS. SINGER:  Sure.  Thanks, Claire.  Sorry.
21         THE COURT:  Thank you.
22         MS. SINGER:  Thank you, Your Honor.
23         THE COURT:  Mr. Mulaney, you saw these?  Did you see
24  these?
25         MR. MULANEY:  Yes, Your Honor.

1        THE COURT:  Thank you.  I'll hand them --

2        MS. SINGER:  Thank you.

3        THE COURT:  Claire, would you --

4        THE CLERK:  Sorry.

5        THE COURT:  Before we turn to the 3553(a) factors, I

6   would like to turn to the conditions of supervised release,

7   please.

8        You have objected to two specific conditions,

9   Ms. Singer?

10       MS. SINGER:  Yes, Your Honor, that's accurate.

11       THE COURT:  I have to say I'm a little surprised you

12  have objected to No. 9, participating in a mental health

13  treatment program at the direction of the probation officer.

14       MS. SINGER:  That's --

15       THE COURT:  Are you still standing on that objection?

16       MS. SINGER:  No.  Your Honor, Mr. Morales would

17  welcome any assistance that he could get in terms of that.  I

18  just was asking if there could be -- we just want it to be,

19  like, kind of narrowly tailored in terms of what he needs and

20  the assistance that he would need.

21       Mr. Morales is open to any assistance, though, that

22  the Court would be willing to give him.

23       THE COURT:  So this condition is, he shall

24  participate at the direction of a probation officer.

25       So the probation officer will make an assessment if

1  he should get any kind of mental health treatment, and then

2  it's up to the mental health provider to determine what that

3  might be.

4  I don't think anybody in the courtroom is in a

5  position to say what that treatment program might look like

6  unless you have --

7  MS. SINGER:  No, no.

8  THE COURT:  -- a specialty that I don't know about.

9  And you may.  But the mental health treatment provider is in

10  the best position to determine what that treatment is.  And

11  based on everything in the record and what I've seen, I think

12  Mr. Morales could benefit from that.

13  MS. SINGER:  Of course, Your Honor.

14  THE COURT:  And you've made some other arguments

15  that -- with respect to mitigation factors that seem a little

16  bit inconsistent with that, so --

17  MS. SINGER:  Judge, we can -- it was as a -- it was

18  just to make sure that it was narrowly tailored enough for him.

19  We can -- we can withdraw that.

20  As I mentioned, you know, he's open to any treatment

21  as long as -- and we just wanted to make sure that it was

22  appropriate for him.  I understand the Court's position, and I

23  agree that the mental health provider is actually in the better

24  position to do that, so I can withdraw that.

25  THE COURT:  Okay.  So I'll note that objection --

1          MS. SINGER:  Thank you.

2          THE COURT:  -- to No. 9 is withdrawn.

3          And the condition will be as it's proposed.  But,

4    again, the probation officer is the one who will decide should

5    he participate in such a program, but it's the mental health

6    treatment provider who determines what that program is.

7          MS. SINGER:  Thank you.

8          THE COURT:  And that's the person who will be in the

9    best situation to make that determination.

10         MS. SINGER:  Yes, Your Honor.

11         THE COURT:  And your other objection was to condition

12   No. 23 --

13         MS. SINGER:  Yes, Your Honor.

14         THE COURT:  -- the one that you shall submit your

15   person, property, house, residence, vehicle, papers, et cetera,

16   to a search conducted by probation officers.

17         MS. SINGER:  I am still objecting to that, Your

18   Honor.

19         This condition No. 23 I have seen now several -- it

20   seems newer that the probation department seems to be asking

21   for this on many -- in many situations now.  The search

22   indicates in the bracketed portion, computers, other electronic

23   communications, data storage devices, or media.

24         And there is another condition of supervised release

25   that allows probation to, you know, seize things if it sees

1    someone -- something in somebody's home or residence or work.

2            This particular condition -- discretionary condition

3    No. 23 seems to really not have any nexus, especially the

4    computers or electronic communications or data storage devices.

5            So I would either ask that that not apply or that be

6    limited.

7            THE COURT:  Mr. Mulaney, this seems incredibly broad.

8    This is a newer condition.  I have not --

9            MR. MULANEY:  Yes, Your Honor.

10           THE COURT:  -- seen this one coming up.  I have --

11           MR. MULANEY:  I believe it has been recently -- yeah,

12   the wording is more recent to the form.

13           Our position is that in this case it is appropriate.

14   It does apply a reasonable suspicion standard, and it says that

15   the search must be conducted in a reasonable time and in a

16   reasonable manner.

17           THE COURT:  What possible relevance could searching

18   his computer have?  This is a possession charge.

