UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

SHELDON MORALES and
EDUARDO SANTANA

No. 19 CR 850

Judge Mary M. Rowland

**GOVERNMENT'S RESPONSE TO
DEFENDANTS' SENTENCING MEMORANDA**

# Exhibit 2

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3   UNITED STATES OF AMERICA,        )
                                      )
 4              Plaintiff,            )
                                      )
 5              v.                    )   No. 18 CR 00835
                                      )
 6   ANEES USMANI,                    )   Chicago, Illinois
                                      )   September 30, 2020
 7              Defendant.            )   3:00 p.m.

 8         TRANSCRIPT OF PROCEEDINGS - Sentencing hearing
              BEFORE THE HONORABLE EDMOND E. CHANG
 9
     APPEARANCES:
10
     For the Plaintiff:        HON. JOHN R. LAUSCH, JR.
11                             United States Attorney
                               BY:  MR. RAJNATH P. LAUD
12                             Assistant United States Attorney
                               219 South Dearborn Street, Suite 500
13                             Chicago, Illinois 60604
                               (312) 353-5300
14                             rajnath.laud@usdoj.gov

15   For the Defendant:        PISSETZKY LAW
                               BY:  MR. GAL PISSETZKY
16                             35 East Wacker Drive, Suite 1980
                               Chicago, Illinois 60601
17                             (847)736-7756
                               gal@pissetzkylaw.com
18
     ALSO PRESENT:             MS. REBECCA FOWLIE,
19                             United States Probation Office

20   ALSO PRESENT TELEPHONICALLY:

21                             MS. KATHY KIRIKLAKIS,
                               United States Probation Office
22
     Court Reporter:        Judith A. Walsh, CSR, RDR, F/CRR
23                          Official Court Reporter
                            219 South Dearborn Street, Room 2118
24                          Chicago, Illinois 60604
                            (312) 702-8865
25                          judith_walsh@ilnd.uscourts.gov
```

1        THE COURT:  All right.  And then Mr. Pissetzky?

2        MR. PISSETZKY:  Yes, Judge.

3        THE COURT:  All right.  On the criminal history

4  category, I don't think there was any objection there.  And

5  the 2001 -- I'm sorry.  Let's just go over the ones that

6  picked up points.

7        So possession of 15 grams or more of cocaine picked

8  up one point.  The 2017 delivery of cocaine picked up one

9  point.  And then two points are added because he was on

10  probation for the 2017 delivery at the time of this offense.

11  So that's four points.  That's criminal history category III.

12  So the advice of the guidelines is 87 to 108 months.

13        Okay.  Let's hear 3553 factors from the government

14  first.

15        MR. LAUD:  Yes, your Honor.  I suppose I need to

16  start by adjusting my recommendation in light of your Honor's

17  findings.  And while I think a sentence within the previously

18  called-for guideline range would be the right sentence, I

19  think it would actually represent a substantial variance from

20  the advisory guidelines sentence your Honor has calculated.

21        So in light of that, I'm going to suggest that your

22  Honor impose a sentence of 120 months which is the sentence

23  that is recommended by the probation officer because I think,

24  you know, that would only be modestly above the guideline

25  range that your Honor has calculated.  And I don't think I'm

1  in a position to ask for a substantially above-guidelines

2  sentence.

3          THE COURT:  Yes, although the probation officer

4  recommendation was also in light of the --

5          MR. LAUD:  No, I agree, your Honor.  But I think on

6  the substance, we're going to be in a very similar place

7  because -- I'll talk about the offense more generally but, you

8  know, as to which drug trafficking counts as relevant conduct

9  and which does not, at the end of the day there's little doubt

10  that Mr. Usmani has been a very substantial drug dealer for a

11  very long period of time and importantly, a period of time

12  that was interrupted by a state arrest and conviction for an

13  offense as set forth in the PSR, dispatching drivers to make

14  retail cocaine deliveries, very, very similar to the offense

15  that he was convicted of here and which had no impact on his

16  behavior whatsoever.  In fact, as set forth in the sentencing

17  memo and some of the excerpts and the wiretap calls is

18  essentially something that Mr. Usmani mocked.

19          This is a very serious offense.  This is an offense

20  of exploitation.  And Mr. Usmani exploited just about

21  everybody who crossed his path.  The most obvious and most

22  significant are the addicts that he sold the drugs to.  And

23  your Honor has commented before at sentencings on what a

24  staggering quantity of doses this amounts to.  And that's

25  certainly true even of the more cabined drug quantity your

1    Honor found as relevant conduct. And it's certainly true

2    under 3553 when you look at the amount of drug dealing that

3    Mr. Usmani has admitted doing.

4         And I think it's fair for the 3553 factors to look

5    beyond the two-year, the two-year excerpt of 11 kilograms but

6    to look at the entire time period and to look at the fact that

7    Mr. Usmani also admitted that at times, he was selling

8    substantially more drugs than the rate that he was selling at

9    the time he was apprehended for this offense.

10        That represents a staggering quantity of harm to the

11   community. And it's over a very extended period of time,

12   which is aggravating. It's greatly aggravating because this

13   is not a mistake. This is not being the victim of

14   circumstances. This is not something that was done at a, you

15   know, particularly stressful time in Mr. Usmani's life or when

16   he was under particular external pressures.

17        This was done as a way of life to make money and to

18   live a lifestyle that Mr. Usmani was very proud of, whether

19   it's bragging about being the grandfather of drug dealing on a

20   wiretap call or, you know, sitting down -- and I absolutely

21   believe he should get credit for forthrightly acknowledging

22   his drug trafficking in the post-arrest interview, but for

23   laying that all out on the table; whether it's, you know,

24   driving, you know, the Mercedes G wagon, the flashy SUV, or

25   the Mercedes sedan that he bought for his girlfriend, Wesam

1    Fattah, one of the co-defendants in this case; the music

2    videos which were self-aggrandizing in which he, you know,

3    invested substantial proceeds.

4           It was a flashy lifestyle.  It was a lifestyle that

5    Mr. Usmani wanted to live.  And that's why he exploited those

6    drug addicts to whom he was selling drugs.

7           But it wasn't just the addicts.  If you go one step

8    up the chain to the drivers, look at the people that

9    Mr. Usmani used.  And I think "used" is the right word.

10   They're responsible for their own actions.  They've pled

11   guilty.  They received punishment from this court.  They've

12   been sent to prison in many instances or deported from this

13   country, but they were used by Mr. Usmani.  They were used to

14   be on the front lines to be the ones who are far more likely

15   to get arrested.  I mean, this is an investigation that really

16   doesn't lead back to Mr. Usmani unless there is a sustained

17   long-term investigation.  Otherwise, you just see one guy with

18   a relatively small quantity of cocaine making a delivery.  So

19   that insulates Mr. Usmani.  Many of the drivers were without

20   legal status, were not financially well off, were dependent on

21   him.