19           MS. KIRIKLAKIS:  Your Honor --

20           THE COURT:  There does have to be a nexus.  I don't

21   see a possible relevance.

22           Yes?

23           MS. KIRIKLAKIS:  Your Honor, we often recommend it

24   now in firearms cases.  Mr. Morales does have a prior firearms

25   conviction.  And people do put pictures on social media, so

1    that's one thing that we think about.

2          The Court can always strike the electronic media,

3    computers, but there is the concern with the prior conviction

4    for a firearms offense.  And there is a procedure by which we

5    follow to do searches.  It's not just an officer deciding, hey,

6    I'm going to do a search.  There is a process.

7          THE COURT:  Ms. Singer, what exactly was it that you

8    were recommending striking?  Electronic communications or data

9    storage or -- what was your proposal?

10         MS. SINGER:  I would propose the -- one moment,

11   Judge.  Let me pull up the exact language from the PSR.

12         I mean, it's the bracketed portion, Your Honor,

13   that --

14         THE COURT:  It's paragraph 23.

15         MS. SINGER:  Yeah, that --

16         THE COURT:  Computers, electronics.

17         MS. SINGER:  So I would propose the bracketed, which

18   is computers, other electronic communications, data storage

19   devices, or media.

20         The papers -- I'm not really sure how this particular

21   paragraph 23 is drafted.  I don't know if papers is separate

22   from that or inclusive of that, but I would suggest striking

23   the bracketed portion, Your Honor.

24         THE COURT:  Okay.  I'm going to sustain that, because

25   this seems very broad.  And a lot of social media, you can just

1    go on yourself and find.  So I will sustain that aspect and
2    strike that portion.
3                MS. SINGER:  Those were our only objections, Judge.
4                THE COURT:  Okay.
5                MS. KIRIKLAKIS:  Your Honor, just to clarify, you're
6    imposing a condition that's striking the language?
7                THE COURT:  Correct, striking the bracketed language
8    as requested.
9                MS. KIRIKLAKIS:  Okay.  Thank you.
10               THE COURT:  And one more question.  Forfeiture, the
11   Court did enter the preliminary order of forfeiture.  Are you
12   seeking a final order of forfeiture today or not yet?
13               MR. MULANEY:  No, Your Honor, although we requested
14   the preliminary order of forfeiture be attached to the
15   judgment.  And I have spoken to the special agent -- Task Force
16   Officer Mike Geyer, who was in charge of the case, and he's
17   agreed that we will not destroy the firearm until the appeal is
18   resolved.
19               THE COURT:  So the preliminary order of forfeiture
20   will become part of the J&C in the case.
21               Mr. Morales, in sentencing you the Court looks to the
22   factors in Section 3553(a).  And the sentence the Court is
23   going to impose will be sufficient but not greater than
24   necessary to comply with the purposes behind those factors.
25               The first factor is the nature and circumstances of

1    the offense.  This is a serious offense.  You are a felon.  You
2    cannot possess a firearm.  You possessed a firearm.  It was
3    loaded.

4              As I have indicated, by a preponderance of the
5    evidence, the government has established that you shot the gun.
6    Your fingerprints were on it.  Your DNA was on it.  I heard all
7    of the evidence here.  This is a very serious offense.

8              The next factor is the history and characteristics of
9    the defendant.  In reading through everything, Mr. Morales,
10   it's clear you went through a very tragic event as a child with
11   the burning and something, as your lawyer said, that no child
12   should ever go through, no person should ever have to go
13   through.  And I am sure that that has had a significant impact
14   on you.  I have no doubt that has impacted you, not just
15   physically but has had mental impact as well, as your lawyer
16   has argued.  And I am certainly going to consider that in
17   imposing the sentence in this case.

18             You have -- as noted in the courtroom, you have very
19   strong family support and a lot of people here who care for you
20   and care for your well-being.  That is clear.  I will take the
21   comments of Ms. Morales and Ms. Waller into consideration in
22   sentencing you and certainly the family support and structure
23   that you have in the courtroom, which is helpful to see,
24   because when you're released, having that structure, support is
25   good for you.

1    Although the number of arrests, I agree, as you

2    indicated, Ms. Singer, they are just arrests.  I certainly

3    can't ignore the criminal history here.  You have a lengthy

4    criminal history, Mr. Morales, that is troubling to the Court,

5    especially in light of some of the convictions that you have

6    and the dangerous nature of some of the convictions that you

7    have.

8    And while you have every right to maintain your

9    innocence and have the right to appeal, which I will tell you

10   about at the end of this, I do have some concern that I have

11   not heard any acceptance of responsibility for your conduct or

12   remorse for the conduct.  But I understand you have a right to

13   maintain your innocence and certainly will not hold that

14   against you.