22          Mr. Usmani exploited, I think it's very clear,

23   Mr. Trotter, a man in poor health as your Honor acknowledged

24   who at times was homeless.  And Mr. Usmani used him to run for

25   a very short period of time but used him to operate that drug

1    trafficking business right out of Mr. Usmani's condo.

2           He used his ex-wife and the mother of his child.  He

3    had her package narcotics for him.  He used Wesam Fattah

4    who -- you know, it's been a while since your Honor had her

5    before the Court but I'll just remind you was a woman who was

6    here without lawful status from Jordan.  Clearly, I think from

7    her statements, they're credible, didn't have any, you know,

8    involvement in drug trafficking before getting to know

9    Mr. Usmani, and he used her to run his business.  He used his

10   own brother, Nafees Usmani, who wound up being prosecuted in

11   this case, to run that business.

12          It was a business of exploitation.  The proceeds

13   overwhelmingly flowed to Mr. Usmani.  And, you know, we will

14   not ever be able to account for every penny, every dime, but I

15   think the government's version in the sentencing memo sets

16   forth where some of the money went, whether it's into

17   vehicles, into properties and, frankly, just in supporting a

18   lifestyle that -- you know, whether it's traveling to go to

19   the all-star weekend or going out to nightclubs, the money

20   gets spent, but the money was going to Mr. Usmani or to the

21   people that Mr. Usmani chose to support.

22          And I will acknowledge that he definitely chose to

23   support his ex-wife, his children, I think his immediate

24   family, his parents and his brother and to some extent as well

25   and, you know, so but it was -- there's no doubt about it, it

 1   was Mr. Usmani's money to do with as he pleased.

 2          It's not an offense that comes from an addiction to

 3   drugs or from this very significant trauma that your Honor had

 4   before you in the case of Mr. Sabih.  It's a grown man,

 5   frankly a middle-aged man who had every reason to know better

 6   who's doing this for self-aggrandizing reasons.  So it's a

 7   very serious, very serious offense.

 8          I want to spend a little bit of time just talking

 9   about Mr. Usmani's history and characteristics.  I think the

10   most significant thing is that that state drug case because

11   that should have been a wakeup call.  I mean, he -- despite

12   being insulated from the consequences of his actions, he was

13   caught.  He was prosecuted and, I mean, he came out of that

14   case very well.  He came out of that case with probation and a

15   chance to, you know, put his life on the right track.  And I

16   think he even came out of it sort of a little bit removed from

17   the lifestyle in that his phone with his customers in it, he

18   had lost control of.  Mr. Cayuela had that.

19          So it wasn't a situation where he was like thrust

20   back immediately into the same lifestyle without, you know,

21   interruption, had no opportunity to reflect, no opportunity to

22   make another conscious choice.  And the conscious choice he

23   made was to rebuild his empire.  That's what he did.

24          And, I mean, there are references to this in the wire

25   affidavits but to customers where he's actually going back and

1    forth, and they're saying, "I can get it cheaper from Tony,"

2    and, you know, he's saying, "Don't mess with Tony, mess with

3    me."  I mean, he's trying to win back those same customers.

4    He's trying to rebuild that business that was disrupted when

5    he was arrested by the State.  That's a very deliberate course

6    of conduct that he engaged in.

7            He has, you know, other significant offenses, be it

8    the residential burglary or a prior cocaine conviction going

9    back to 2008.  He was on probation, like actually under the

10   supervision of the court, while he was engaged in this

11   offense.  So I think that is significant aggravation here.

12           Mr. Usmani is not a United States citizen.  And so I

13   think he may be deported.  As we've discussed at prior

14   sentencings, this is an aggravated felony.  I don't know

15   exactly what the options are for Mr. Usmani who has lived here

16   for -- since high school essentially, so for a long period of

17   time where his family is here.

18           But I think, unlike some of the other cases where

19   your Honor viewed the risk of deportation as a significant

20   additional punishment that would warrant a reduction in

21   sentence, Mr. Usmani is not somebody who there's any reason to

22   believe would be victimized or attacked or any of the other

23   horrible consequences that potentially faced some of the other

24   defendants to come before your Honor for sentencing.

25           So I think that this is not a case where Mr. Usmani's

1    immigration, you know, situation really warrants a reduced

2    sentence.  I mean, he has made his choices.  He's made his

3    choice to engage in this conduct even though it could result

4    in him being deported.  Other members of his family have

5    naturalized.  He did not.  And so this is the position he

6    finds himself in, but I don't think that is a significant

7    factor in mitigation.

8            And regarding the firearm, I thought carefully about

9    what your Honor just said.  And I don't want to go against

10   your Honor's ruling, but I think that vignette, that back and

11   forth with the courier and then the very casual conversation

12   that followed five hours later with Mr. Cayuela, the fact that

13   a firearm was found in the home of a co-conspirator, even if

14   we are not holding Mr. Usmani responsible for that firearm for

15   the purposes of the sentencing guidelines highlights another

16   aspect of the seriousness of this offense which is that drug

17   trafficking on this scale always accompanies the potential for

18   violence.

19           I acknowledge in the sentencing memo and I want to

20   say it out loud again here today, apart from incidents of

21   domestic violence, Mr. Usmani did not use violence as part of

22   this offense, but the risk that comes around when you have

23   people moving large quantities of drugs, when you're dealing

24   with suppliers who move large quantities of drugs, when you're

25   storing large quantities of drugs, there is an attendant risk

1    to society that, you know, is part of why drug trafficking is

2    such a more serious crime than merely the possession of drugs

3    or the use of drugs.  You know, that does carry significant

4    risk.  And I respect your Honor's decision not to impose the

5    guideline enhancement, but I think that the presence of

6    firearms in this case isn't a factor that can be totally

7    ignored either.

8           So your Honor acknowledged, I think, in reaching the

9    drug quantity finding that this is a case where 3553(a)

10   factors could, you know, actually support a sentence in excess

11   of the advisory guideline range as calculated because so much

12   drug quantity, which I don't think there's any serious dispute

13   that the trafficking actually occurred.  I mean, I don't hear

14   Mr. Usmani to be walking back his post-arrest statement.

15          For the reasons I articulated earlier, I think it's a

16   well-corroborated post-arrest statement in terms of whether

17   drug trafficking on the scale that he estimated occurred.  And

18   I understand your Honor's ruling to be more focused on, can we

19   say it's sufficiently tied to this offense to count as

20   relevant conduct.