15   From everything I can see, you are a good father and

16   a good brother and a good son, and you care for your family,

17   and you want to take care of them.  I am -- I have had many

18   defendants come before me who have been sentenced who have

19   nobody in the courtroom for them.  And when I see the support

20   coming for you in the courtroom here, I have to shake my head a

21   bit and think, how did you get yourself in this position and

22   how have you gone back and continued to go out and commit

23   additional crimes?

24   Your criminal history concerns me and the fact that

25   you have served other criminal sentences, and it has not

1  deterred you from going back out and engaging in additional

2  criminal conduct and conduct with a firearm.  That is troubling

3  to the Court, because I worry that the same thing could happen

4  again, that you could recidivate based on your history and what

5  you have done in the past.

6          I am also considering the arguments that have been

7  submitted.  You no doubt had a tough childhood, Mr. Morales,

8  and have been through a hard time as a child and trying to

9  protect your siblings and living in conditions that children

10  shouldn't have to live in.

11          Your lawyer has argued that you have been targeted by

12  the Evanston Police Department.  I am not putting any weight on

13  that factor.  I have not seen any evidence that you have been

14  targeted by the Evanston Police Department.  And several of

15  your convictions here came from other jurisdictions, not

16  Evanston, from Lincolnwood and Chicago, which -- well, I will

17  leave it at that.  I am not considering that factor as any type

18  of a mitigating factor here.

19          Your lawyer has also raised some arguments about

20  deterrence from a lengthy sentence and the fact that the social

21  science literature doesn't support that a lengthy sentence

22  imposes deterrence.  And I have read that social science

23  literature.  I agree with what Judge Chang said, that this

24  relevance applies more to policy-makers than to picking

25  individual sentences.  But significantly here that argument

1 might have more strength if you were here for your first time

2 appearing in the criminal justice system and didn't have any

3 kind of prior convictions or any kind of prior sentences. But

4 given that your prior sentences have not deterred you from

5 going out and engaging in this activity, the social science

6 research does not seem particularly relevant to the Court in

7 this case.

8            I have also considered the argument with respect to

9 the conditions of your confinement and the additional

10 challenges COVID has brought to you and being incarcerated

11 during COVID.

12            I understand COVID has brought additional challenges

13 for everybody who is incarcerated. I haven't seen any evidence

14 here and you haven't put forth any that the conditions were

15 extraordinarily harsh or unusually harsh, but I understand the

16 argument that you are making about it.

17            I will and my sentence that I am going to impose will

18 reflect credit for the 51 days you served in state time. So I

19 am going to lower -- I am actually going to lower your sentence

20 by about 60 days from what I would impose to give you credit

21 for that state time. And the J&C will reflect that I have

22 already given you credit for state time.

23            It has been my experience that if I simply make a

24 recommendation and do not do the calculation and give the

25 credit myself, that defendants don't always get that credit

1  from BOP and that you end up back in here asking for the Court

2  to do something additional that may or may not work.

3          So the cleanest thing and the most certain route is

4  for me to give that departure up-front to you, and that's what

5  I am going to do -- or not departure but to give you that

6  credit up-front, and the Court's sentence will reflect that.

7          The sentence the Court is going to impose will also

8  reflect the seriousness of the offense, which is a serious

9  offense, promote respect for the law, and provide just

10  punishment for the offense.  It will afford adequate deterrence

11  to criminal conduct.  It is -- as I have said, your prior terms

12  of incarceration have not deterred you from going out and

13  engaging in additional conduct, and I am mindful of that and

14  also mindful of the general deterrence that the sentence can

15  have.

16          It will also protect the public from further crimes

17  by you.  That is a relevant factor to the Court, Mr. Morales.

18  I hope what you have said to me is correct.  I hope you meant

19  it when you said you were tired of this and you get --

20          THE DEFENDANT:  I am.  I'm sorry.

21          THE COURT:  I hope you meant that and that you take

22  advantage of all of this family support that you have in this

23  courtroom, and when you're released you get yourself on a

24  straight-and-narrow path.

25          You are at a fork in the road.  You are a relatively

1   young man, but you are old enough to know better.  So when you

2   are released from this sentence, you can go one path or you can

3   go another path.  And I hope you don't take the path that

4   brings you back before the Court again.  The choice is yours,

5   and it will be up to you.  You are an intelligent man.  I hope

6   for your sake as well as for your kids' sake that you decide to

7   take the right path and the right fork.