21          So in light of that, I think going up to a 120-month

22   sentence, which I believe would be the high end of the

23   advisory guideline range immediately above the one your Honor

24   just calculated -- and I'll consult my book again just to be

25   sure.  But we were at -- I'm sorry.  Yes, we are at 87 to 108,

1   so if we go just one level up, Level 28, to 97 to 121, you

2   know, a ten-year sentence, 120 months, would actually be

3   within a guideline range that's just one offense level higher

4   than the guideline range your Honor calculated.  I think a

5   sentence of that -- of 120 months would be perfectly

6   appropriate here.

7           And frankly, I do think, your Honor, it's difficult

8   in light of Mr. Usmani's recidivism, in light of the fact that

9   he was the kingpin in this case, in light of the fact that he

10  bragged about that and engaged in that conduct after having

11  been caught before, I really believe, your Honor, that it

12  would not be appropriate to go below that.  That really, I

13  think as always we're looking for a sentence sufficient but

14  not greater than necessary to meet the 3553(a) factors in this

15  case.

16          THE COURT:  All right.  Thank you.  Just on

17  co-defendant disparity, so that would be doubled basically the

18  highest other sentence because Mr. Dominguez and Mr. Allen, it

19  looks like -- well, Mr. Allen it's a definite, everyone is

20  asking for 60 months at this point.  And Mr. Dominguez,

21  there's some issue that has cropped up, but the government is

22  seeking the 60 months there.

23          So do you think the -- that doubling his is

24  appropriate?

25          MR. LAUD:  Absolutely, your Honor.  Those defendants

1   are, first of all, responsible under the guidelines but also,

2   there's not going to be 3553 aggravation evidence as to a

3   larger drug quantity presented as to those defendants.  So

4   they're, first of all, responsible for a fraction of the drug

5   trafficking.

6        Second, each of those defendants operated, you know,

7   on their own or they may have had suppliers of their own, but

8   there's absolutely no evidence that they had workers or an

9   organization underneath them.  Mr. Usmani had a very

10  significant organization underneath him involving, you know,

11  several drivers, sort of the frontline workers, as well as

12  additional people he roped in to perform specific tasks,

13  whether it's assisting with packaging or handing out the drugs

14  or handling the phones at various points in time.

15       And then, you know, the -- I mean, the -- I think

16  there will be evidence introduced as to Mr. Allen that he has

17  from time to time in his life returned to drug trafficking.

18  It is certainly not his first offense, but the evidence that

19  it was a way of life, I mean, Mr. Usmani freely admits that he

20  was deriving significant income.  He was supporting his

21  family.  He was making his music videos.  He was buying flashy

22  cars.  He was doing all of these things with the proceeds that

23  he amassed over a significant period of time with this as a

24  way of life.

25       And I think that when you factor all of those things

1    together, he's significantly more culpable than the other

2    defendants.  I did not have qualms about asking for a

3    guideline sentence when the guidelines were higher on the

4    co-defendant disparity issue, and now that we're talking about

5    a 120-month sentence, I think that that step is not at all in

6    conflict with 3553(a)(6).

7            THE COURT:  All right.  Thank you.

8            Mr. Pissetzky?

9            MR. PISSETZKY:  Maybe I should start where the

10   government finished.  That five-year disparity in sentence is

11   almost unheard of but especially in this case where it's the

12   suppliers that the government agrees to a five-year sentence

13   but the person who was supplied with the drugs, they ask for

14   more.

15           Now, I have never heard the government say in the 20

16   years that I've practiced that the suppliers who were able to

17   get kilos of cocaine supposedly, these were their only

18   transactions and they have not done this before.  I doubt if

19   it was Ron Allen's only customer.  I doubt if Mr. Dominguez

20   only provided in his drug life career 916 grams to Mr. Usmani,

21   and that's it.

22           THE COURT:  Yes, the question is whether there's

23   evidence, though, that would meet the preponderance standard

24   and is reliable of quantities beyond that.  And here, there is

25   the post-arrest statement.

1          MR. PISSETZKY:  And that's my next point.

2          Mr. Usmani was -- gave the government a statement,

3   post-arrest statement, and afterwards went in to cooperate and

4   sat down in an interview with the government and the agents

5   because he wanted to help the government, because he provided

6   them with information about other individuals, because he

7   answered all their questions.  Yet he's getting no credit and

8   the government almost ignores the fact that not only he gave a

9   post-arrest statement but he wanted to cooperate and gave them

10  other information that they could have used or not used or

11  whatever it is that they want.

12          I don't understand to this day because I have not

13  been explained why the government agreed to sit down and

14  potentially have this cooperation meeting but later on never

15  provided us with the cooperation.  I have not received an

16  answer to that, your Honor.

17          But Mr. Usmani sits here today able and willing to

18  continue to cooperate with the government which tells a lot

19  because you have to look at rehabilitation, recidivism, and

20  deterrence, specific deterrence.  And I think --

21          THE COURT:  Let me just -- do you want to put

22  anything on the record?

23          MR. LAUD:  I do, your Honor.  And I don't want to get

24  into anything that Mr. Usmani said in the proffer but I -- and

25  I don't have authority to do that either.  I think it's fair

1    to say, though, the proffer letter was very clear and the

2    statements made leading up to the proffer were very clear as

3    they always are that just coming in for a proffer is not an

4    agreement to cooperate.  So I think it is clear that the

5    government has not breached any agreement with Mr. Usmani if

6    that's the suggestion.

7         I respectfully disagree with Mr. Pissetzky's

8    statement that it wasn't explained to him why Mr. Usmani did

9    not get a cooperation reduction.  It was explained to him both

10   by the attorneys assigned to this matter.  He also came in and

11   met with the criminal chief in the office and pitched a

12   cooperation deal, and that was rejected and there was an

13   explanation that followed that.

14        THE COURT:  All right.

15        MR. LAUD:  And I just -- I don't believe that

16   Mr. Usmani based on that proffer put himself in a situation

17   where we could use him as a cooperator.  I'm not asking that

18   the proffer be held against him.  I'm asking that he do get

19   credit for having been forthright with the government in his

20   post-arrest statement, but the government is not making a 5K

21   motion here, and we're not making a 5K motion in good faith

22   just as we met with Mr. Usmani in good faith.

23        And so I don't see how that can be a reason to

24   essentially say that the government has taken advantage of

25   Mr. Usmani in some way by having him sit down for that

1    proffer.