8           Your time at incarceration, hopefully you will take

9   advantage of educational opportunities that are offered to you

10  and vocational opportunities that are offered to you,

11  Mr. Morales, so that when you are released from prison that you

12  will have those skills and that education that you can put to

13  productive use and to good use, again, both for yourself and

14  for your family members.

15          Before I impose the amount of time, I want to

16  review -- just go back through the conditions.  Were there any

17  other objections to any conditions of confinement?

18          MS. SINGER:  No, Your Honor.

19          THE COURT:  Okay.  I've addressed all of your

20  objections?

21          MS. SINGER:  Yes.

22          THE COURT:  And have I addressed all of your

23  arguments in mitigation, Ms. Singer?  Is there anything else

24  that you would like me to address?  Is there anything else you

25  would like me to elaborate on that you don't feel like I have

1  sufficiently addressed?

2       MS. SINGER:  No, Your Honor.

3       THE COURT:  Again, I have tried to address all of

4  your arguments in mitigation, but if there's something else you

5  want me to add more to or address sufficiently if you don't

6  think I have, I am happy to do it.

7       MS. SINGER:  No, Your Honor.  Nothing further.

8       THE COURT:  Okay.  Thank you.

9       So for all of those reasons, again, the sentence the

10 Court is going to impose will be sufficient but not greater

11 than necessary to comply with the purposes that I have just

12 reviewed.  And this sentence, again, does give you the credit

13 for the time that was served in state custody.

14      Pursuant to the Sentencing Reform Act of 1984, it is

15 the judgment of this Court, Mr. Morales, that you are hereby

16 committed to the custody of the Bureau of Prisons to be

17 imprisoned for a term of 94 months on Count One.  You must pay

18 a special assessment of $100.  Any fine is hereby waived.

19      Upon your release from imprisonment, you shall be

20 placed on supervised release for a term of three years on Count

21 One.  Within 72 hours of your release from the custody of the

22 Bureau of Prisons, you shall report in person to the probation

23 office in the district to which you are released.

24      While on supervised release, you shall comply with

25 the mandatory, discretionary, and special conditions that I am

1   about to review with you.

2          You shall not commit another federal, state, or local

3   crime.  You shall not unlawfully possess a controlled

4   substance.  You shall cooperate in the collection of a DNA

5   sample if such a collection is required by law.

6          You shall refrain from any unlawful use of a

7   controlled substance and submit to one drug test within 15 days

8   of release on supervised release and at least two periodic

9   tests thereafter up to 104 periodic tests for use of a

10  controlled substance during each year of supervised release.

11         You shall provide financial support to any dependents

12  if you are financially able to do so.

13         You shall seek and work conscientiously at lawful

14  employment, or if you are not gainfully employed, you shall

15  pursue conscientiously a course of study or vocational training

16  that will equip you for employment.

17         You shall not knowingly meet or communicate with any

18  person whom you know to be engaged or planning to be engaged in

19  criminal activity and shall not knowingly meet or communicate

20  with Twan Daniels-Robinson.

21         You said yourself you've been hanging around with the

22  wrong people, so you should not knowingly, as I just said,

23  communicate with anybody along these lines.

24         You shall refrain from any excessive use of alcohol,

25  which is defined as having a blood alcohol concentrate of

1     greater than .08 percent, or from any use of a narcotic drug or

2     other controlled substance, as defined by Section 102 of the

3     Controlled Substances Act, without a prescription by a licensed

4     medical practitioner.

5                You shall not possess a firearm, destructive device,

6     or dangerous weapon.

7                You shall participate at the direction of a probation

8     officer in a mental health treatment program and shall take any

9     medications prescribed by the mental health treatment provider.

10               You shall not knowingly leave from the federal

11    judicial district where you are being supervised unless granted

12    permission to leave by the Court or a probation officer.

13               The geographic area of the Northern District of

14    Illinois currently consists of the Illinois counties of Cook,

15    DuPage, Grundy, Kane, Kendall, Lake, LaSalle, Will, Boone,

16    Carroll, DeKalb, Jo Daviess, Lee, McHenry, Ogle, Stephenson,

17    Whiteside, and Winnebago.

18               You shall report to the probation office in the

19    federal judicial district to which you are released within 72

20    hours of your release from imprisonment.

21               You shall thereafter report to a probation officer at

22    reasonable times as directed by the Court or the probation

23    officer.

24               You shall permit a probation officer to visit you at

25    any reasonable time, at home, work, school, a community service

1    location, other reasonable location specified by your probation

2    officer.  And you shall permit confiscation of any contraband

3    in plain view of the probation officer.

4            You shall notify your probation officer within 72

5    hours after becoming aware of any change in your residence,

6    employer, or workplace and absent constitutional or other legal

7    privilege, answer inquiries by a probation officer.