2        MR. PISSETZKY:  Your Honor, I did not say that the

3    government breached their agreement with Mr. Usmani, but

4    obviously Mr. Usmani didn't breach his agreement with the

5    government where he was supposed to be and was truthful with

6    the government and --

7        THE COURT:  All right.  But you are saying that

8    you've never been given an explanation.  The government says

9    that you have.  They're obviously trying to not put things on

10   the public record that might actually harm him.  So I take

11   your point that he came in and he tried to cooperate.  And I

12   will take that into account.  So you can move on to the next

13   argument.

14       MR. PISSETZKY:  And so when you look at avoiding

15   disparity in sentencing, such a disparity is not warranted in

16   this case.  And we're asking for the five-year mandatory

17   minimum which is the same amount of time that the government

18   is asking for the suppliers in this case.

19       Now, as far as his criminal history, your Honor,

20   Mr. Usmani never did any prison sentence.  So a five-year

21   prison sentence is going to be a very long prison sentence for

22   Mr. Usmani.  He received -- like the government said and as

23   you see in the PSR, he received probation for his prior

24   charges and prior acts, and that is the reason why he was in

25   criminal history III, and that's the reason why he got -- he

1    received two more points when you calculated the criminal

2    history for being on probation when he committed this crime.

3         And so that has been taken into account already when

4    you calculate the criminal history.  He is in criminal history

5    III.  And when you look at his criminal history and you see

6    that he has not been in prison before and this is going to be

7    his prison sentence, a 60-month sentence is a very long

8    sentence.  And that's what we're asking for.

9         Mr. Usmani, his parents -- he was born in

10   Afghanistan.

11        THE DEFENDANT:  Yes.

12        MR. PISSETZKY:  And when he was five, his parents

13   left to come to the United States but left him behind where he

14   was left with an aunt and uncle that were supposed to take

15   care of him but did not take care of him and, in fact, abused

16   him.

17        Once he arrived here in the United States around the

18   age of 10, not during high school but at the age of 10, he was

19   put in a scenario that he was -- he had to take care of his

20   siblings because his parents would be working all day long.

21   So from a very young age, he was abused and then put in a

22   scenario where he was supposed to become an adult at almost

23   the -- around the age of 10.  Despite that, your Honor, he was

24   an honor roll student when he was in school.  And you heard he

25   just received his GED now.

1        And he is a successful musician.  And recently before

2   his arrest, in a way he became a You Tube sensation when he

3   came out with a song with a very well-known rapper, Twista.

4   So the potential for rehabilitation that Mr. Usmani has is

5   enormous.

6        He does have -- so when he married Lisa, Lisa had

7   three kids.  And he basically took them and raised them as if

8   they were his own.  And then they had two more biological

9   children.  The turning point, unfortunately, for Mr. Usmani in

10  his life was when they lost their son shortly after he was

11  born.  That's when his marriage to Lisa spiralled.  That's

12  when he started drinking heavily, started using drugs like

13  marijuana and cocaine.

14       They eventually divorced at 2014 but at that point,

15  they had financial trouble.  They didn't even have money to --

16  for the funeral of the burial for their young son that just

17  passed away.  And it took a great toll on Mr. Usmani

18  psychologically, physically, and emotionally.  And that's when

19  things started going downhill for him, unfortunately.

20       Now, when Mr. Usmani -- and the government is

21  describing the people that worked with Mr. Usmani as his

22  victims as well and that he exploited them.  Look, they're all

23  adults.  They were all adults that knew Mr. Usmani.  It was

24  his brother.  It was his ex-wife.  It was his girlfriend.

25  They went into it with their eyes open.  And they went into it

1    willingly and not being exploited.  They're all adults that

2    made decisions.  They all -- they're all adults that, as

3    Mr. Usmani was helping the family, they were working together,

4    unfortunately.

5          So it's -- he is not different than them and they are

6    not different than him in that perspective which also goes

7    into avoiding disparity in sentencing.  When Mr. Usmani wasn't

8    in Chicago around the month of February of 2018, his brother

9    took over.  His brother and Mr. Trotter took over the drug

10    dealing.

11          They had a choice.  They didn't have to do that.

12    Mr. Usmani was never violent.  Mr. Usmani was not violent

13    against them.  Mr. Usmani did not have guns.  Mr. Usmani did

14    not threaten them to do it.  They did it.  And so when you're

15    sentencing Mr. Usmani, you have to look at disparity in

16    sentencing as they are compared to these individuals as well.

17          As far as recidivism and rehabilitation and the

18    future for Mr. Usmani, your Honor, he did cooperate, as I told

19    you.  He is working on changing his life.  He has gotten his

20    GED.  He has worked very hard at the MCC to better himself.

21    He has a very loving and supportive family that is still here,

22    and they're all in the courtroom.

23          And most importantly, despite being here since the

24    age of 10, Mr. Usmani will be deported.  And I'm not sure

25    where the government gets their information, but he was born

1  in Afghanistan.  He will be deported back to the country that

2  he was born in, despite the fact that his entire family is

3  going to stay here because they're citizens here.  And when

4  they arrived here, they arrived here on a political refugee

5  asylum.  So he will be sentenced and then deported to a place

6  where he does not know anybody, has no family.  And his

7  family, in fact, escaped from there because they were

8  persecuted.

9         MR. LAUD:  Your Honor, can I just ask for a point of

10  clarification?  My understanding from the PSR and the

11  investigation is that Mr. Usmani is a citizen of Pakistan and

12  that he was born in Afghanistan but the Pakistani citizens, in

13  fact, a Pakistani diplomat, I believe, or somebody -- you

14  know, his father had some role in the government and that as a

15  result, he has Pakistani citizenship and that they later

16  traveled to Yugoslavia and to the United States.

17         So I am not aware of any indication that Mr. Usmani

18  would be -- has any claim to Afghani citizenship or would be

19  sent to Afghanistan.  And if that is the case, I'd just like

20  to make sure that that's well developed for the record.

21         MR. PISSETZKY:  So, your Honor, Mr. Usmani was born

22  in Afghanistan.  He is -- was not a Pakistani citizen.  His --

23  and currently, he is a green card holder that gets extended

24  every ten years because of his status as a political refugee.

25  However, at this point, he cannot become a United States

1  citizen.  So by operation of law, he will be deported to the

2  country that he was born in, which is Afghanistan.

3        THE COURT:  Well, he would be returned to the country

4  where he holds citizenship, and you're saying that he does not

5  hold Pakistani citizenship.