8            You shall answer truthfully any inquiries by a

9    probation officer subject to any constitutional or other legal

10    privilege.

11            You shall notify your probation officer within 72

12    hours if -- after being arrested, charged with a crime, or

13    questioned by a law enforcement officer.

14            You shall satisfy other special conditions, including

15    you shall submit your person, property, house, residence,

16    vehicle, papers to a search conducted by the United States

17    Probation Office or officer.  Failure to submit to a search may

18    be grounds for revocation of release.  You shall warn other

19    occupants that the premises may be subject to searches pursuant

20    to this condition.

21            An officer may conduct a search pursuant to this

22    condition only when reasonable suspicion exists that you have

23    violated a condition of your supervision and that the areas to

24    be searched contain evidence of this violation.  Any search

25    must be conducted at a reasonable time and in a reasonable

1   manner.

2          In addition, if you have not obtained your high

3   school diploma or equivalent, you shall participate in a

4   general educational development or GED preparation course and

5   seek to obtain a GED within the first year of your supervision.

6          I strongly encourage you, Mr. Morales, that while you

7   are incarcerated, if you don't have your GED, to take the

8   courses while you are incarcerated.  You will have the time.

9   They have excellent programs for this and get your GED before

10  you leave incarceration.  It will help you with jobs.  It will

11  help you with a lot of things.  It will be a good role model

12  for your kids.

13         You shall participate in an approved job-skill

14  training program at the direction of a probation officer within

15  the first 60 days of placement on supervision.  You shall, if

16  unemployed after the first 60 days of supervision or if

17  unemployed for 60 days after termination or layoff from

18  employment, perform at least 20 hours of community service per

19  week at the direction of and in the discretion of the U.S.

20  Probation Office until gainfully employed.  The amount of

21  community service shall not exceed 250 hours per year.

22         You shall not enter into any agreement to act as an

23  informer or special agent of a law enforcement agency without

24  the permission of the Court.

25         I will, as I said, make the preliminary order of

1    forfeiture part of the J&C in this case.

2            And before I advise Mr. Morales of his right to

3    appeal, is there anything else for the Court or -- there aren't

4    additional counts.  Is there anything else for the Court?

5            Any recommendation of a place to serve his time?

6    Would you like as close to Chicago as possible so he can be

7    near his family?

8        (Discussion off the record between Ms. Singer and the

9        defendant.)

10           MS. SINGER:  Judge, can I have one moment?

11           THE COURT:  Yes, you may.

12       (Discussion off the record between Ms. Singer and the

13       defendant.)

14           MS. SINGER:  Yes, Judge, a recommendation as close to

15   Chicago.

16           THE COURT:  Okay.  I will recommend that you serve

17   your time as close to Chicago as possible so that you can be

18   near your family and your children.  All I can do is recommend.

19   It will be up to the Bureau of Prisons to determine where you

20   serve that time, but I will recommend it.

21           Is there anything else from the government before I

22   advise him of his appellate rights?

23           MR. MULANEY:  Nothing further, Your Honor.

24           THE COURT:  And nothing else, Ms. Singer?

25           MS. SINGER:  No, Your Honor.

| | |
|---|---|
| 1 | THE COURT:  Mr. Morales, you have the right to appeal |
| 2 | both your conviction and your sentence in this case.  If you |
| 3 | wish to do so, you have 14 days to file a notice of appeal, and |
| 4 | you could speak with Ms. Singer about how to go about doing |
| 5 | that. |
| 6 | I have given you somewhat of a break here today, |
| 7 | Mr. Morales.  I wish you the best of luck.  I hope I don't see |
| 8 | you here again.  Again, I hope what you have told me, that you |
| 9 | really mean.  And look around.  I hope for the members in this |
| 10 | courtroom who have come today to support you that you really |
| 11 | mean that and that you carry that out. |
| 12 | THE DEFENDANT:  Yes, ma'am. |
| 13 | THE COURT:  Good luck to you, sir. |
| 14 | MS. SINGER:  Thank you, Your Honor. |
| 15 | THE CLERK:  All rise. |
| 16 | (Proceedings concluded.) |

C E R T I F I C A T E

          I, Nancy L. Bistany, certify that the foregoing is a
complete, true, and accurate transcript, to the best of my
ability, from the record of proceedings on June 10, 2022,
before the HON. AMY J. ST. EVE in the above-entitled matter.


/s/ Nancy L. Bistany, CSR, RPR, FCRR          July 29, 2022
          Official Court Reporter             Date
          United States District Court
          Northern District of Illinois
          Eastern Division