6        MR. PISSETZKY:  Correct.  That's based on the

7  information that I have.  In fact, I don't think he -- at this

8  particular time, he doesn't have a passport or hold

9  citizenship anywhere in the world except for a visa or a green

10  card from the United States.  And he has never visited --

11        THE DEFENDANT:  Pakistan or Afghanistan.

12        MR. PISSETZKY:  -- these countries in his life.  He's

13  been here.  So the sentence that -- whatever sentence you're

14  going to give him, your Honor, when he gets deported, he is

15  going to go to a completely foreign country where as we all

16  know, whether it's Pakistan or Afghanistan, the conditions in

17  either place are not ideal.

18        THE COURT:  Yes.  Well, he did live in Pakistan

19  before immigrating here.

20        THE DEFENDANT:  When I was --

21        MR. PISSETZKY:  When he was before ten -- between the

22  age of zero and ten.

23        THE COURT:  Right.

24        MR. PISSETZKY:  Yeah.  So, I mean, he is a lot older

25  today, Judge.

1          THE COURT:  Yes.

2          MR. PISSETZKY:  All right.  So the sentence is going

3    to be very, very harsh because this is his family.  They're

4    all here, Judge.

5          Now, finally, I want to talk about his health and our

6    current situation, which is the COVID situation.  And it's a

7    very scary situation.  We're all sitting here in court at

8    least six feet apart.  We all are wearing masks.  There are

9    COVID-positive people, thousands of them, every day and just

10   recently in this courthouse, a couple days ago, I believe.

11         The CDC has -- if you go on the CDC website,

12   cdc.gov/coronavirus, there is a very handy chart that

13   indicates factors that increase community spread and

14   individual risks, COVID-19 associated hospitalization related

15   to underlying medical conditions.  And it indicates that

16   crowded situations, as we know, increase the risk of

17   individual risk and hospitalization.  Close physical contact

18   increases it.  In close places increases it and duration of

19   exposure.

20         These are the normal -- these are the main four

21   factors.  As you know, all these factors exist in a prison.

22   There's no way to avoid crowded situations, close physical

23   contact in close places and a very long duration of exposure

24   if your Honor is even going to sentence Mr. Usmani to a year.

25         Then the CDC says, risk for hospitalization if you

1    have any of these conditions and get COVID compared to people

2    without these conditions.  And it lists the conditions that

3    increases the risk of COVID and hospitalization beyond the

4    first four that I provided you with.  And hypertension, which

5    Mr. Usmani is suffering and is taking medication for,

6    increases the risk by three times.  Obesity increases the risk

7    by three times.  And diabetes, again which Mr. Usmani has,

8    increases the risk by three times.

9          So Mr. Usmani has three of these conditions that

10   further increases the risk by three times, but the CDC says

11   that if you have three or more of these conditions, your risk

12   is increased by five times at least of getting hospitalized or

13   being hospitalized due to COVID and possibly suffering severe

14   consequences from it; if not death, then very long-lasting

15   consequences.  Mr. Usmani is obese.  Mr. Usmani has

16   hypertension.  And Mr. Usmani has diabetes.

17         Your Honor, I cannot ask you for to give him less

18   than five years because that's the mandatory minimum.  Any

19   sentence -- and under 3553, you have to consider, one of the

20   things that you must consider is whether or not they'll be

21   able to sufficiently provide him with medical care and keep

22   him safe.  The answer is no.

23         And so in addition to thinking about disparity in

24   sentencing, thinking about lack of recidivism here, the fact

25   that he cooperated, the fact that he did have a very traumatic

1    life and now will be deported which will continue to make his

2    life even more dramatic, you have to look at the medical

3    condition and the lack of safety that the Bureau of Prisons

4    will be able to provide for Mr. Usmani because we don't have a

5    vaccine.  And prisons are dangerous.

6          And so, your Honor, I would ask you to sentence

7    Mr. Usmani to, unfortunately, the only -- the minimum that you

8    can, which is 60 months.

9          THE COURT:  All right.  Thank you.

10         Before we get to the allocution, let's talk about the

11   supervised release conditions.  Even though deportation is

12   virtually guaranteed, there's a mandatory minimum, so we still

13   have to go through it.

14         MR. PISSETZKY:  Unless you find that supervised

15   release will not be necessary.

16         THE COURT:  I think because of the mandatory minimum,

17   I have to.  This is one of those -- if there's no mandatory

18   minimum, I think I can say, yes, I'm not going to impose any

19   supervised release, but I think I have to because there's a

20   mandatory minimum.

21         MR. PISSETZKY:  I'm not sure.  I don't know.  Maybe I

22   misread the way that the Seventh Circuit ruled on that --

23   those issues.  But I thought that you can waive it if we think

24   that he will be deported.  However, I don't have any

25   objections to these conditions because --

1        THE COURT:  Okay.  He's not going to serve them?

2        MR. PISSETZKY:  Right.

3        THE COURT:  Well --

4        MR. LAUD:  Your Honor, what I propose then is we

5 could have a sort of bare bones set of conditions including, I

6 believe there's a special condition -- although he would

7 likely be deported directly from prison -- about, you know,

8 cooperating with any removal.  And then, you know, I don't

9 know that we need to go through each and every condition.  If

10 that --

11        THE COURT:  Okay.

12        MR. LAUD:  -- changes, I suppose we could always come

13 in and ask that his conditions of supervised release be

14 modified.

15        THE COURT:  All right.  Well, let me ask the

16 probation office, if there's a mandatory, statutory mandatory

17 minimum, I do have to impose a term of supervised release,

18 right?

19        PROBATION OFFICER FOWLIE:  That would be my

20 understanding as well, your Honor.

21        THE COURT:  Okay.  So let's do this --

22        PROBATION OFFICER KIRIKLAKIS:  Your Honor, Kathy

23 Kiriklakis, U.S. Probation.  On Page 24 at Paragraph 103, 102

24 and 103, I list the statutory and the guidelines range for

25 supervised release.  It is required in this case.

1        THE COURT:  Yeah.  I'm pretty sure I can't waive it.

2    However, given that deportation is basically guaranteed, let's

3    do this.  On the mandatory conditions, Mr. Pissetzky, do you

4    have any objections to -- this is on Page 24.

5        MR. PISSETZKY:  No.

6        THE COURT:  1 -- okay.  1, 2, 5, and 6.

7        MR. PISSETZKY:  No objection.

8        THE COURT:  All right.  So those will be imposed.

9    And there is a prior cocaine use which justifies No. 6.

10       Then let's just go ahead and turn to Page 27.  Is

11   there any objection to No. 21?

12       MR. PISSETZKY:  No.

13       THE COURT:  All right.  So 21 will be imposed so that

14   the defendant will surrender to a duly authorized official of

15   the Homeland Security Department for a determination on the

16   issue of deportability by the appropriate authority in

17   accordance with the laws under the Immigration and Nationality

18   Act and the established implementing regulations.  If ordered

19   deported, you shall not reenter the United States without

20   obtaining in advance the express written consent of the

21   Attorney General or the Secretary of the Department of

22   Homeland Security.

23       Okay.  And then I think we can just hold off on

24   everything else.

25       PROBATION OFFICER KIRIKLAKIS:  Your Honor, if I may,

1    again, Kathy Kiriklakis, U.S. Probation.  We have had a few

2    instances where individuals were not automatically deported

3    and I believe were released on some sort of immigration bond.

4         If possible, could we please request discretionary

5    condition 15 that he shall report to the probation office just

6    in case for some reason Immigration does not automatically

7    report to him -- to deport him so we can know where he is.

8         THE COURT:  Okay.  All right.  We'll add that one as

9    well.  All right.  Thank you.

10        PROBATION OFFICER KIRIKLAKIS:  Thank you.

11        MR. LAUD:  And, your Honor, just so the record is

12   clear, I think it is, if that were the case, the government

13   might file a motion to impose sort of additional conditions,

14   the ones necessarily attendant to supervision like, you know,

15   meeting with the probation officer, reporting contact with law

16   enforcement.  And so I just want to make clear I'm not waiving

17   the idea that that those are needed if he's on supervised

18   release.

19        MR. PISSETZKY:  That's understood, your Honor.

20        THE COURT:  Yes, that's fine.  If he makes bond then,

21   of course, I would expect a motion.

22        Okay.  Mr. Usmani, now is your time to speak on your

23   own behalf.  So you may go ahead and do that.

24        THE DEFENDANT:  Your Honor, I have prepared a letter.

25        THE COURT:  All right.  Go ahead.

1    THE DEFENDANT:  To the most Honorable Judge Edmond

2    Chang, thank you, your Honor, for granting me the time and

3    opportunity to show this Court how remorseful I am for my

4    actions which led us all here today before you.

5        With respect to this court, your Honor, I would like

6    to address my family and all who are present.  Your Honor, I

7    stand before you guilty for my actions, guilty for my

8    decisions, and guilty for all my wrongdoings.  I disregarded

9    sound advice from those I love and chose a path of

10   self-destruction, a path that I'm truly ashamed of today.

11       I cannot go back and turn back the hands of time, but

12   I can assure you that I will do my best to educate my children

13   and the youth in my community and prevent them to ever follow

14   the path I was on and persuade them to make lifestyle choices

15   for their betterment as individuals and to become productive

16   members of our society.  At this point, all I can do is

17   respectfully hope that this Court will be satisfied with this

18   judgment in my case and know that without a shadow of a doubt

19   how truly sorry I am because I really am sorry, your Honor.

20       I'm sorry for not doing better in making poor life

21   choices.  I was ignorant and arrogant.  I involved my friends

22   and family.  I involved the mothers of my children.  It was

23   because of me and me alone that my whole family has gone

24   through a tremendous amount of pain and suffering.  I caused

25   enormous embarrassment.  And this weighs really heavy on my

1   soul.  And I do not want to be known to my friends and family

2   as an outcast for all that I have done and indulged in.  And I

3   look forward to the day I can redeem myself in my family's

4   name.

5           Your Honor, being incarcerated for the past 22 months

6   has not only saved my life from the drugs and alcohol, it has

7   also brought me closer to my god, Allah, and my religion.  I

8   have fasted for the months of Ramadan and prayed five times a

9   day asking for forgiveness for my sins and my deeds.

10          While incarcerated I participated in programs such as

11  Parenting for Fathers, Total Body Fitness, and I completed my

12  GED, your Honor.  I have also taken this time to reflect what

13  I want to accomplish in life.  I have set my goals that I will

14  pursue by hard work and effort.  I have taken personal

15  inventory of everything I will change in my life.  Although

16  change does not come overnight, it is a slow process, and as

17  painful as it might be, it is very essential for my growth and

18  development into a new man, a pursuing man with dedication and

19  purpose, goal oriented and determined to be better, for I can

20  live a precise life and provide for my children.

21          Your Honor, I ask that you consider my future and

22  respectfully grant me the opportunity to show you better than

23  I can tell you what I intend to accomplish in my future.  All

24  I need is for this Court to grant me the tools necessary to

25  reach my goals whether it be programs that fit my needs or

64

1 whatever this court deems appropriate for me to participate

2 in.

3 My future is in your hands, Judge Chang. Please

4 grant me leniency and give me a chance to do right by my

5 family and help me become a man of great integrity and honor.

6 Thank you, Judge.

7 THE COURT: All right. Thank you, Mr. Usmani.

8 MR. PISSETZKY: May I run to the restroom real quick?

9 THE COURT: Yes, you may.

10 (Pause.)

11 THE COURT: All right. We're back on the record.

12 Mr. Usmani, federal law tells judges what we have to

13 consider in picking a sentence. I do have to consider the

14 nature and circumstances of the crime that you committed. And

15 I consider your personal history and background.

16 Then I'm supposed to try to achieve certain goals of

17 sentencing and pick a sentence that is enough but not more

18 than necessary to achieve those goals. The goals include

19 providing for just punishment. The sentence must reflect the

20 seriousness of the crime. I have to try to promote respect

21 for the law. I also have to try to provide for something

22 that's called deterrence. And there are two forms of that

23 under the law: General deterrence, which is just sending a

24 message out generally to the public to not commit this kind of

25 crime; and then specific deterrence, which is giving a

1   sentence that is enough to specifically encourage you to not

2   commit any other crimes.

3         I have to consider the protection of the public.  I

4   consider needs like rehabilitative, medical, vocational needs.

5   That can only ever push a sentence down, though.  That can't

6   ever be a reason that a sentence gets higher.

7         I have to consider the advice of the sentencing

8   guidelines.  I have to try to avoid unwarranted disparities.

9   And you've heard a little bit about that today.  I ought to

10  treat you the same way I treat anyone else with the same kind

11  of personal history that you have and has committed the same

12  kind of crimes that you have committed.  And it also means

13  that when sentencing you relative to the other defendants in

14  the case, I am trying to just slot everyone into the right

15  spot in terms of culpability and all the other relevant

16  factors.  So those are all the goals and factors that I have

17  to consider in picking a sentence.

18        On the nature and circumstances of the crime, it is a

19  serious crime.  What you're being held responsible under the

20  sentencing guidelines is for a little over two kilograms of

21  cocaine.  And because each individual dose of cocaine is about

22  a tenth of a gram, that represents thousands and thousands of

23  individual doses.

24        And you just think about the extreme societal harms

25  that drug use has on our society at large, but you think about

1  it on the individual basis.  That means thousands of times

2  that someone used this substance, this poisonous substance and

3  worked harms on their personal lives, on their professional

4  lives, and on the lives of their families.  So this is why

5  drug dealing is just a very serious crime, and it's one that

6  we have been dealing with for decades and decades and probably

7  will be fighting for decades to come.

8          You also, I do believe that you did deal in much more

9  than just the two kilograms that I found you responsible for

10  under the guidelines.  You did make this post-arrest

11  statement.  There is a reason why we usually credit what's in

12  a post-arrest statement because you are speaking against your

13  very own interest, so you have every reason, if you're going

14  to make an admission against yourself, to speak truthfully

15  about that and to not exaggerate.

16          So in the most defendant-friendly, the most innocuous

17  interpretation of your post-arrest statement, from 2008 for

18  about ten years on and off, you sold on average four ounces of

19  cocaine a week.  And, you know, as the probation officer had

20  proposed, if we just take one-fifth of that time, then you

21  sold in this time period something around 10 kilos, maybe 11

22  kilos of cocaine.  That's not in addition to the 2.1.  This is

23  a grand total.

24          And I do take that into account when I consider

25  things like your risk of repeat offense because you had been

1   doing this, on and off to be sure, but you had been doing this

2   on and off for over a decade by the time that you got caught.

3   And so this is part of your personal history, too, that you

4   were willing to sell this -- that quantity of drugs over that

5   quantity of time.

6        Now, having said that -- and this is kind of a sad

7   and tragic point to make these days, it just shows you the

8   extent of the drug crime in our country -- 10 or 11 kilos over

9   10 years is not the most prolific drug dealer actually.  It's

10  one kilo a year basically which again as a grand total, it is

11  very serious.  It is, sad to say, not very prolific when it

12  comes to federal court cases.

13       All right.  Leaving the drug quantity, you are the

14  most culpable defendant in this particular case because you

15  are the organizer and leader of this drug business.  It really

16  was a drug business.  It's getting supplies of a good and then

17  selling that good and then delivering that good and then

18  picking up money for those deliveries.  It was a drug

19  business, and you organized and you led it.

20       Mr. Pissetzky says, well, you should be on about an

21  equal level of culpability with the suppliers, but no.

22  Sometimes suppliers are sentenced to less time than those to

23  whom they sell because of various circumstances, and many of

24  them apply here.  One is you did organize this drug business,

25  and so that is more damaging to society because you were able

1    to create this efficient operation of drug dealing.

2         Second is your criminal history.  That does factor

3    into the -- your culpability here.  And so there are a variety

4    of reasons, some of which I will talk about, in aggravation

5    where a drug seller may very well get more than their

6    supplier.

7         With regard to your co-defendants, I have now

8    sentenced ten of them with Mr. Allen and Mr. Dominguez coming

9    up.  And the way I see you and your co-defendants, there are

10   basically two lower-level tiers of sellers and couriers and

11   also people who helped out just for a week or so.  And so many

12   of those, the defendants in the lower-level tier got sentences

13   of a day or just a few months.

14        And then there's another tier that they were getting

15   about a one-and-a-half-year sentence.  And then there is

16   Mr. Allen and Mr. Bowens and Mr. Dominguez, basically

17   suppliers.  And then there's you at the top.  And you are at

18   the top here.

19        Mr. Allen and Mr. -- well, Mr. Allen for sure,

20   essentially as certain as I can be, is heading for a 60-month

21   sentence because everyone is asking for that at this point.

22        Mr. Dominguez, it looks like he's going to try to ask

23   for under the 60 months but, you know, as far as I can

24   estimate, based on the 916 grams that he has sold, even if he

25   is safety valve eligible, he would most likely receive

1    something in that neighborhood.

2           And so I am keeping an eye out for the fact that what

3    the government has requested would be double the sentence of

4    anyone else in the case.  And so I do take that into account

5    in mitigation, but please let there be no mistake that you are

6    the most culpable defendant in this case.

7           Mr. Pissetzky talks about the others who are involved

8    and that they were adults, they made their own decisions.

9    Here's the thing.  Nafees Usmani, your brother; Steven Trotter

10   who was homeless and needed a place to stay and had very

11   serious health issues; Lisa Usmani; Wesam Fattah, yes, they're

12   adults and they make their own decisions.  They would not have

13   committed a drug crime if you had not asked them.

14          And that's based on all four of those individuals.  I

15   sentenced them.  I've looked at their character and their

16   past.  They would not have committed these crimes without you

17   asking them.  So that is how you are more culpable in getting

18   them involved, despite the fact that, of course, they're

19   adults and they made adult decisions, and they paid a price

20   for it.

21          You did plead guilty to the crime.  You have accepted

22   responsibility.  Now, when I look at your personal history, it

23   does include your criminal history.  It would be naive of me

24   to think that despite the rehabilitative steps that you've

25   taken -- and I do think that you should be praised for taking

1    those steps, earning the GED.  Those are important steps to

2    take.  But I do have to look at your criminal history too.

3    And it does include a prior conviction for possessing more

4    than 15 grams of cocaine.  And it even includes a conviction

5    for delivery of cocaine for which you were on probation at the

6    time that you committed this offense.  And I'm afraid that

7    that tells me that there is a very serious risk that you would

8    reoffend if I gave you too low of a sentence.

9         It's true, you haven't done any time in custody but

10    for many defendants, walking into that state court -- well,

11    getting arrested in the first place for drug dealing let alone

12    then being prosecuted and found guilty for it and getting a

13    sentence for it, even a noncustodial one, would be a shock to

14    their system and that would be the end of it but

15    unfortunately, that is not what happened with you.

16         Now, on your personal history, your upbringing was

17    obviously very difficult.  There was an abusive -- you

18    suffered from an abusive environment, but I don't see a direct

19    connection between that upbringing and when you were over 40

20    years old and you committed this offense.

21         The written filing mentions another very serious

22    trauma in your life in losing your infant son.  I -- and no

23    doubt, that is traumatic.  The connection between that tragedy

24    and this offense, I again don't see very much of a connection

25    there.  I don't think that's where you turned down -- you

1    started going downhill and started selling drugs.  Tragically,

2    many families encounter that kind of tragedy without them

3    turning into a substantial drug dealer.  So I don't think

4    that's particularly mitigating.

5            Now, you have contributed greatly to your family.

6    Obviously, many have written letters in support, and your

7    siblings, too, are still standing by you.  So that's to your

8    credit that your family is still supportive.  It speaks to the

9    fact that you were supporting them and provided both financial

10   and emotional support.

11           MR. PISSETZKY:  Your Honor, I'm sorry to interject.

12   But Mr. Usmani lost his son around 2005.  And that's where his

13   downward spiral started.  And I do believe that it has a

14   direct connection because that's when he started using drugs,

15   abusing alcohol, and that's what led to him starting selling

16   drugs.

17           THE COURT:  Well, I said that he said that he started

18   selling around 2007 or 2008.  And, of course, it is a tragic

19   event, and no doubt he was affected by it.  But as I said,

20   most people do not then turn into substantial drug dealers for

21   a decade based on a tragedy like that.  So I do not believe

22   that there is a direct connection, and it is not mitigating in

23   light of the fact that people, most people do not turn into a

24   drug dealer based on that.

25           With regard to the family separation, that is also

1   the most difficult part of any sentencing.  The fact that you

2   are separated from your daughter and your son, your

3   five-year-old son who has, you know, special needs, it was

4   heartbreaking to read the letters written by one of your

5   sisters and your daughter wrote a letter, and it was

6   heartbreaking to read them describe how your son has been

7   reacting and affected by your absence.

8          I believe your sister wrote about how sometimes he'll

9   wake up in the middle of the night just calling your name.

10  That is -- it is absolutely heart wrenching.  And I take into

11  account that you are being separated from them.  And of

12  course, you have a one-year-old, a very young son with your --

13  with Ms. Fattah.  And so I take into account the family

14  separation.

15         It must be said, not to take away from your

16  contributions to your family and not to take away from how

17  hard it is going to be to be -- continue to be separated from

18  them, but it must be said that it is -- it's a product of your

19  choices that you made.  And people who deal in this kind of

20  quantity of drugs, they have to realize that that means

21  there's going to be family separation which you've been

22  suffering through these last almost two years.

23         There is hope for rehabilitation.  I think you did

24  well in school.  You had this music career going.  And I think

25  anyone who can organize -- use their intelligence and work

1   ethic to organize this drug business can use it for positive

2   things.  So there is some rehabilitative hope, and I take that

3   into account.

4        The deportation is somewhat mitigating here.  Assume

5   the worst and that you would be deported to Afghanistan then,

6   you know, obviously life is going to be very difficult over

7   there.  You will be separated.  It's not going to be easy to

8   travel, even for your family to travel there to visit you.  So

9   I do take that into account.

10       It's not quite as mitigating, though, as some of your

11  co-defendants who for reasons that are under seal, although

12  you might know about them, are going to face really difficult

13  circumstances returning to their countries of origin, but I do

14  take it into account.

15       On general deterrence, I just want to -- I'll just

16  say a few words on this.  Your lawyer argued in the written

17  filing that these social science, social scientists have

18  determined that there's more deterrence effect in terms of

19  sending a message out to the community if a punishment is

20  certain rather than lengthy.  And I've read, you know, these

21  studies.

22       And I don't think, first of all, that these studies

23  establish that the length of a sentence has no general

24  deterrence effect.  It's just comparatively these social

25  scientists believe that certainty has more of a deterrence

1    effect, not that there's zero deterrence effect in a lengthy

2    sentence.

3            And really, the social scientists, they're making an

4    argument not so much to judges I think, but the argument

5    applies more to policymakers, that if you put more money into

6    policing and increase the chances of detection, that will have

7    a better deterrent effect than just imposing long sentences.

8    So it's not really something that I think is persuasive to me

9    in picking individual sentences.

10           Also, these studies, it is really hard to study

11   general deterrence.  The studies involve things like, well, if

12   we tell everyone who violates a condition of probation they

13   would definitely get two days in jail, then they study the

14   effects.  I think it was in Hawaii.  And it looked like it had

15   a better deterrent effect.  That, that there was a certain two

16   days as opposed to an uncertain longer period of time, I don't

17   know what conclusions to draw from that.  And so it's -- and

18   other studies rely on comparing juveniles who are like 16 or

19   17 and then people who are just young adults at 18 and the

20   differences in deterrence there because juveniles tend not to

21   get prison sentences.

22           Again, I don't know what inferences to draw from

23   that.  So I really think the social scientists have not made

24   the case that general deterrence does not work.  And when I

25   say "general deterrence," it's not because the *Tribune* or

1   *Sun-Times*, they're not here, of course, but it's just the

2   people who know you, you know, your community.  Every

3   defendant, their family and their friends and so on, they know

4   what the sentence is.  And so that is where you could have

5   general deterrence effect even if it's not a high-profile

6   case.

7           And lastly, I have no doubt that if it became known

8   that the federal judges in the Northern District of Illinois

9   were giving slaps on the wrist for drug crimes that drug

10  crimes would increase.  So I do have to account for general

11  deterrence.

12          Lastly, your medical condition.  I am concerned with

13  the fact that you have these risk factors for COVID risk.  And

14  although I didn't see the obesity actually in the presentence

15  report, you know, just from your height and weight, I can

16  understand why Mr. Pissetzky maybe is making that argument.

17  So I do take into account the risks of COVID and its impact on

18  you.

19          Even more generally, I have been giving every

20  defendant basically a discount for the fact that we're in the

21  middle of a pandemic.  And I do believe that the BOP is

22  getting better, as all society is or at least all society is

23  learning how to deal with the pandemic better and try to

24  control it including in the prison setting, but some of these

25  controls make prison harder now.  Like, prison time is harder

1   now than -- during a pandemic than even if you don't catch

2   the -- you don't get infected.  So I take that into account.

3   And then again, you specifically have more of these risk

4   factors.

5         I do have to reflect the seriousness of this crime,

6   though, that you committed, the fact that you organized and

7   led all of these other defendants and got some of them

8   involved and they otherwise would not have been involved.  I

9   have to account for the recidivism risk and the need for

10  deterrence, both general and specific.

11        So based on that, I do believe the appropriate

12  sentence is a sentence of 96 months of imprisonment.

13        Supervised release will be the mandatory minimum of

14  four years with the conditions that we discussed previously.

15        I will not impose a fine.  I don't have a lot of

16  information on the financial condition, but at least based on

17  the credit report and other public databases, it does not

18  appear like Mr. Usmani has the ability to pay a fine.  I do

19  have to impose the $100 special assessment.

20        If you are going to appeal the sentence, you must

21  appeal within 14 days of entry of judgment on the docket.  If

22  you can't afford the fees or costs of appeal, then you just

23  ask to have them waived.  And if you can show that you can't

24  pay them, then they'll be waived.  If you can't afford an

25  attorney on appeal, you can ask to have one appointed free of